**Nos. 2022-1884, -1886**

*In the*

# United States Court of Appeals

*for the*

# Federal Circuit

WISCONSIN ALUMNI RESEARCH FOUNDATION,
*Plaintiff-Appellant*

v.

APPLE INC.,
*Defendant-Appellee*

*Appeal from the United States District Court for the Western District of Wisconsin, Case Nos. 3:14-cv-00062-wmc, 3:15-cv-00621-wmc · Honorable William M. Conley, Judge*

# BRIEF OF PLAINTIFF-APPELLANT WISCONSIN ALUMNI RESEARCH FOUNDATION

MORGAN CHU
ALAN J. HEINRICH
AMY E. PROCTOR
**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
(310) 277-1010 Telephone
mchu@irell.com • aheinrich@irell.com
aproctor@irell.com

*Counsel for Plaintiff-Appellant, Wisconsin Alumni Research Foundation*

September 7, 2022

## U.S. PATENT NO. 5,781,752

### Representative Claim 1

In a processor capable of executing program instructions in an execution order differing from their program order, the processor further having a data speculation circuit for detecting data dependence between instructions and detecting a mis-speculation where a data consuming instruction dependent for its data on a data producing instruction of earlier program order, is in fact executed before the data producing instruction, a data speculation decision circuit comprising:

a) a predictor receiving a mis-speculation indication from the data speculation circuit to produce a prediction associated with the particular data consuming instruction and based on the mis-speculation indication; and

b) a prediction threshold detector preventing data speculation for instructions having a prediction within a predetermined range.[1]

[1] All emphases in quotes are added unless otherwise noted.

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Wisconsin Alumni Research Foundation certifies the following:

1. **Represented Entities**. Fed. Cir. R. 47.4(a)(1). Provide the full names of all entities represented by undersigned counsel in this case.

Wisconsin Alumni Research Foundation.

2. **Real Party in Interest**. Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

3. **Parent Corporations and Stockholders**. Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

4. **Legal Representatives**. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

Irell & Manella LLP: Jason Sheasby, Christopher Abernethy, H. Annita Zhong, Anthony Rowles, Emily Grant, Jackson Trugman (former), Brian Eggleston (former), Gary Frischling (former)

Godfrey & Kahn S.C.: Jennifer Gregor, Bryan Cahill

5. **Related Cases**. Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

*Wisconsin Alumni Research Foundation v. Apple Inc.*, 22-1886 (Fed. Cir.)

6. **Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None.

Dated: September 7, 2022

*<u>/s/ Amy E. Proctor</u>*

Amy E. Proctor
Irell & Manella LLP
1800 Avenue of the Stars, Ste 900
Los Angeles, CA 90067
(310) 277-1010
aproctor@irell.com

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ........ ii

STATEMENT OF RELATED CASES ........ 1

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 4

STATEMENT OF ISSUES ........ 4

STATEMENT OF THE CASE ........ 5

I. TECHNOLOGY BACKGROUND ........ 5

II. THE *WARF I* CASE ........ 8

A. The District Court Excluded The A9 And A10 From *WARF I* ........ 9

B. Apple Waived A Construction For The "Particular" Limitation In District Court ........ 10

C. This Court Narrowed The "Particular" Limitation For The First Time On Appeal ........ 13

III. THE *WARF II* CASE AND *WARF I* REMAND ........ 15

SUMMARY OF THE ARGUMENT ........ 15

ARGUMENT ........ 18

STANDARDS OF REVIEW ........ 18

I. THE DISTRICT COURT ERRED IN BARRING WARF'S CLAIMS IN *WARF II* UNDER EITHER CLAIM OR ISSUE PRECLUSION ........ 20

A. Claim Preclusion Cannot Bar WARF's Claims Against The A9 and A10 Processors Because Those Claims Could Not Have Been Brought In *WARF I* ........ 20

1. WARF Was Precluded From Litigating Its Claims Against The A9 And A10 Processors In *WARF I* ........ 20

2. WARF Was Not Obligated To Include The A9 And A10 In *WARF I*, Because Those Processors Were Released Long After The *WARF I* Case Was Filed .......22

3. The District Court Did Not Perform A Proper Claim Preclusion Analysis............................................23

B. Issue Preclusion Does Not Apply Because The Issue Actually Litigated In *WARF I* Was Literal Infringement, Not Infringement Under The DoE ..........................................28

1. DoE And Literal Infringement Are Distinct Issues For Purposes Of Issue Preclusion..................................28

2. DoE Was Not Actually Litigated In *WARF I* .................30

3. The District Court's *Sua Sponte* Ruling On Claim Vitiation Does Not Fulfill The "Actually Litigated" Requirement ................................................32

4. The District Court Failed To Perform A Proper Issue Preclusion Analysis ..............................................34

II. THE DISTRICT COURT ERRED IN FORECLOSING WARF'S NEVER-LITIGATED DoE CLAIM IN *WARF I* ...............36

A. WARF Did Not And Could Not Have Waived DoE In *WARF I* .........................................................................36

1. WARF Relied On Apple's Waiver Of A Narrower Construction And Did Not Relinquish A Known Right .........................................................................37

2. *Exxon* Demonstrates That WARF Did Not Abandon DoE Under The New Construction First Adopted On Appeal ......................................................38

3. The District Court's Attempt To Distinguish *Exxon* Fails...................................................................41

B. The District Court's *Sua Sponte* Decision On The Merits Of WARF's Doctrine Of Equivalents Claim Was Improper.........44

1. WARF Was Deprived Of The Opportunity To Present Evidence On Its Equivalents Claim Under The New Construction....................................................................44

2. Given The Opportunity, WARF Would Have Presented Evidence That Demonstrates Its Equivalents Claim Is Viable Under The New Claim Construction ..................49

CONCLUSION ........................................................................................................56

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abbott Lab'ys v. Andrx Pharms., Inc.*,
473 F.3d 1196 (Fed. Cir. 2007) ....................28

*Acumed LLC v. Stryker Corp.*,
525 F. 3d 1319 (Fed. Cir. 2008) ....................19

*Adair v. Sherman*,
230 F.3d 890 (7th Cir. 2000) ....................28

*Adobe Sys. Inc. v. Wowza Media Sys.*,
LLC, 72 F. Supp. 3d 989 (N.D. Cal. 2014) ....................21

*Alcon Research Ltd. v. Barr Lab'ys, Inc.*,
745 F.3d 1180 (Fed. Cir. 2014) ....................35

*ArcelorMittal France v. AK Steel Corp.*,
700 F.3d 1314 (Fed. Cir. 2012) ....................40

*Asetek Danmark A/S v. CMI USA Inc.*,
852 F.3d 1352 (Fed. Cir. 2017) ....................27

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
672 F.3d 1335 (Fed. Cir. 2012) ....................*passim*

*Aviles v. Cornell Forge Co.*,
183 F.3d 598 (7th Cir. 1999) ....................55

*B & B Hardware, Inc. v. Hargis Indus., Inc.*,
575 U.S. 138 (2015) ....................29

*Bemis Mfg. v. Dornoch Med. Sys., Inc.*,
21 F. App'x 930 (Fed. Cir. 2001) ....................19

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
967 F.3d 1353 (Fed. Cir. 2020) ....................4, 18, 48

*Blonder–Tongue Lab'ys, Inc. v. Univ. of Ill. Found.*,
402 U.S. 313 (1971) ....................28

*Brain Life, LLC v. Elekta Inc.*,
746 F.3d 1045 (2014) ....................30

*Caudill Seed & Warehouse Co., Inc. v. Rose*,
868 F.3d 558 (7th Cir. 2017) ....................30

*Chicago Truck Drivers v. El Paso CGP Co.*,
525 F.3d 591 (7th Cir. 2008) ....................45

*Comair Rotron, Inc. v. Nippon Densan Corp.*,
49 F.3d 1535 (Fed. Cir. 1995) ....................33

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
126 F.3d 365 (2d Cir. 1997) ....................22

*Continental Can Co. v. Marshall*,
603 F.2d 590 (7th Cir. 1979) ....................30

*Curtis v. Citibank,* N.A.,
226 F.3d 133 (2d Cir. 2000) ....................23

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
469 F.3d 1005 (Fed. Cir. 2006) ....................48

*Dow Chem. Co. v. Nova Chems. Corp. (Can.)*,
803 F.3d 620 (Fed. Cir. 2015) ....................27

*EPOS Techs. v. Pegasus Techs.*,
842 F. Supp. 2d 31 (D.D.C. 2012)....................23

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
149 F.3d 1309 (Fed. Cir. 1998) ....................29

*Exxon Chem. Pats., Inc. v. Lubrizol Corp.*,
137 F.3d 1475 (Fed. Cir. 1998) ....................*passim*

*Florida Power & Light Co. v. United States*,
198 F.3d 1358 (Fed. Cir. 1999) ....................26

*In re Freeman*,
30 F.3d 1459 (Fed. Cir. 1994) ....................30

*Gillig v. Nike, Inc.*,
602 F.3d 1354 (Fed. Cir. 2010) ....................22, 23

*Hallco Mfg. Co. v. Foster*,
256 F.3d 1290 (Fed. Cir. 2001) ....................18, 19

*Harris Corp. v. Ericsson Inc.*,
417 F.3d 1241 (Fed. Cir. 2005) ....................19

*Int'l Rectifier Corp. v. IXYS Corp.*,
383 F.3d 1312 (Fed. Cir. 2004) ....................26

*Johnson v. City of Chi.*,
712 F. Supp. 1311 (N.D. Ill. 1989) ....................31

*Johnson v. Zerbst*,
304 U.S. 458 (1938) ....................37

*Laguna Hermosa Corp. v. United States.*,
671 F.3d 1284 (Fed. Cir. 2012) ....................30

*Lear Siegler, Inc. v. Sealy Mattress Co. of Mich., Inc.*,
873 F.2d 1422 (Fed. Cir. 1989) ....................30

*Litton Sys., Inc. v. Honeywell, Inc.*,
140 F. 3d 1449 (Fed. Cir. 1998) ....................29

*Manning v. City of Auburn*,
953 F.2d 1355 (11th Cir. 1992) ....................22

*Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*,
58 F. 3d 616 (Fed. Cir. 1995) ....................21

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
851 F.3d 1275 (Fed. Cir. 2017) ....................2, 19, 20, 21

*Mother's Rest., Inc. v. Mama's Pizza, Inc.*,
723 F.2d 1566 (Fed. Cir. 1983) ....................30, 33

*nCube Corp. v. Seachange Int'l, Inc.*,
436 F. 3d 1317 (Fed. Cir. 2006) ....................29, 30

*Nystrom v. Trex Co., Inc.*,
580 F.3d 1281 (Fed. Cir. 2009) ....................*passim*

*Pactiv Corp. v. Dow Chem. Co.*,
449 F.3d 1227 (Fed. Cir. 2006) ....................22

*Pactiv Corp. v. Rupert*,
724 F.3d 999 (7th Cir. 2013) ....................49

*Peabody Coal Co. v. Spese*,
117 F.3d 1001 (7th Cir. 1997) ....................................................................33

*Peckmann v. Thompson*,
966 F.2d 295 (7th Cir. 1992) ......................................................................49

*In re Piper Aircraft Corp.*,
244 F.3d 1289 (11th Cir. 2001) ..................................................................23

*Promega Corp. v. Life Techs. Corp.*,
875 F.3d 651 (Fed. Cir. 2017) ....................................................................37

*R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Loc. Union 150*,
335 F.3d 643 (7th Cir. 2003) ..........................................................45, 49, 55

*S. Ill. Riverboat Casino Cruises, Inc. v. Triangle Insulation & Sheet Metal Co.*,
302 F.3d 667 (7th Cir. 2002) ......................................................................17

*Sawyer v. United States*,
831 F.2d 755 (7th Cir. 1987) ......................................................................45

*Simpson v. Merchants Recovery Bureau, Inc.*,
171 F.3d 546 (7th Cir. 1999) ................................................................45, 46

*Sims-Madison v. Inland Paperboard & Packaging, Inc.*,
379 F.3d 445 (7th Cir. 2004) ......................................................................45

*Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*,
778 F.3d 1311 (Fed. Cir. 2015) ..................................................................19

*SpeedTrack, Inc. v. Off. Depot, Inc.*,
791 F.3d 1317 (Fed. Cir. 2015) ..................................................................18

*Spread Spectrum Screening L.L.C. v. Eastman Kodak Co.*,
657 F.3d 1349 (Fed. Cir. 2011) ..................................................................34

*Target Training Int'l, Ltd. v. Extended Disc North Am., Inc.*,
645 F. App'x 1018 (Fed. Cir. 2016) ...........................................................27

*UCB, Inc. v. Watson Lab'ys, Inc.*,
927 F.3d 1272 (Fed. Cir. 2019) ..................................................................48

*United States v. Int'l Bldg. Co.*,
345 U.S. 502 (1953).................................................................................3, 32

*Valenzuela v. Union Pac. R.R. Co.*,
194 F. Supp. 3d 918 (D. Ariz. 2016) .......... 33

*Wallace v. McGlothan*,
606 F.3d 410 (7th Cir. 2010) .......... 37

*Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997) .......... 29

*Williams v. Brooks*,
809 F.3d 936 (7th Cir. 2016) .......... 18

*Wis. Alumni Rsch. Found. v. Apple Inc.*,
905 F.3d 1341 (Fed. Cir. 2018) .......... *passim*

*In re Zwanziger*,
741 F.3d 74 (10th Cir. 2014) .......... 32

**Statutes**

28 U.S.C. § 1295(a)(1) .......... 4

28 U.S.C. § 1331 .......... 4

28 U.S.C. § 1338 .......... 4

**Other Authorities**

18 C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 4417
(2d ed. 2002) .......... 29

Restatement (Second) of Judgments § 26(1)(a) (1982) .......... 22

Restatement (Second) of Judgments § 27 cmt. I .......... 34

Restatement (Second) of Judgments § 27 (1982), Comment (d) .......... 30, 33

Restatement (Second) of Judgments § 27, Comment (e) .......... 31

## STATEMENT OF RELATED CASES

There has been one previous appeal of these actions to this Court, and it is no longer pending. *Wis. Alumni Rsch. Found. v. Apple Inc.*, 905 F.3d 1341 (Fed. Cir. 2018). This appeal also consolidates two originating cases: 14-cv-062-wmc ("*WARF I*") and 15-cv-621-wmc ("*WARF II*").

## INTRODUCTION

This appeal concerns the Wisconsin Alumni Research Foundation's ("WARF's") infringement claims against Apple under U.S. Patent 5,781,752 ("the '752 patent"), which claims circuitry that makes processors faster by enabling aggressive out-of-order execution with very few errors. The first case, *WARF I*, has been pending since early 2014, when the only accused Apple processor being sold was the A7, used in Apple's iPhone 5s. WARF added the A8 processor to *WARF I*, and later filed the *WARF II* case accusing Apple's A9 and A10 processors, based on Apple's representations that those products were not far enough along to be adjudicated as part of *WARF I.*

In *WARF I*, WARF obtained a jury verdict that Apple's A7 and A8 chips literally infringe the '752 patent based on the plain and ordinary meaning of a claim term that requires associating "predictions" with "particular" load instructions. Near the end of trial, over a year after the deadline for seeking claim constructions had passed, Apple first sought a specific jury instruction construing that term. The

district court determined that Apple waived that request and affirmed the jury's verdict post-trial.

On appeal, Apple argued for a construction of that claim term that was narrower than the district court's and the jury's interpretation of plain and ordinary meaning and that foreclosed literal infringement. This Court adopted it, without addressing the district court's waiver finding. Based on the new construction, this Court reversed the literal infringement judgment. On remand, WARF moved for a new trial under the doctrine of equivalents ("DoE") in *WARF I*, and sought to move forward with its DoE claims in *WARF II.* Over three years later, the district court denied WARF's motions and entered judgment against WARF in both cases, even though DoE has never been litigated in either case.

The district court committed a series of errors in denying WARF's motions in *WARF I* and *WARF II*.

***WARF II***: The district court erred as a matter of law in concluding that "preclusion" generally required dismissal of *WARF II*. Neither claim nor issue preclusion can apply on these facts. It is well established that claim preclusion applies only when "the claim either was asserted, ***or could have been asserted***, in the prior action." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1298 (Fed. Cir. 2017). Here, WARF's claims against the A9 and A10 chips were never asserted in *WARF I.* At the time WARF filed its complaint, those processors did not

yet exist, and when WARF sought to add them to the case, Apple opposed WARF's motion and persuaded the district court to limit *WARF I* to the earlier A7 and A8 processors. This history forecloses any application of claim preclusion. Similarly, issue preclusion bars only the re-litigation of issues that were actually litigated in the prior suit. *See, e.g.*, *United States v. Int'l Bldg. Co.*, 345 U.S. 502, 505–06 (1953). There is no question that DoE was not litigated, making issue preclusion inapplicable. The district court's contrary ruling ignored long-established preclusion principles.

***WARF I***: In refusing to hold a trial on infringement under the DoE in *WARF I*, the district court concluded that WARF waived its DoE claims under the new construction first adopted on appeal. "The question whether there could be doctrine-of-equivalents infringement ***under the claim construction adopted by this court*** became a critical issue in the case only ***after*** this court's decision on appeal." *Exxon Chem. Pats., Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 1479 (Fed. Cir. 1998). As in *Exxon*, because this question had not even arisen pre-appeal, WARF could not have waived DoE under this Court's new construction.

Perhaps aware of the flaws in its rulings in both *WARF I* and *WARF II*, the district court attempted to backstop its findings by determining, *sua sponte*, that WARF's DoE claim is barred by claim vitiation. But claim vitiation "is not an exception or threshold determination that forecloses resort to the doctrine of

equivalents, but is instead a ***legal conclusion of a lack of equivalence based on the evidence presented*** and the theory of equivalence asserted." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1366–67 (Fed. Cir. 2020). Here, the district court failed even to give WARF an opportunity to present such evidence, making its ruling both procedurally and substantively improper. The district court's flawed claim vitiation conclusion cannot stand.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338 and entered final judgment. Appx1–13, Appx14–15. WARF timely appealed. Appx15455; Appx15459–15460. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES

1. In *WARF II*, whether the district court erred as a matter of law in precluding WARF from litigating its equivalents infringement claims against Apple's A9, A9X, A10 and A10X processors (collectively, the "A9 and A10 processors") based on claim or issue preclusion, where:

   a. WARF could not have brought those claims in *WARF I*, because Apple released those processors after WARF filed its *WARF I* complaint, and Apple persuaded the district court to bar WARF from adding those processors to its *WARF I* case; and

b. infringement under the doctrine of equivalents was neither actually litigated nor necessarily decided in *WARF I*.

2. In *WARF I*, whether the district court erred as a matter of law in barring WARF from trying its equivalents infringement claims against Apple's A7, A8 and A8X processors (collectively, the "A7 and A8 processors") based on waiver and claim vitiation grounds, where:

a. infringement under the doctrine of equivalents became a critical issue in the case only after this Court adopted a claim construction that foreclosed literal infringement for the first time on appeal; and

b. the district court issued a *sua sponte* ruling on claim vitiation without providing WARF an opportunity to be heard or to introduce evidence on the issue, and where the district court's ruling misstated the facts and law pertaining to claim vitiation.

## STATEMENT OF THE CASE

This appeal concerns two related cases, *WARF I* and *WARF II*. Both cases involve WARF's '752 patent, which improves a processor's ability to execute instructions out-of-order, thereby increasing the processor's speed and performance.

## I. TECHNOLOGY BACKGROUND

Microprocessors can run faster by executing instructions out-of-order. But this is not always possible, because some instructions require data from prior

instructions. For example, “store” instructions write data to memory and “load” instructions read data from memory. “Data dependence” is when a “load” must read data previously written by a “store.” At execution time, the processor may not know if a store and load are dependent. But it may still execute them out-of-order, “speculating” that they are probably not dependent. If correct, performance improves. But if incorrect, a “mis-speculation” occurs, causing an error and harming performance.

WARF’s ’752 invention describes and claims a “Predictor” circuit in a processor that predicts when it is likely safe to execute a load before a store, enabling significantly faster execution. The claims recite “detecting a mis-speculation” by “a [load] instruction,” then creating “a prediction associated with the particular [load] instruction.” Appx116–133. Two of the named inventors received the most prestigious awards in computer science (Eckert-Mauchly & Maurice Wilkes) for their work on the ’752 patented invention. Appx13081–13083, Appx13077; *see* Appx11339, Appx11344–11345.

These WARF inventors realized future, “billion transistor chips” would require “aggressive use of speculation” for increased performance. Appx13042–13060. This proved prescient. Apple’s first infringing chip, the A7, was the first mobile processor with a billion transistors. Appx10610. Apple’s A7 used aggressive out-of-order execution. But with this broad use of “speculation” came more costly

penalties for mis-speculation—a problem one of Apple's senior microarchitects described as causing "such a train wreck in the pipeline, we can't afford to come up short on this." Appx13075. To solve this problem, Apple adopted the accused Load-Store Dependency Predictor ("LSD Predictor" or "LSDP") circuit.

Like WARF's patented approach, Apple's LSD Predictor tracks load instructions to predict how likely each one is to mis-speculate and cause an error. And like the patent, Apple's LSDP does this by associating each load with a dynamic prediction. Specifically, when a load instruction mis-speculates, Apple's processors add a "prediction" counter to an entry in a prediction table, and associate that prediction with a load tag to identify the specific load instruction that mis-speculated. Appx10477–10483. This load tag is a 12-bit abbreviation of the load instruction's longer memory address and register number. Appx10484–10485.

Although Apple's prediction table uses shortened load tags to correlate each prediction with a particular load instruction, it is undisputed that 99.9% of predictions are only ever associated with, and updated by, one load instruction. Appx11238–11240 (Apple's expert agreeing that "the chances in which a prediction will be associated with more than one load instruction is .0 –.0.1 percent."); Appx11516–11517; Appx10620 (WARF's expert calculating unique correspondence 99.98 percent of the time); Appx10500–10502; Appx11243. As described further below, after both parties rested their cases-in-chief, Apple for the

first time sought a jury instruction providing a narrow construction of the "particular" limitation to support its non-infringement defense. Appx15300. According to Apple, there is a group of loads associated, ***in the abstract***, with each load tag because complex programs include multiple loads that will generate the same load tag. *See WARF*, 905 F.3d at 1348. So although in practice, because the predictions have short lifespans and the processors see only a few hundred instructions at any given time, 99.9% of "predictions" are only ever associated with a "particular" load instruction, Appx11238–11240, Apple claimed that the hypothetical association of each load tag with additional load instructions prevented its processors from infringing. *WARF,* 905 F.3d at 1347. The district court determined that Apple waived this untimely request and instructed the jury to apply plain and ordinary meaning. Appx15302. The jury found literal infringement. *See* Appx15372–15374. On appeal, this Court adopted Apple's narrower construction for "particular." *WARF,* 905 F.3d at 1347–51. Based on that construction, this Court reversed the judgment of literal infringement.

## II. THE *WARF I* CASE

WARF filed *WARF I* on January 31, 2014, alleging that Apple's A7 processor and incorporating end products infringe the '752 patent. When Apple released its A8 processor in the fall of 2014, which included the same LSDP as the A7 processor,

WARF promptly added that processor and incorporating end products to the case. Appx15045–15055.

### A. The District Court Excluded The A9 And A10 From *WARF I*

WARF also sought to include in the case, and obtain discovery on, Apple's next generation processors, the A9 and A10, but Apple objected. Appx15080–15081. On October 10, 2014, WARF moved to compel discovery on those processors. Appx15045–15046, Appx15060. Apple vigorously opposed. Appx15076–15077; Appx15080–15081. Apple submitted a declaration from an engineer who testified that "[A9] is still in development. . . . major changes will occur at [A9's] stage of design. One change being considered for [A9] involves the Load Store Dependency Predictor." Appx15102–15105. Apple's engineer further testified that the A10 was "at least one year behind the [A9] design. Presently, significant design changes are being considered for the [A10] design, ***including at least one significant change involving the Load Store Dependency Predictor***." Appx15104.

The court ruled for Apple and excluded the A9 and A10 processors from the case, noting "concern about experts" and the scheduled "trial in October of 2015" as reasons for why "[w]e can't just keep adding additional products that are still being worked on." Appx15128–15129. The court concluded that "the fairest line to draw right now is [to include] all of the currently released products [i.e., A7 and A8]," but

explained "[y]ou're not going to get [discovery] for the A9 and A10, because that's the line I'm drawing in the sand." Appx15129, Appx15135; *see* Appx15106. The court thus categorically excluded the A9 and A10 processors from the *WARF I* case, explicitly concluding that "***I'll tell you right now I'm going to stick with the A7, A8 distinction for trial.***" Appx15138. *WARF I* thus proceeded to trial on just the A7 and A8 processors.

### B. Apple Waived A Construction For The "Particular" Limitation In District Court

In the months leading up to trial in *WARF I*, the parties engaged in summary judgment and claim construction briefing pursuant to the schedule set by the district court, during which neither party proposed a construction for the "particular" claim limitation. Per the Court's pretrial order, Appx15002, the parties exchanged lists of disputed claim terms and proposed constructions on October 15 and November 12, 2014, in which neither party identified the "particular" limitation as needing construction. Appx15142–15145, Appx15147–15151; Appx15160–15161. Because neither party had sought a claim construction for the "particular" limitation, the Court's *Markman* ruling did not provide one. Appx15160–15161.

Trial commenced on October 5, 2015. On the eve of trial, an evidentiary dispute arose regarding the admissibility of a later-filed Apple patent relating to its accused LSD predictor. WARF moved to exclude that patent from the liability phase of trial as irrelevant and prejudicial. Appx15290–15294. Apple responded that the

patent was allegedly relevant to rebutting DoE infringement as to the "mis-speculation" limitations. Appx15274, Appx15279–15281. Once again, Apple did not mention the "particular" limitation. *Id.* WARF accordingly responded that it would "make no doctrine of equivalents arguments" at trial, Appx15290, and Apple's patent was excluded, Appx15294. This agreement was based on Apple's waiver of specific claim constructions for the remaining terms of the asserted claims, including the "particular" limitation, which would receive its plain and ordinary meaning as determined by the jury, and the fact that WARF had a literal infringement claim thereunder.

During trial, the district court confirmed that the "particular" limitation's plain and ordinary meaning included "a prediction associated with a single load instruction, albeit one that is 'dynamic,'" and concluded "there is no need for instructing the jury on the meaning of this term." Appx15298. The court's view of plain and ordinary meaning, including the reference to "dynamic" association between predictions and load instructions, allowed WARF to show literal infringement. Specifically, although Apple's LSDP uses shortened load tags, in practice, 99.9% of predictions are associated with and updated by only a single load instruction. *E.g.*, Appx11238–11240 (Apple's expert agreeing that "the chances in which a prediction will be associated with more than one load instruction is .0 –.0.1 percent."). The district court also cautioned Apple's expert against making

arguments contrary to this interpretation, explaining that he should not "over emphasiz[e] the importance of the terms 'the particular'…." Appx15298.

Then, after WARF rested its case-in-chief and just before closing arguments, Apple filed a "request for a closing instruction construing 'a prediction associated with the particular data consuming instruction.'" Appx15300. Specifically, Apple requested that the court instruct the jury that this term means "a prediction associated with a ***single*** load instruction." *Id.* Apple's 11th hour request came almost a full year after the October 2014 claim construction deadline provided by the court in its case management order.

The district court found that "Apple ***waived any request*** to now insert a construction of the term . . . . [and] plain meaning is sufficient." Appx15302. Accordingly, the jury was instructed to give the unconstrued terms "their plain and ordinary meaning as viewed from the perspective of a person of ordinary skill in the art." Appx11614. So instructed, the jury agreed with WARF and found literal infringement.

Post-trial, Apple moved for JMOL on literal infringement, including based on the "particular" limitation. Appx15332–15334. The district court denied Apple's motion, finding that "a reasonable jury could conclude that a prediction was associated with a particular load instruction even if that same prediction may be associated with other load instructions." *Id.* Apple also moved for JMOL on DoE,

but the district court denied Apple's motion, explaining that issue had not actually been litigated. Appx15322 (denying 50(a) JMOL). Apple appealed.

### C. This Court Narrowed The "Particular" Limitation For The First Time On Appeal

Despite the district court's express finding that Apple "***waived any request*** to now insert a construction of the term" during the proceedings before it, Appx15302, this Court entertained Apple's invitation to seek a claim construction for the "particular" limitation for the first time on appeal. Apple proposed that each prediction must be associated with ***one and only one*** load instruction. *WARF v. Apple Inc.*, 905 F.3d 1341, 1347 (Fed. Cir. 2018).

Oral argument on appeal was essentially a *Markman* hearing on claim construction for the "particular" limitation. This was the first and only *Markman* hearing on that issue given the district court's express finding that plain and ordinary meaning was sufficient and that Apple waived any request for a more specific instruction below. Appx15302. Apple made a lengthy claim construction argument to the panel—all told, Apple spent approximately ***nineteen minutes*** on the issue. *See, e.g.*, Appx15375–15454 (4:25-15:21, 31:12-37:4, 77:14-78:2) (transcribing recording at 03:43-16:05, 36:00-42:40, 1:38:31-1:38:59).

During oral argument, this Court probed why Apple had "***never asked for***" its new construction and why that construction was "very different" from that in the proceedings below:

> MR. LEE: Point number two, the word 'particular' is used consistently in these twenty different references to point to ***one and only one*** instruction. And point --
>
> THE COURT: All throughout the course of the trial, you talked about a ***single*** instruction. And even when you, at the last minute, said you wanted, you said you've probably already ruled on this, but we're going to ask you to give this instruction, and you said you wanted it [to] say it was a ***single***, you wanted – as a single load instruction. But ***single*** is very different from ***one and only one***, which is now what you're arguing on appeal.

Appx15384 (Recording at 09:00-09:36).

> THE COURT: ***But you never asked for it***, and then at the end of, at the end of the charge conference, you submitted one document that said, you've probably already ruled on this, we know we didn't ask for a construction, and now we want it to be a ***single***. Not ***one and only***, but a ***single***.

Appx15386 (Recording at 11:02-11:17).

Nevertheless, this Court reversed the judgment of literal infringement after construing the "particular" limitation for the first time.[2] The Court did not address waiver, but instead adopted Apple's proposal on appeal, requiring a prediction

[2] To the extent Apple argues that the construction did not change on appeal, because the district court and this Court both purported to apply plain and ordinary meaning, that argument fails. The district court expressly concluded that literal infringement was possible within its interpretation of "particular," *see* Appx15332–15334 ("a reasonable jury could conclude that a prediction was associated with a particular load instruction even if that same prediction may be associated with other load instructions"), whereas this Court interpreted "particular" as precluding literal infringement, *see WARF*, 905 F.3d at 1348 ("no reasonable juror could have found literal infringement in this case"). These opposite outcomes confirm that this Court narrowed the construction of "particular" on appeal.

associated with one and only one load instruction, and reversed the district court's judgment on literal infringement. *WARF*, 905 F.3d at 1348. This Court's ruling was limited to literal infringement and did not address DoE other than to note it was not part of the *WARF I* trial. *Id.* at 1350.

## III. THE *WARF II* CASE AND *WARF I* REMAND

WARF filed its second lawsuit on September 25, 2015. *WARF II* accused Apple's A9 and A10 processors, which the district court excluded from *WARF I*. Appx110. The district court stayed all proceedings in *WARF II* while the *WARF I* appeal was pending. Appx112.

On February 15, 2019, after this Court's *WARF I* mandate issued, WARF moved for a new trial in *WARF I* on its never-before-litigated doctrine of equivalents claims. Apple opposed and also moved for judgment of non-infringement in *WARF II* on preclusion grounds. On May 10, 2022, more than three years after the parties completed briefing, the district court ruled that WARF waived DoE in *WARF I* and that WARF was precluded from bringing its DoE claims in *WARF II*, without identifying the specific preclusion doctrine it applied. Appx12–13.

## <u>SUMMARY OF THE ARGUMENT</u>

No theory of preclusion bars *WARF II*'s DoE claims against Apple's A9 and A10 processors. Claim preclusion does not apply because WARF could not have brought these claims in *WARF I*. Indeed, at the time WARF filed its complaint in

*WARF I*, Apple's A9 and A10 processors were still in development, and Apple successfully excluded them from the *WARF I* case. Issue preclusion does not apply because the issue of whether the A9 and A10 processors infringe the '752 patent under the DoE was never actually litigated in *WARF I*.

Instead of performing a proper preclusion analysis, the district court tried to analogize to *Nystrom v. Trex Co., Inc.*, 580 F.3d 1281 (Fed. Cir. 2009). *Nystrom* purports to apply claim preclusion, but has been recast by this Court as an issue preclusion case because its claim preclusion analysis is contrary to this Court's precedents. Specifically, the *Nystrom* panel ruled that the patentee's claims asserted in a second lawsuit were barred by "claim preclusion" even though the accused products did not exist when the patentee filed its first suit, and hence those claims could not have been brought in that first suit. Federal Circuit cases both before and after *Nystrom* uniformly hold that claim preclusion does not apply in that situation—the identical situation presented here. This Court has accordingly described *Nystrom* as an issue preclusion case, but on that basis it is readily distinguishable. Critically, the plaintiff Nystrom stipulated to non-infringement under the DoE in his first case, and that stipulation was binding against him in his second case. Here, WARF never stipulated to non-infringement under the DoE; to the contrary, when Apple sought to sweep DoE into the literal infringement judgment, WARF successfully opposed. The district court's ruling that preclusion, generally, bars WARF from pursuing

infringement claims under the DoE against Apple's A9 and A10 processors in *WARF II* was legally erroneous and should be reversed.

The district court also separately erred in denying WARF's motion to try DoE infringement on remand in *WARF I.* First, the district court's waiver ruling is contrary to *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 1475 (Fed. Cir. 1998). *Exxon* is on all fours with this case. In *Exxon*, this Court vacated a ruling denying Exxon's motion for a trial on DoE on remand following this Court's reversal of a literal infringement judgment. As in *Exxon*, "[t]he question whether there could be doctrine-of-equivalents infringement ***under the claim construction adopted by this court*** became a critical issue in the case only ***after*** this court's decision on appeal." *Id.* at 1479. And as in *Exxon*, because this question had not even arisen pre-appeal, WARF could not have waived DoE under this Court's new construction. *Exxon* controls here.

The district court's alternative basis for entering judgment against WARF in both cases—its *sua sponte* "claim vitiation" ruling—was erroneous both procedurally and on the merits. Procedurally, the district court deprived WARF of a "fair opportunity to present evidence in opposition to the court's entry of summary judgment" on an issue that the parties did not raise in their briefing. *S. Ill. Riverboat Casino Cruises, Inc. v. Triangle Insulation & Sheet Metal Co.*, 302 F.3d 667, 678 (7th Cir. 2002). Without the benefit of briefing from the parties, the district court

misapprehended the facts and law on this issue. Claim vitiation "is not an exception or threshold determination that forecloses resort to the doctrine of equivalents, but is instead a ***legal conclusion of a lack of equivalence based on the evidence presented*** and the theory of equivalence asserted." *Bio-Rad Lab'ys*, 967 F.3d at 1366–67. The district court was in no position to draw such a legal conclusion here, because it deprived WARF of the opportunity to present any evidence on its DoE claim. Substantively, the district court asked the wrong question and ignored critical evidence in evaluating the answer, underscoring why *sua sponte* decisions are disfavored. In fact, WARF's DoE claim has a sound evidentiary and legal basis.

The district court's flawed rulings in both cases should be vacated.

## ARGUMENT

## STANDARDS OF REVIEW

This Court reviews a grant of summary judgment under the law of the regional circuit. *SpeedTrack, Inc. v. Off. Depot, Inc.*, 791 F.3d 1317, 1322 (Fed. Cir. 2015). The Seventh Circuit reviews grants of summary judgment *de novo*. *Williams v. Brooks*, 809 F.3d 936, 941 (7th Cir. 2016).

This Court reviews a judgment based on claim preclusion or issue preclusion[3] *de novo* because both doctrines are questions of law. *Hallco Mfg. Co. v. Foster*, 256

[3] Courts sometimes refer to the doctrine of "claim preclusion" as "res judicata" and the doctrine of "issue preclusion" as "collateral estoppel."

F.3d 1290, 1294 (Fed. Cir. 2001) (claim preclusion); *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015) (issue preclusion). "Whether two infringement allegations constitute the same claim or cause of action" for claim preclusion purposes "is an issue particular to patent law, and [this Court] appl[ies] [its] own law." *Mentor Graphics*, 851 F.3d at 1298. Similarly, this Court applies its own law to "issues of issue preclusion that implicate substantive patent law issues." *Soverain Software*, 778 F.3d at 1314. For general principles of claim or issue preclusion, this Court applies the law of the regional circuit, here the Seventh Circuit. *Id.*; *Acumed LLC v. Stryker Corp.*, 525 F. 3d 1319, 1323 (Fed. Cir. 2008).

This Court's law governs the issue of waiver in this case because the waiver of an infringement theory due to a changed claim construction "is intimately bound up with patent enforcement." *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1250–51 (Fed. Cir. 2005).

Seventh Circuit case law applies to the issue of whether the district court improperly entered a *sua sponte* summary judgment without affording WARF sufficient notice and an opportunity to be heard. *Bemis Mfg. v. Dornoch Med. Sys., Inc.*, 21 F. App'x 930, 935 (Fed. Cir. 2001) ("Whether an opposing party is afforded sufficient notice and opportunity to be heard by a district court granting summary

judgment against it presents a procedural question not unique to patent law, and as such, is governed by the law of the regional circuit.").

# I. THE DISTRICT COURT ERRED IN BARRING WARF'S CLAIMS IN *WARF II* UNDER EITHER CLAIM OR ISSUE PRECLUSION

## A. Claim Preclusion Cannot Bar WARF's Claims Against The A9 and A10 Processors Because Those Claims Could Not Have Been Brought In *WARF I*

Under this Court's settled law, "in order for a particular claim to be barred [by claim preclusion], it is necessary that the claim ***either was asserted, or could have been asserted***, in the prior action." *Mentor Graphics*, 851 F.3d at 1298 (quoting *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1342 (Fed. Cir. 2012)). If a claim was not in existence at the time of the original complaint, "it could not have been asserted in that action and ***is not barred*** by res judicata [claim preclusion]." *Aspex Eyewear*, 672 F.3d at 1342, 1345. "[F]or products made or sold after [a] previous action[], it d[oes] not matter whether the new products were 'essentially the same' as the previously accused products – claim preclusion d[oes] not bar the infringement allegations as to the new products." *Mentor Graphics*, 851 F.3d at 1299.

### 1. WARF Was Precluded From Litigating Its Claims Against The A9 And A10 Processors In *WARF I*

WARF's infringement claims against the A9 and A10 processors "could not have been asserted" in *WARF I*. At Apple's insistence, WARF was ***actually precluded*** from litigating its claims against those processors in *WARF I*. When

WARF moved to compel discovery on the A9 and A10 processors in *WARF I,* Apple vigorously opposed. Appx15076–15077; Appx15080–15081. Apple insisted that those processors were "still in development" and that it anticipated making "major changes" to them, including a "significant change" to the accused LSD Predictor. Appx15102–15105. The district court was convinced. As Apple requested, the court excluded the A9 and A10 processors from the *WARF I* case, explicitly concluding that "***I'll tell you right now I'm going to stick with the A7, A8 distinction for trial.***" Appx15138.

Because WARF ***could not have asserted***—and in fact was precluded from asserting—its claims against the A9 and A10 in *WARF I*, claim preclusion does not apply. *See, e.g.*, *Mentor Graphics*, 851 F.3d at 1298 ("Claim preclusion does not bar [Mentor's infringement claims that "were not part of the previous suit"] because Mentor could not have previously brought them."); *Adobe Sys. Inc. v. Wowza Media Sys.*, LLC, 72 F. Supp. 3d 989, 995 (N.D. Cal. 2014) (claim preclusion did not apply to claims regarding new "products that Wowza made or sold during the pendency of *Wowza I*," in part because "the Court's own order barred Adobe from introducing those claims in that litigation").

Claim preclusion is at root a doctrine that bars a plaintiff from "claim splitting." *See, e.g.*, *Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*, 58 F. 3d 616, 619 (Fed. Cir. 1995) ("It is well established that a party may not ***split a cause of***

***action*** into separate grounds of recovery and raise the separate grounds in successive lawsuits."). But "[a]n exception to the normal rules of claim preclusion exists when '[t]he parties have agreed in terms or in effect that the plaintiff may split his claim, or ***the defendant has acquiesced therein***. . . .'" *Pactiv Corp. v. Dow Chem. Co.*, 449 F.3d 1227, 1231 (Fed. Cir. 2006) (quoting Restatement (Second) of Judgments § 26(1)(a) (1982)). Here, Apple convinced the district court to ***force*** WARF to split its claims into two different suits. As such, claim preclusion cannot apply.

### 2. WARF Was Not Obligated To Include The A9 And A10 In *WARF I*, Because Those Processors Were Released Long After The *WARF I* Case Was Filed

Even if WARF had not unsuccessfully attempted to add the A9 and A10 processors to *WARF I*, claim preclusion would still not apply. This Court's law is clear that a patentee does not face the consequences of claim preclusion if it fails to add to its case, midstream, new accused products released after it filed its original complaint:

> In patent cases, this court has applied the general rule that res judicata does not bar the assertion of 'new rights acquired during the action which might have been, but were not, litigated.' *Gillig v. Nike, Inc.*, 602 F.3d 1354, 1363 (Fed. Cir. 2010), quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 370 (2d Cir. 1997); *see also Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992) ("for res judicata purposes, claims that 'could have been brought' are claims in existence at the ***time the original complaint is filed*** or claims actually asserted by supplemental pleadings or otherwise in the earlier action"). ***While a party may seek to pursue claims that accrue during the pendency of a lawsuit adjudicated in that lawsuit, the party is not required to do so, and res judicata will not be applied to such accruing claims if the party elects***

> ***not to have them included in the action***. *Gillig*, 602 F.3d at 1363; *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1298 (11th Cir. 2001); *Curtis v. Citibank*, N.A., 226 F.3d 133, 139 (2d Cir. 2000).

*Aspex Eyewear, Inc.*, 672 F.3d at 1345.

Here, it is undisputed that the A9 and A10 processors were not in existence when WARF filed its complaint in *WARF I* on January 31, 2014. Nine months later, Apple successfully blocked WARF from adding those processors to the case on the ground that they "do not yet exist in final form." Appx15090–15092 (citing *EPOS Techs. v. Pegasus Techs.*, 842 F. Supp. 2d 31, 34 (D.D.C. 2012) (scope of discovery "is not so broad so as to require the discovery of products that do not yet exist in final form.")). Thus, because WARF's claims against the A9 and A10 processors were not in existence when it filed its *WARF I* complaint, this provides an additional reason why claim preclusion does not apply. *Aspex Eyewear*, 672 F.3d at 1345.

### 3. The District Court Did Not Perform A Proper Claim Preclusion Analysis

The district court ruled that WARF's claims against the A9 and A10 processors in *WARF II* were precluded, "whether viewed as claim or issue preclusion." Appx12. But the district court failed to perform a proper analysis under either doctrine. With respect to claim preclusion, the court did not address whether WARF ***could have brought*** its claims against the A9 and A10 processors in *WARF I*. Nor did the court consider how its own prior order ***precluding*** WARF from adding the A9 and A10 processors to *WARF I* foreclosed application of claim preclusion.

Instead of addressing the threshold question for claim preclusion—whether the claims at issue in *WARF II* "could have been brought" in *WARF I*—the district court attempted to analogize this case to *Nystrom v. Trex Co.*, 580 F.3d 1281 (Fed. Cir. 2009), believing that the "procedural posture of this case is the same as that presented in the *Nystrom* case." Appx12. But the district court overlooked that this Court has since repudiated *Nystrom* as a claim preclusion case—because the *Nystrom* panel failed to consider that the claims in the patentee's second suit could not have been brought in the patentee's first suit, which is the same error the district court made here.

In *Nystrom*, the patentee had filed a first lawsuit accusing Trex's first generation wood-composite boards of infringing its patent. Following claim construction proceedings, Nystrom admitted that he "'lack[ed] sufficient evidence to prove infringement" under the court's claim constructions, and Nystrom himself (joined by Trex) "moved for summary judgment of noninfringement on all claims." *Nystrom*, 580 F.3d at 1284. The motion was granted, and Nystrom then appealed to this Court, which ***affirmed*** two key disputed claim constructions. *Id.* On remand, Nystrom tried to pursue an infringement claim under the doctrine of equivalents, but the district court ruled that "Nystrom had previously stipulated to 'non-infringement' without reference to equivalents in the first action," and hence his stipulation of non-infringement covered both DoE and literal infringement. *Id.* This Court affirmed. *Id.*

Nystrom then filed a second suit, alleging that Trex's second-generation Trex II boards infringed the same patent. *Nystrom*, 580 F.3d at 1284. The district court granted Trex summary judgment of non-infringement on the merits, and this Court affirmed, albeit on alternative grounds. The panel purported to determine whether Nystrom's infringement claim in *Nystrom II* was barred by "claim preclusion." *Id.* at 1285-86. However, in its claim preclusion analysis, the panel completely ignored the significance of the fact that the Trex II boards at issue in *Nystrom II* "could not have been included in the first suit because they reached the market after the filing date of the original December 2001 complaint." *Id.* at 1284. Instead, the panel focused solely on the fact that the Trex II boards were the same as the Trex I boards with respect to the two claim limitations that led to the judgment of non-infringement in *Nystrom I*, and thus concluded that Nystrom's second suit was barred by "res judicata." *Id.* at 1286.

Contrary to the district court's ruling, *Nystrom* does not dictate the result in this case. *Nystrom* misapplied this Court's claim preclusion precedents. The fact that the Trex II "products ***could not have been included*** in the first suit because they reached the market after the filing date of the original December 2001 complaint," *id.* at 1284, foreclosed application of claim preclusion as a matter of law. *See supra*. *Nystrom* (decided in 2009) did not and could not overrule this Court's long line of cases holding that "res judicata does not punish a plaintiff for exercising the option

not to supplement the pleadings with an after-acquired claim." *Florida Power & Light Co. v. United States*, 198 F.3d 1358, 1360 (Fed. Cir. 1999) (internal citations and quotations omitted); *cf. Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1317-18 (Fed. Cir. 2004).

Given *Nystrom's* misapplication of claim preclusion precedent, this Court has subsequently repudiated *Nystrom* as a claim preclusion case and recast it as an ***issue preclusion*** case. As the Court explained in *Aspex Eyewear*:

> The *Nystrom* court held that particular claims were barred based on previous litigation between the same parties. The previous litigation in that case, however, had resolved certain issues against the appellant, and the appellant sought to litigate those issues again in the second case, hoping for a different outcome. Because those issues had been resolved against the appellant in the first case, this court held that the appellant was precluded from relitigating them. ***In so doing, the court applied the doctrine generally referred to as collateral estoppel or issue preclusion.*** Although the *Nystrom* court characterized its analysis as falling under the general rubric of res judicata or claim preclusion, the principle that the court applied was that when a party that has had a full and fair opportunity to litigate an issue and has lost on that issue, it may not relitigate that issue in a later case.

*Aspex Eyewear*, 672 F.3d at 1343. Simply put, notwithstanding *Nystrom*, this Court's law is settled that, "[w]hile a party may seek to pursue claims that accrue during the pendency of a lawsuit . . . , the party is not required to do so, and res judicata will not be applied to such accruing claims if the party elects not to have them included in the action." *Id.* at 1345. This Court has since repeatedly applied *Aspex Eyewear*

as controlling authority on the issue.[4] As a result, *Nystrom* does not support dismissal of *WARF II* on claim preclusion grounds and the district court's reliance on *Nystrom* was erroneous.

Finally, although it was not necessary to reach this issue in light of WARF's inability to bring its claims against the A9 and A10 in *WARF I*, the district court also erred in apparently concluding that the A9 and A10 processors were essentially the same as the A7 and A8 processors at issue in *WARF I*. Appx6. There was an insufficient basis in the record for such a finding. Apple provided no discovery on the A9 and A10 processors. Appx15106. The district court stayed and then dismissed the *WARF II* case before discovery commenced, and Apple successfully avoided providing discovery on the A9 and A10 processors in *WARF I*. *See supra* at Section I.A.1. Although the district court relied on a declaration Apple submitted in connection with the post-remand motion practice, Appx6, WARF had no opportunity to test the assertions in that declaration.

---

[4] *E.g.*, *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620, 626–67 (Fed. Cir. 2015) (holding it is "well-established" and "clear that claim preclusion . . . does not apply to damages accruing after the filing of the complaint and not the subject of the first judgment") (citing *Aspex Eyewear*, 672 F.3d at 1342–44); *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1365 (Fed. Cir. 2017) (citing *Aspex Eyewear*, 67 F.3d at 1343); *Target Training Int'l, Ltd. v. Extended Disc North Am., Inc.*, 645 F. App'x 1018, 1026 (Fed. Cir. 2016) (citing *Aspex Eyewear*, 672 F.3d at 1345).

### B. Issue Preclusion Does Not Apply Because The Issue Actually Litigated In *WARF I* Was Literal Infringement, Not Infringement Under The DoE

WARF's claims that the A9 and A10 processors infringe the '752 patent under the doctrine of equivalents in *WARF II* similarly are not barred by issue preclusion. Issue preclusion requires four showings: "(1) the issue sought to be precluded is the same as that involved in a prior action; (2) the issue was actually litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is invoked was represented in the prior action." *Adair v. Sherman*, 230 F.3d 890, 893 (7th Cir. 2000).

The issue litigated in *WARF I* was whether Apple's A7 and A8 processors literally infringe the '752 patent. The issue to be litigated in *WARF II* is whether Apple's A9 and A10 processors infringe the '752 patent under the DoE. That is a distinct "issue" for purposes of issue preclusion, and it was not "actually litigated" in *WARF I*. Hence, issue preclusion does not apply.

#### 1. DoE And Literal Infringement Are Distinct Issues For Purposes Of Issue Preclusion

For issue preclusion to apply, the issue litigated in the prior action must be ***"identical"*** to the issue presented in the current action. *Abbott Lab'ys v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1203 (Fed. Cir. 2007) (citing *Blonder–Tongue Lab'ys, Inc. v. Univ. of Ill. Found.*, 402 U.S. 313 (1971)). "***[I]ssues are not identical if the second action involves application of a different legal standard***, even though the

factual setting of both suits may be the same." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 154 (2015) (quoting 18 C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 4417, p. 449 (2d ed. 2002)).

Plainly, infringement under the DoE is not "identical" to literal infringement, as each manifestly "involves application of a different legal standard." *Id.* "Literal infringement requires that the accused device contain each limitation of the claim exactly; any deviation from the claim precludes a finding of literal infringement." *Litton Sys., Inc. v. Honeywell, Inc.*, 140 F. 3d 1449, 1454 (Fed. Cir. 1998). The legal standard for DoE is very different:

> Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." Infringement may be found under the doctrine of equivalents if every limitation of the asserted claim, or its "equivalent," is found in the accused subject matter, where an "equivalent" differs from the claimed limitation only insubstantially. Whether a component in the accused subject matter performs substantially the same function as the claimed limitation in substantially the same way to achieve substantially the same result may be relevant to this determination."

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998) (citing *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 (1997)). As a result, "this [C]ourt has articulated distinct rules for the evidence showing infringement under the doctrine of equivalents" vs. literal infringement. *nCube Corp. v. Seachange Int'l, Inc.*, 436 F. 3d 1317, 1325 (Fed. Cir. 2006) (holding

that evidence presented at trial for literal infringement did not support a finding of infringement under the DoE). Given the different standards governing these two issues, "[t]he evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement." *Id.* (quoting *Lear Siegler, Inc. v. Sealy Mattress Co. of Mich., Inc.*, 873 F.2d 1422, 1425 (Fed. Cir. 1989)).

### 2. DoE Was Not Actually Litigated In *WARF I*

Infringement under DoE was not actually litigated in *WARF I*, even for the A7 and A8 processors. Both the Federal Circuit and Seventh Circuit have long held that the "actually litigated" requirement of issue preclusion generally requires that "the parties to the original action disputed the issue ***and the trier of fact resolved it***." *Mother's Rest., Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1570 (Fed. Cir. 1983) (citations omitted); *In re Freeman*, 30 F.3d 1459, 1466 (Fed. Cir. 1994) (same); *Laguna Hermosa Corp. v. United States.*, 671 F.3d 1284, 1288–89 (Fed. Cir. 2012) (same); *see also, e.g.*, *Continental Can Co. v. Marshall*, 603 F.2d 590, 596 (7th Cir. 1979) (same). An issue is "actually litigated" when it "is properly raised, by the pleadings or otherwise, ***and is submitted for determination, and is determined***." Restatement (Second) Judgments § 27 (1982), Comment (d).[5] Issues that "***might***

[5] The Seventh and Federal Circuits both adopt the Restatement (Second) of Judgments § 27 on this issue. *See, e.g.*, *Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045, 1055 (Fed. Cir. 2014); *Caudill Seed & Warehouse Co., Inc. v. Rose*, 868 F.3d 558, 560 (7th Cir. 2017).

have been litigated" will not be subject to preclusion without a showing that the issue was "actually litigated." *Johnson v. City of Chi.,* 712 F. Supp. 1311, 1315 (N.D. Ill. 1989) (citing Restatement (Second) of Judgments) (following the Restatement and declining to apply preclusive effect from earlier waiver). "[I]f [the issue] is the subject of a ***stipulation between the parties***, the issue has not been actually litigated." Restatement (Second) Judgments § 27, Comment (e).

WARF never submitted its equivalent infringement theories for determination by the jury or the court in *WARF I*. Apple similarly did not challenge the merits of infringement under the DoE, choosing to bring dispositive motions only on willful infringement and invalidity. Appx15196–15197. At trial, WARF opted not to proceed on DoE based in part on Apple's waiver of a specific claim construction for the "particular" limitation, which would receive its plain and ordinary meaning as determined by the jury, and the fact that WARF had a literal infringement claim thereunder. The issue of DoE was thus not submitted to the jury (Appx15310–15312), which did not resolve any DoE claim. Appx15372 (judgment only on "claim of literal infringement"). After the jury found for WARF on literal infringement, the district court ***denied*** Apple's Rule 50(a) motion for judgment as a matter of law of non-infringement under the DoE, explaining that Apple "never pressed a declaration of noninfringement on abandoned claims at trial." Appx15322. This Court's

subsequent opinion in *WARF I* was limited to WARF's ***literal*** infringement claims. *WARF*, 905 F.3d at 1348.

Finally, even if this Court were to find that WARF waived its DoE claims in *WARF I*, WARF's DoE claims were still not "actually litigated" in that case. Merely finding waiver does not constitute an "adjudication of the merits" for issue preclusion purposes. *United States v. Int'l Bldg. Co.*, 345 U.S. 502, 506 (1953) ("[U]nless we can say that [there was] an adjudication of the merits, the doctrine of [collateral] estoppel by judgment would serve an unjust cause; it would become a device by which a decision not shown to be on the merits would forever foreclose inquiry into the merits."); *In re Zwanziger*, 741 F.3d 74, 78 (10th Cir. 2014) (holding that "a waiver finding in one case is not the type of finding entitled to issue preclusion in another case," and finding no issue preclusion where plaintiffs "had waived emotional distress damages" in a prior case, as the court "did not . . . decide the merits of [that] claim").

### 3. The District Court's *Sua Sponte* Ruling On Claim Vitiation Does Not Fulfill The "Actually Litigated" Requirement

The district court's finding of claim vitiation on remand cannot establish that the issue of DoE was actually litigated. In denying WARF's request to reopen *WARF I* for a new trial on DoE, the district court engaged in an improper *sua sponte* analysis of WARF's purported DoE infringement theory under the Federal Circuit's new claim construction. ***But neither party raised this issue nor provided any briefing to***

***the district court.*** As explained below, *see infra* at Section II.B, although the district court apparently attempted to create a judgment "on the merits" (Appx12), its ruling was both legally and factually incorrect and also a deprivation of WARF's due process rights, because the court did not provide WARF an opportunity to be heard and present evidence on the district court's *sua sponte* vitiation theory.

At minimum, the district court's *sua sponte* ruling on claim vitiation does not and cannot satisfy the "actually litigated" requirement of claim preclusion. "[As] a matter of basic fairness, it is appropriate to limit the collateral effects of a decision rendered *sua sponte* and on an incomplete factual record." *Valenzuela v. Union Pac. R.R. Co.*, 194 F. Supp. 3d 918, 930 (D. Ariz. 2016). Further, claim vitiation had not yet been "disputed" or "submitted for determination" by the parties. *Mother's Restaurant, Inc.*, 723 F.2d at 1570; Restatement (Second) Judgments § 27 (1982).

Finally, because the district court's claim vitiation ruling was an alternative basis for its *WARF I* judgment, it was not "necessary" to that judgment. "[H]oldings in the alternative, either of which would independently be sufficient to support a result, ***are not conclusive in subsequent litigation with respect to either issue standing alone***." *Peabody Coal Co. v. Spese*, 117 F.3d 1001, 1008 (7th Cir. 1997) (citing Restatement (Second) of Judgments § 27 cmt. I); *Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1538 (Fed. Cir. 1995). In sum, the district court's claim vitiation ruling cannot have preclusive effect.

#### 4. The District Court Failed To Perform A Proper Issue Preclusion Analysis

Again in lieu of a proper preclusion analysis, the district court attempted to analogize to *Nystrom*, but the district court's reliance on *Nystrom* was also erroneous for issue preclusion. As an initial matter, *Nystrom* is entitled to little if any weight as an issue preclusion case because the panel did not even purport to apply the required elements of issue preclusion. In any event, the facts are materially different.

In *Nystrom I*, the patentee stipulated to "non-infringement" generally, encompassing both literal infringement and infringement under the DoE.[6] *Nystrom*, 580 F.3d at 1284–85. And as the *Nystrom II* panel noted, this Court's judgment of non-infringement in *Nystrom I* covered both literal and DoE infringement. *Id.* As such, DoE was actually litigated in *Nystrom I*. For good reason, then, *Aspex Eyewear* characterized *Nystrom* as involving a situation in which *Nystrom I* "resolved certain issues against the appellant, and the appellant sought to ***litigate those issues again in the second case***, hoping for a different outcome. Because those issues had been

[6] Indeed, if, following the district court's claim construction ruling, Nystrom had preserved an infringement claim under the doctrine of equivalents instead of stipulating to "non-infringement" generally, there would have been no final judgment and hence this Court would not have had appellate jurisdiction over Nystrom's appeal. "Under the final judgment rule, parties may only appeal a final decision of a district court." *Spread Spectrum Screening L.L.C. v. Eastman Kodak Co.*, 657 F.3d 1349, 1354 (Fed. Cir. 2011) (internal quotations omitted).

resolved against the appellant in the first case, this court held that the appellant was precluded from ***relitigating them***." *Aspex Eyewear*, 672 F.3d at 1343.

WARF's position is materially different than Nystrom's. Unlike Nystrom, WARF never at any point stipulated that the A7 and A8 processors at issue in *WARF I* do not infringe under the DoE. In fact, in its post-trial motions in *WARF I*, WARF opposed Apple's motion for JMOL of no DoE. Appx15321–15324. Because the parties did not actually litigate DoE at trial, the district court denied Apple's motion. Appx15322; Appx15372. *See Alcon Research Ltd. v. Barr Lab'ys, Inc.*, 745 F.3d 1180, 1193 (Fed. Cir. 2014), ("The scope of any judgment should conform to the issues that were actually litigated"; affirming district court's refusal to enter judgment on claims that were "not litigated or fairly placed in issue, during the trial."). And again unlike *Nystrom*, this Court's opinion in *WARF I* was limited to literal infringement. *WARF*, 905 F.3d at 1348. Further, in this case, a key claim construction changed on appeal, putting WARF's DoE claim under that new claim construction at issue only post-appeal (*see* Section II.A, *infra*); in *Nystrom*, the key claim constructions were affirmed, resulting in no new issues to be resolved.

Thus, unlike in *Nystrom I*, DoE was never actually litigated in *WARF I*. This is not a situation in which WARF is seeking to "relitigate" any "issues again in the second case, hoping for a different outcome," as in *Nystrom II*. *Aspex Eyewear*, 672 F.3d at 1345. Instead, WARF is simply seeking to litigate DoE for a ***first time***. On

this record, issue preclusion does not and cannot bar WARF from pursuing a never-before litigated DoE claim in *WARF II*. The district court's contrary ruling was erroneous and should be reversed.

## II. THE DISTRICT COURT ERRED IN FORECLOSING WARF'S NEVER-LITIGATED DoE CLAIM IN *WARF I*

### A. WARF Did Not And Could Not Have Waived DoE In *WARF I*

Because WARF believed Apple literally infringed under the "particular" term's plain and ordinary meaning, WARF agreed (in connection with resolving an evidentiary dispute) not to present its doctrine of equivalents claim at the 2015 trial. At the time of that agreement, the governing claim construction—plain and ordinary meaning, *i.e.*, no construction—did not require DoE, and Apple had waived a specific narrower construction by omitting any such requests from its claim construction disclosures. During and after trial, the district court confirmed WARF's view, explaining that the "particular's" plain meaning did not foreclose literal infringement, and that Apple "waived" any narrower jury instruction. Appx15298; Appx15322; Appx15302. WARF therefore relied on Apple's waiver in deciding that it could present only literal infringement at the 2015 trial.

If Apple had timely requested and received the narrower "one and only one" construction that it later sought and obtained for the first time on appeal (*i.e.,* a construction that ***foreclosed*** literal infringement), then WARF would have certainly pursued an infringement claim under the DoE at trial. Specifically, WARF would

have presented evidence proving that Apple's products are insubstantially different from a system that associates predictions with "one and only one" load instruction. But under the governing plain and ordinary meaning of "particular" in place during the 2015 trial, that question was not at issue.

#### 1. WARF Relied On Apple's Waiver Of A Narrower Construction And Did Not Relinquish A Known Right

Because WARF relied on this Court's case management and other orders pursuant to which Apple waived any claim construction for "particular," and because its doctrine of equivalents claim under Apple's narrower construction became relevant only after appeal, WARF could not have waived its equivalents claim under that new construction nearly three years before that construction was even adopted. A party waives a theory only when it intentionally relinquishes a ***known*** right, similar to consenting to an adverse judgment or failing to oppose judgment as a matter of law. *See Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (explaining that waiver is the "intentional relinquishment or abandonment of a ***known*** right"); *see also Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 661 (Fed. Cir. 2017) (finding waiver where the plaintiff failed to rebut the dispositive argument in its opposition to a 50(b) motion for judgment as a matter of law); *Wallace v. McGlothan*, 606 F.3d 410, 418–19 (7th Cir. 2010) (same); *Nystrom II* (finding that equivalent infringement was waived when the plaintiff stipulated to "noninfringement" generally,

encompassing both literal and DoE infringement, and the key claim constructions were affirmed on appeal).

Here, WARF did not and could not know that it needed to pursue a DoE claim under the Federal Circuit's new, narrower construction until after the appeal, when that construction was first adopted. Nor did WARF take any action to waive its DoE rights generally. WARF did not stipulate to any adverse inferences or judgment against it. To the contrary, WARF successfully opposed Apple's motion for JMOL on DoE infringement on the basis that it had never actually been litigated. *See* Appx15322. WARF's actions in *WARF I* with regard to its DoE claim therefore cannot support a finding of waiver.

#### 2. *Exxon* Demonstrates That WARF Did Not Abandon DoE Under The New Construction First Adopted On Appeal

This Court has addressed a nearly identical fact pattern and determined that, when the doctrine of equivalents becomes a critical issue only after a new claim construction is adopted on appeal, a plaintiff's prior choice to not present that theory at trial does not constitute abandonment. *See Exxon Chem. Pats., Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 1479 (Fed. Cir. 1998) ("The question whether there could be doctrine-of-equivalents infringement under the claim construction adopted by this court became a critical issue in the case only after this court's decision on appeal.").

In *Exxon*, plaintiff Exxon pleaded both literal and equivalent infringement. *Exxon*, 137 F.3d at 1477. Like WARF, Exxon developed both infringement theories

during discovery. Exxon ultimately decided not to litigate DoE at trial because it reasonably believed there was ***literal*** infringement under the district court's adopted claim construction. The jury agreed and found literal infringement in Exxon's favor. *Id.* at 1477. On appeal, however, this Court instead "adopted a construction based on the one proposed by [defendant] Lubrizol." *Id.* As in *WARF I,* this Court applied the new construction to ultimately find that "under the correct claim interpretation no reasonable jury could have found that Lubrizol's products literally infringed Exxon's patent." *Id.* Also as in *WARF I,* this Court reversed the infringement judgment, did not remand for a new trial on equivalent infringement, and was silent as to further proceedings. On remand, Exxon moved for a new trial on infringement under the doctrine of equivalents given the new claim construction. The district court denied Exxon's motion for a new trial and Exxon appealed.

This Court considered whether its prior mandate prevented Exxon from revisiting its equivalent infringement claims. First, this Court in *Exxon* found that because the Court's prior mandate expressly touched only on literal infringement, it did not preclude a new trial on DoE infringement. *Id.* at 1477. Second, this Court rejected the contention that Exxon had "abandoned its doctrine-of-equivalents theory of liability by not submitting it to the jury or raising it on the previous appeal." *Id.* at 1479. Even though Exxon decided not to pursue its equivalents claim, this Court found that Exxon did not abandon the doctrine of equivalents because the

governing claim construction rendered Exxon's literal infringement theory possible, and the equivalent infringement theory moot. "The question whether there could be doctrine-of-equivalents infringement ***under the claim construction adopted by this court*** became a critical issue in the case ***only after this court's decision on appeal***." *Id.* at 1479.[7]

WARF is in the same position. In reliance on the governing claim constructions—***including Apple's waiver of further claim construction*** on "particular" under the district court's case management and other orders—WARF decided not to litigate its DoE theory based on "particular's" plain and ordinary meaning. Exxon, like WARF, maintained and pursued its equivalents claim up until the issue was effectively rendered moot: in Exxon, by a specific claim construction ruling, and in WARF, by Apple's waiver of any claim construction other than plain and ordinary meaning. This Court made clear that, in precisely the present scenario,

[7] *Exxon* is not an anomaly—this Court has found for other plaintiffs like WARF and Exxon. In *ArcelorMittal,* this Court issued a new claim construction on appeal that impacted the below proceeding's infringement trial. Prior to the appeal, the jury had been "instructed at trial to consider direct infringement only under the doctrine of equivalents." *ArcelorMittal France v. AK Steel Corp*., 700 F.3d 1314, 1322 (Fed. Cir. 2012). But the Federal Circuit changed a claim construction, and specifically found that "there has been ***no determination*** below regarding which accused products would or would not literally infringe under the correct claim construction. That infringement issue will need to be addressed in the first instance on remand, either by the court on summary judgment or by a jury in a new trial." *Id.* That this Court's appellate mandate was more explicit in *ArcelorMittal* than in *Exxon* and *WARF* is of no matter: *Exxon* makes clear that a specific mandate is not required.

a plaintiff "cannot be charged with having abandoned its doctrine-of-equivalents theory of liability." *Id.* at 1478. Because WARF, like the plaintiff in *Exxon*, had no opportunity to try infringement under the DoE as applied to this Court's new claim construction, and because the issue of infringement under that doctrine has never been resolved by any judgment, a trial on infringement under the doctrine of equivalents and the new claim construction is necessary.

#### 3. The District Court's Attempt To Distinguish *Exxon* Fails

The district court attempted to distinguish *Exxon* to find that WARF abandoned its DoE claims. Specifically, to avoid a waiver finding, the district court believed that WARF's decision not to pursue the DoE ***must*** be "traced to a[] decision by this court found to be in error on appeal." Appx9. According to the district court, because WARF agreed not to try DoE infringement in connection with resolving an evidentiary dispute, rather than in direct response to an explicit claim construction ruling that was reversed, WARF must have knowingly abandoned its claim. But this ignores the context of WARF's decision—it was relying on "particular" being given its plain and ordinary meaning rather than a narrower construction that completely foreclosed literal infringement. That plain and ordinary meaning and Apple's waiver of a narrower construction were necessarily a basis for WARF's decision not to pursue DoE infringement because without them, DoE would have been necessary. And as in *Exxon*, it is unreasonable to conclude that pre-appeal, WARF somehow

abandoned a ***different*** equivalents claim based on a different, later-adopted construction. As this Court explained:

> Exxon could not realistically be expected to request alternative jury instructions asking for an advisory verdict on whether the patent would be infringed under the doctrine of equivalents on Lubrizol's proposed claim construction. Nor could Exxon, as appellee, have been expected to defend the judgment in its favor on the basis of a theory of liability that was never given to the jury. The question whether there could be doctrine-of-equivalents infringement under the claim construction adopted by this court became a critical issue in the case only after this court's decision on appeal. For that reason, this court did not address the merits of Exxon's claim that it is entitled to a new trial on infringement under the doctrine of equivalents, and the district court therefore ***erred in concluding that it was barred by this court's mandate*** from considering Exxon's new trial motion.

*Exxon*, 137 F.3d at 1479.

Just like Exxon, WARF "could not realistically be expected" to raise the doctrine of equivalents under a non-operative claim construction at a trial before that construction was even adopted—whether Apple's products infringe under this Court's new construction became "a ***critical issue*** in the case ***only after*** this court's decision on appeal." *Id.* As discussed above, WARF relied upon the claim construction in effect pre-trial, plain and ordinary meaning, and on Apple's failure to seek a narrower construction, when it narrowed the case for trial. But it never had an opportunity to consider, much less to present, a claim for infringement under the doctrine of equivalents based on this Court's post-trial narrowing of the construction.

Ultimately, the district court's conclusion that WARF "abandoned" its equivalent infringement claims for "reasons wholly apart" from claim construction ignores the context in which WARF's decision was made. Appx9. WARF believed under the governing claim construction in 2015 that Apple literally infringed, making its presentation of the DoE unnecessary. When it became clear WARF could resolve an evidentiary dispute by not presenting an unnecessary DoE argument at trial, it agreed to that resolution. But if that dispute had arisen in the context of the narrower construction now in place, which this Court determined forecloses literal infringement, WARF would of course have proceeded differently and presented DoE infringement at trial. This is not speculation; it is a fact necessitated by the new construction. Under the original construction, Apple literally infringed; under the new construction, Apple infringes only under the doctrine of equivalents. Given this context, the exact way in which WARF formalized its decision not to present DoE infringement at trial is irrelevant—what is clear is that WARF made that decision in reliance on the broader construction then in place.

Accordingly, the district court's distinction between this case and *Exxon* is not meaningful—in both cases, the plaintiff narrowed issues for trial in reliance on the governing claim construction, and in both cases, that claim construction changed on appeal. The issue of infringement under the doctrine of equivalents as applied to the new construction became significant for the first time only post-appeal, and therefore

the plaintiff's conduct pre-appeal, in the context of a broader construction, did not constitute abandonment of an issue that had not yet arisen. The district court here therefore erred in finding that WARF abandoned its DoE infringement claim under the new construction.

### B. The District Court's *Sua Sponte* Decision On The Merits Of WARF's Doctrine Of Equivalents Claim Was Improper

#### 1. WARF Was Deprived Of The Opportunity To Present Evidence On Its Equivalents Claim Under The New Construction

In an effort to backstop its abandonment finding, the district court improperly raised claim vitiation *sua sponte* to find that WARF's doctrine of equivalents claims would vitiate a claim limitation. WARF and Apple did not raise this issue, and at no point during the three plus years that the parties' post-remand motions were pending did the district court request any supplemental briefing on the issue. The district court *sua sponte* ruled on the merits of WARF's claim in *WARF I,* despite no party ***ever*** providing evidence that probed the merits of this claim. Appx12.

It is improper for a district court to enter judgment against a party that had no opportunity to present evidence in its defense. "As a general rule, a district court lacks the power to grant summary judgment *sua sponte* unless the party against whom summary judgment was entered had (1) proper notice that the district court was considering entering summary judgment and (2) a fair opportunity to present evidence in opposition to the court's entry of summary judgment." *Simpson v.*

*Merchants Recovery Bureau, Inc.*, 171 F.3d 546, 549 (7th Cir. 1999). *See also Sawyer v. United States*, 831 F.2d 755, 758–59 (7th Cir. 1987); *Sims-Madison v. Inland Paperboard & Packaging, Inc.*, 379 F.3d 445, 449 (7th Cir. 2004). This principle also applies to district court rulings on motions based on legal theories or facts not raised by the movants. *See, e.g.*, *Chicago Truck Drivers v. El Paso CGP Co.*, 525 F.3d 591, 603 (7th Cir. 2008). *Sua sponte* judgments are appropriate "***only when*** it is clear that neither side will be disadvantaged or unfairly surprised by the move." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Loc. Union 150,* 335 F.3d 643, 650 (7th Cir. 2003). Here, WARF was both disadvantaged and unfairly surprised, and received neither the required notice nor an opportunity to present evidence in opposition.

At no point before, during, or after trial, on appeal, or on remand, did Apple or WARF actually present evidence to the court on the merits of WARF's DoE infringement claims under this Court's new claim construction (or any other construction). The issue briefed on remand in *WARF I* was purely procedural. WARF moved for a new trial on DoE infringement, detailing the procedural opening for this new trial, but not the merits of its underlying claims. Appx100. Apple's opposition also did not address the merits of WARF's DoE claim, instead arguing that WARF had waived its claim and focusing on WARF's procedural arguments.

Nor were the merits of WARF's DoE claims addressed pre-appeal. Before the *WARF I* trial, neither WARF, nor Apple, moved for summary judgment on equivalents infringement, and neither presented ***any*** evidence about the "particular" claim limitation and how it related to infringement. WARF similarly presented no evidence on the doctrine of equivalents at trial. Post-trial, the district court denied Apple's request to enter judgment on infringement under the doctrine because it had not actually been litigated. Appx15322.

Despite neither party litigating or even briefing the merits of DoE infringement, the district court ruled *sua sponte* that the ***new*** claim construction did not allow for infringement under the doctrine of equivalents in *WARF I* based on the principle of claim vitiation. Appx10. The majority of the district court's analysis is contained in one paragraph, without any reference to the record:

> Second, even if the Federal Circuit's finding of error in this court's treatment of the term "particular" as the parties requested somehow allowed for the possibility of a do-over under *Exxon*, the Federal Circuit's own conclusion -- that the "plain meaning of 'particular' as understood by a person of ordinary skill in the art after reading the '752 patent requires" an LSD Predictor "to be associated with a single load instruction" -- precludes as a matter of law of the case ***WARF's argument now that this limitation allows for an equivalence infringement based on the prediction being associated with a group of load instructions, something it is undisputed each load tag in the accused LSD Predictor depends upon***. In this way, the situation here is the exact opposite of that in *Exxon*. In that case, the Federal Circuit reopened a claim of infringement under the doctrine of equivalence by accepting plaintiff's claim construction upon which it depended after that construction had been rejected by the district court below. In contrast, the Federal Circuit adopted in *WARF I* a claim construction that expressly

> reads out of the reach of the claims of the '752 patent any ***argument that a LSD Predictor using a group of load instructions is equivalent of one using a single load instructor***.

Appx10–11 (case citations omitted). The district court appears to base its holding on supposedly "***undisputed evidence*** that each load tag is associated with a group of load instructions in the LSD Predictor." Appx5, *see also* Appx10. But WARF has consistently disputed this finding, and the record establishes that it ***is*** in fact disputed. Appx13067 ("[T]he [prediction] table can be thought of [as] tuples of the form (StPC, LdPC) that ***uniquely identify*** a given store and load in virtual address space."); Appx11239 (Apple's expert agreeing that "the chances in which a prediction will be associated with more than one load instruction is .0 –.0.1 percent.").

The district court's limited *sua sponte* analysis is factually and legally erroneous. Factually, the district court misstated the equivalents question that WARF would ask to the jury. The district court incorrectly characterized the jury question as being whether this Court's construction "allows for an equivalence infringement based on the ***prediction*** being associated with ***a group*** of load instructions." Appx10. But the question WARF would put to the jury is whether a prediction associated with a load tag that ***in fact matches with only one*** load instruction processed by the CPU during the prediction's lifespan (which is undisputedly 99.9%

of all load tags) is the ***equivalent of*** a load tag associated with a "particular" load instruction. The technical details supporting this framing are discussed further *infra*.

The district court also misapprehended the law on claim vitiation. Claim vitiation "is not an exception or threshold determination that forecloses resort to the doctrine of equivalents, but is instead a ***legal conclusion of a lack of equivalence based on the evidence presented*** and the theory of equivalence asserted." *Bio-Rad Lab'ys*, 967 F.3d at 1366–67 (quoting *UCB, Inc. v. Watson Lab'ys, Inc.*, 927 F.3d 1272, 1283 (Fed. Cir. 2019)). As this Court has explained:

> A holding that the doctrine of equivalents cannot be applied to an accused device because it "vitiates" a claim limitation is nothing more than a conclusion that the evidence is such that no reasonable jury could conclude that an element of an accused device is equivalent to an element called for in the claim, or that the theory of equivalence to support the conclusion of infringement otherwise lacks legal sufficiency.

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1018–19 (Fed. Cir. 2006). Here, the district court could not possibly have reached the legal conclusion of a lack of equivalents based on the evidence presented because the district court decided this issue without affording WARF the opportunity to present ***any*** evidence on its DoE theory.

Without the benefit of briefing by the parties, the district court mistakenly mischaracterized the record, and then relied on this mischaracterization to find WARF's argument precluded and to conclude that WARF's equivalents claim was meritless under this Court's new construction, all without any opportunity for

WARF to present evidence to the contrary. This is clearly procedurally improper and prejudicial. *See Pactiv Corp. v. Rupert*, 724 F.3d 999, 1001 (7th Cir. 2013) (vacating and remanding a *sua sponte* judgment so the district court could have "the benefit of briefs from either side" rather than deciding suits "on the basis of considerations the litigants were not contesting"); *R.J. Corman*, 335 F.3d at 649 (reversing because the record did not support the judge's *sua sponte* finding of an "undisputed fact"). Depriving WARF of the opportunity to present evidence on the doctrine of equivalents and claim vitiation resulted in substantial prejudice to WARF and the exact type of surprise the Seventh Circuit disfavors in *sua sponte* rulings. *See, e.g.*, *Peckmann v. Thompson*, 966 F.2d 295, 298 (7th Cir. 1992) ("Entry of summary judgment is improper when it comes as a surprise to the adverse party."); *R.J. Corman*, 335 F.3d at 650. This decision therefore cannot stand.

#### 2. Given The Opportunity, WARF Would Have Presented Evidence That Demonstrates Its Equivalents Claim Is Viable Under The New Claim Construction

Beyond this procedural defect is a more troubling substantive one: had the issue of claim vitiation been raised properly, WARF would have presented evidence demonstrating that its doctrine of equivalents claim is viable under this Court's new claim construction.

There is substantial evidence demonstrating that the accused A7 and A8 processors infringe claims 1-3, 5-6, and 9 of the '752 patent under the doctrine of

equivalents. The ’752 patent claims a “Predictor” circuit that enables out of order operation. Appx116-133. Modern processors have multiple instruction pipelines that allow them to operate on multiple computer instructions simultaneously. Appx126; Appx15153–15155. This speeds up the overall processor so long as it does not create any errors based on a “mis-speculation,” which can be costly and require a whole series of instructions to be performed again after the error is corrected. Appx10268–10269; Appx13075–13076. The WARF inventors created a technique that allows processors to benefit from out-of-order execution by allowing most instructions to jump ahead, but flagging certain instructions that are more likely to create an error, and forcing those few instructions to stay in order. Appx127 (3:39-48), Appx11926–11927 (citing Appx13078–13080). The instructions that are most likely to create errors, according to the invention, are load instructions that previously went out of order and created an error by mis-speculating. Appx10265–10269. The next time the processor sees that same load instruction, it forces that one instruction to stay in order while others continue to go out of order, thereby maximizing speed and minimizing errors. Appx10425. It does this by “detecting a mis-speculation” by “a [load] instruction,” then creating “a prediction associated with the particular [load] instruction.” Appx126–133. That prediction is not static—it is updated each time the load instruction operates. Appx126–133 (4:66-5:4, 14:6-14). If the load once again needed to go in order, the prediction value stays high and continues to require in-

order operation for that specific load, but if the load could have gone out of order, then the prediction is decremented and eventually the load is allowed to go out of order again, once the risk has been established to be comparatively small. Appx126–133 (14:9-11); Appx10425; Appx10474–10475. In this way, the invention captures all of the benefits of out of order operation while dynamically minimizing the penalties associated with mis-speculation.

At trial, WARF showed that Apple's processors use precisely this same system to track load instructions and associate them with predictions in a prediction table. Appx10523–10530. But because the load instructions have long names, Apple's prediction table stores shortened versions of those names, called "load tags." *See* Appx11053–11055; Appx13084. On appeal, Apple successfully argued that, under its narrower claim construction requiring the "particular" instruction to be one and only one instruction, that load tags' (and therefore predictions') theoretical association with multiple load instructions defeats literal infringement. *WARF*, 905 F.3d at 1346-49. But substantial evidence establishes that in practice, Apple's prediction table using load tags operates in exactly the same way as a table that associates predictions with the load's longer names, because in practice, 99.9% of load tags and corresponding predictions are associated only with a single load instruction. Appx10500–10502; Appx11238–11240 (Apple's witnesses admitting predictions are associated with one and only load instruction "99.9 percent of the

time”); Appx11516–11517 (WARF’s expert calculating unique correspondence 99.98 percent of the time); Appx10620; Appx11243.

This 99.9% unique correlation in practice is a natural (and intended) consequence of the way computers actually work. Although a given computer program might include billions of instructions, including millions of load instructions, and some of those load instructions might generate the same load tag, in practice, the processor is not operating on billions of instructions at once. Instead, it has a small “instruction window” of only a few hundred instructions. Across this instruction window, it is extremely uncommon for two or more load instructions to appear and generate the same load tag—in fact, Apple engineers optimized the infringing predictor circuit to ensure this happens for only about 0.1% of all load tags that appear in the accused LSD Predictor table. Appx11243 (Apple’s expert testifying that Apple’s “engineers” optimized performance “by minimizing the frequency of aliasing,” where “aliasing” refers to two load instructions updating the same prediction); Appx11238 (“Aliasing is very low.”). Just as the instruction window is small, so is the prediction table itself. It has room for at most 192 entries, so as new load instructions enter the instruction window and mis-speculate, entries for those new instructions are added to the table. Appx13067; Appx13072. To make room for these new predictions, older predictions associated with older load instructions are replaced. *Id.* (describing the “replacement policy” and “‘age-out’

scheme"). Each prediction typically has a very short lifespan in the prediction table, which corresponds to a period during which the processor sees only a small number of other load instructions. *Id.* Given this small window and limited table size, the likelihood of two load instructions with the same load tag appearing simultaneously and both updating the same prediction is very small. Appx10500–10502; Appx10620; Appx11238; Appx11239–11240; Appx11516–11517. Indeed, in practice, a prediction and its load tag are actually associated with two load instructions only 0.1% of the time. Appx11239–11240 ("[T]he chances in which a prediction will be associated with more than one load instruction is .0 -- .0.1 percent? A. Correct"); Appx11243.

This is very similar to our society's use of first and last names without further identifying information in most settings. Take, for example, a classroom. Although across the United States' hundreds of millions of people, or the entire world's nearly 8 billion people, there may be multiple people associated with the name John Smith, in any given classroom, there is likely to be only one "John Smith." Perhaps there will be two John Smiths in 0.1% of classrooms in the United States, but in most cases, using only the shortened title "John Smith" would uniquely identify the one and only one John Smith present in that particular classroom (even if his longer name is John James Smith from Middletown, Ohio). The same is true of load tags—although theoretically across an entire program there might be multiple load

instructions that would generate the same load tag, in practice, across the processor's small instruction window and during the prediction's short lifespan, 99.9% of load tags are only ever associated with a single—one and only one—load instruction. In 99.9% of cases, the difference between using long names and shortened load tags is not just insubstantial; it is zero.

Under the plain and ordinary meaning of "particular," which the district court concluded required a prediction "associated with a single load instruction, albeit one that is 'dynamic'" (Appx15298), this 99.9% unique identification of load instructions in practice literally infringed. Appx15332–15334 (denying JMOL of non-infringement because "a reasonable jury could conclude that a prediction was associated with a particular load instruction even if that same prediction may be associated with other load instructions"). On appeal, this Court's new construction effectively held that the "particular" limitation requires 100% uniqueness by concluding that the mere possibility of a load tag being associated with multiple load instructions defeats literal infringement. *WARF*, 905 F.3d at 1348. But that new construction is perfectly consistent with infringement under the doctrine of equivalents, because Apple designed its LSD Predictor to be insubstantially different from a predictor with 100% unique association by achieving 99.9% uniqueness across computer programs. Indeed, Apple has all but admitted that any difference between its products and a system requiring "unique" associations between

predictions and load instructions is insubstantial. *See, e.g.*, Appx13067 ("[T]he [prediction] table can be thought of [as] tuples of the form (StPC, LdPC) that ***uniquely identify*** a given store and load in virtual address space."); Appx11239–11240 (Apple's expert agreeing that "the chances in which a prediction will be associated with more than one load instruction is .0 –.0.1 percent."). Apple's design is therefore clearly equivalent to, and was designed to be equivalent to, a design that uses the loads' longer names rather than load tags, for at least the 99.9% of the time when it operates identically to such a system.

Accordingly, this Court's new construction did not foreclose WARF's claim for infringement under the doctrine of equivalents. Nor would such a claim vitiate the "particular" claim limitation—to the contrary, it gives it full meaning by achieving perfect correlation 99.9% of the time, by performing the same function, in the same way, to achieve an identical result as a literally infringing system using loads' longer names.

Parties who can demonstrate that they would have presented evidence to support their position should be given the opportunity to do so. *See R.J. Corman*, 335 F.3d at 649–50 (reversing district court's *sua sponte* motion because the district court's judgment was not supported by the record and the losing party would have introduced evidence); *Aviles v. Cornell Forge Co.*, 183 F.3d 598, 606 (7th Cir. 1999)

(reversing *sua sponte* judgment because plaintiff "presented enough evidence" to establish a viable claim).

Here, if the district court had considered the correct question and reviewed briefing on the relevant evidence, it would have reached the opposite outcome. In light of these procedural and substantive errors, the district court's ruling on claim vitiation in *WARF I* should be vacated.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's judgments in *WARF I* and *WARF II* and remand for further proceedings on WARF's infringement claims under the DoE in both cases.

Dated: September 7, 2022

*/s/ Amy E. Proctor*
Amy E. Proctor
Irell & Manella LLP
1800 Avenue of the Stars, Ste 900
Los Angeles, CA 90067
(310) 277-1010
aproctor@irell.com

# ADDENDUM

## TABLE OF CONTENTS

**Documents Required by Fed. Cir. R. 28(a)(11)**


| Description | Page |
|---|---|
| Opinion and Order, Dkt. No. 805 (May 10, 2022) | Appx1–13 |
| Third Amended Judgment in a Civil Case, Dkt. No. 806 (May 10, 2022) | Appx14–15 |
| U.S. Patent No. 5,781,752 (PX0001) | Appx116–133 |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

WISCONSIN ALUMNI RESEARCH FOUNDATION,

Plaintiff,

v.

APPLE, INC.,

Defendant.

OPINION AND ORDER

14-cv-062-wmc
15-cv-621-wmc

---

In Case No. 14-cv-062 (the "'062 case" or "*WARF I*"), the Wisconsin Alumni Research Foundation ("WARF") asserted patent infringement claims against an "LSD Predictor" used in computer chips contained in various models of Apple, Inc.'s iPhones and iPads. While the jury found in favor of WARF on its infringement claim, and this court denied Apple's post-judgment motions, the Federal Circuit reversed the jury's finding of infringement on appeal. On remand from the appeal, plaintiff WARF now seeks to pursue the *same* infringement claim, except this time under the doctrine of equivalents. In a second follow-on lawsuit, Case No. 15-cv-621 (the "'621 case" or "*WARF II*"), which was filed on the eve of the first trial, WARF seeks to challenge Apple products containing later chips, with the same alleged, LSD Predictor infringing technology at issue in *WARF I*. The court stayed *WARF II* pending resolution of *WARF I* on appeal from the original, final judgment. Following remand, WARF also seeks to pursue a doctrine of equivalents claim against the later products accused in *WARF II*. For the reasons that follow, in this consolidated opinion, the court denies plaintiff's requests and will direct entry of final judgment in both cases.

BACKGROUND

## A. Doctrine of Equivalents Infringement Claims

On January 31, 2014, WARF filed the '062 lawsuit against Apple, alleging infringement of U.S. Patent No. 5,781,752 ("the '752 patent"). In its original infringement contentions, WARF disclosed that "[t]o the extent Apple will contend that an element is not met literally, WARF will contend that each element of each identified claim is met under the doctrine of equivalents." (Dkt. #49-4 at 2.)[1] WARF disclosed a similar theory of infringement under the doctrine of equivalents in its expert reports in *WARF I*. (Conte Rept. (dkt. #105) 508.)

With jury trial approaching in the '062 suit, WARF moved *in limine* to bar any evidence, testimony or argument concerning Apple's own patent application on an LSD Predictor, which had just been allowed by the USPTO. (Pl.'s MIL No. 2 (dkt. #290).) Apple opposed that motion, in part arguing that because the accused technology used an LSD Predictor that had been found separately patentable over the '752 patent by the USPTO (a representation WARF disputed), that fact was relevant to its defense against WARF's alternative theory of infringement based on the doctrine of equivalents. (Def.'s Opp'n (dkt. #398) 2-3, 6-8.) The court initially reserved on this motion and directed supplemental briefing. In response, WARF indicated that in exchange for excluding evidence of Apple's patent, it would "drop doctrine of equivalents and make no doctrine of equivalents argument whatsoever at trial," assuming the court were to "conclude that Apple has laid a proper foundation for the question of the impact of the allowance of the

[1] Unless otherwise noted, the citations to the docket are to Case No. 14-cv-062.

'647 application on the doctrine of equivalents to be presented to the jury." (Pl.'s Suppl. Br. (dkt. #512-1) 1.) In response, Apple then agreed not to offer evidence of approval of its own patent during the liability phase "if the doctrine of equivalents is not in issue." (Def.'s Suppl. Br. (dkt. #513-1) 2.)

Although this court subsequently denied WARF's motion *in limine*, ruling that Apple's patent was admissible during the liability phase of trial (10/4/15 Order (dkt. #517) 1-2), it also recognized in the same ruling that the parties had reached an apparent compromise on the issue, and ordered that "[b]y agreement of the parties . . . neither side may introduce evidence or argument regarding the '647 application, prosecution or issuance during the liability phase of trial." (*Id.* at 6.) Moreover, in an October 5, 2015, email responding to Apple's follow-up request for confirmation that "WARF will not raise the doctrine of equivalents at trial," WARF memorialized the parties' agreement: "WARF will not raise or mention doctrine of equivalents, and Apple will not raise or mention the '647 application of the '725 patent in the liability phase." (Def.'s Mot. for Judgment as a Matter of Law, Ex. 1 (dkt. #555-1) 1.) Further, in its opinion, the Federal Circuit recognized that "WARF abandoned its theory of infringement under the doctrine of equivalents before trial, and has proceeded only on a theory of literal infringement." *Wis. Alumni Research Foundation v. Apple, Inc.*, 905 F.3d 1341, 1347 n.5 (Fed. Cir. 2018).

**B. "Particular" Limitation**

While not a central part of Apple's defense in *WARF I*, or at least not one raised in the parties' summary judgment briefs, Apple also asserted that the LSD Predictor in the accused products used a "hashed" Load Tag, and therefore, associated predictions from

groups of load instructions, rather than a "particular" load instruction, as the '752 patent requires. Specifically, Apple's expert on non-infringement explained in his March 12, 2015, *WARF I* report that:

> Accordingly, because each counter value in the LSD Predictor corresponds to a group of load instructions (all load instructions that have the same Load Tag as a given entry) rather than a "particular" load instruction, it is my opinion that the LSD Predictor in the Apple Accused Chips does not include "a prediction associated with the particular data consuming [load] instruction" as required in the '752 patent."

(August Rept. (dkt. #103) ¶ 252; *see also id.* ¶¶ 241-61.) However, neither party sought construction of the term "particular," at least not as part of a formal motion for claims construction to be submitted at the same time with dispositive motions.

Instead, this issue came to a head at trial, with WARF seeking to exclude Apple asserting non-infringement based on a construction of "particular" inconsistent with its "plain and ordinary" meaning. (Pl.'s Mot. to Exclude (dkt. #550) 2.) However, because Apple's non-infringement argument (and, specifically, the opinion of its expert) was consistent with the plain meaning of "particular" as contemplating association with a single load instruction, the court denied WARF's last minute request to exclude this argument. (10/8/15 Order (dkt. #559) 3-4.) In turn, Apple then pressed the court to instruct the jury on the meaning of "particular" in light of WARF's trial testimony, which Apple contended was itself contrary to the plain and ordinary meaning of "particular." (Trial Tr. (dkt. #665) 158, 169.) Because Apple, too, "had failed to seek claims construction of the term, and, therefore, had waived any request to now insert a construction of the term in the closing jury instructions," the court denied that request as well. (10/9/15 Text Order (dkt. #575).)

Rather, the court instructed the jury to apply the plain and ordinary meaning for claim terms, including "particular." (Closing Instr. (dkt. #646) 5.)

After the jury found in favor of WARF, Apple then filed post-trial motions, in part seeking judgment as a matter of law because no reasonable jury could find literal infringement under the plain meaning of "particular." (Def.'s Rule 50(a) Mot. (dkt. #555) 5-7; Def.'s Rule 50(b) Mot. (dkt. #678) 9-13.) Although this court denied that motion, the Federal Circuit reversed on appeal, concluding that "the plain meaning of 'particular,' as understood by a person of ordinary skill in the art after reading the '752 patent, require[d] the prediction to be associated with a single load instruction." *Wis. Alumni Research Foundation v. Apple, Inc.*,905 F.3d 1341, 1348 (Fed. Cir. 2018). As such, the court of appeals reasoned that "[a] prediction that is associated with more than one load instruction does not meet this limitation," and no reasonable jury could find this limitation met in light of undisputed evidence that each load tag is associated with a *group* of load instructions in the LSD Predictor in the accused products, rather than a particular or single one as called for in the '752 patent. *Id.* Accordingly, the Federal Circuit reversed the infringement judgment without remand for further proceedings regarding infringement. *Id.* at 1343, 1353. Indeed, in its petition for panel rehearing and rehearing *en banc*, WARF specifically requested without success that the Federal Circuit remand for, among other things, further proceedings on WARF's theory of infringement under the doctrine of equivalents. (Danford Decl., Ex. 2 (dkt. #795-2) 2, 7, 19.) The Federal Circuit denied that petition outright. (Dkt. #787.) The mandate followed. (Dkt. #788.)

**C. Second Lawsuit**

On September 25, 2015, approximately ten days before the start of trial in *WARF I*, WARF filed a second lawsuit claiming that Apple's iPhone and iPads containing the new A9 and A9X chips also infringed the '752 patent ('621 dkt. #1), and it later amended that complaint to add infringement claims against Apple products containing the A10 chip ('621 dkt. #39). There is no dispute that the LSD Predictor technology at issue in this second lawsuit, *WARF II*, is the same as that at issue in *WARF I*, at least as material to plaintiff's renewed infringement claims under the '752 patent. (Kanapathipillai Decl. (dkt. #796) ¶¶ 4-12; Pl.'s Infringement Contentions (dkt. #49-5) (expressly including the A9 and A10 processors in its list of accused processors in *WARF I*); Pl.'s Mot. to Compel (dkt. #59) 14 (asserting that the A9, A9X and A10 chips also infringed the '752 patent because they "operate in a manner reasonably similar" to the A7 chip at issue in *WARF I*); *see also* Def.'s Opp'n (dkt. #794) 21 (detailing WARF's statements made in post-trial briefing seeking equitable relief against the A9 chips, because it has the "same infringing design" as the A7 and A8 chips).) In other words, all of the chips at issue in these two cases contain the same accused feature -- the LSD Predictor using hashed load tags.

Further, in post-trial proceedings in *WARF I*, Apple proposed to incorporate the A9, A9X and A10 chips into that case to eliminate the need to press forward separately in *WARF II*. At that time, the court also indicated that it was inclined to include the sales of products including these newer chips in calculating a supplemental damages award and in setting the ongoing royalty rate; thus, it ordered supplemental briefing on this issue and the production of relevant sales information. (6/6/17 Op. & Order (dkt. #757) 34-36.)

Finally, in response, WARF itself proposed that "the most efficient path forward" would be to keep *WARF II* separate and postpone an accounting until after the appeal of *WARF I* was decided by the Federal Circuit, representing that "should Apple prevail on appeal, there may be no need for such calculations." (Pl.'s Resp. (dkt. #761) 2; *id.* at 10-11.)

Accordingly, while Apple continued to seek incorporating sales of the A9, A9X and A10 chips into the judgment in *WARF I* (Def.'s Resp. (dkt. #765) 1), the court opted to defer any accounting until after the *WARF I* appeal (7/10/17 Order (dkt. #767).) Similarly, the court stayed all proceedings in *WARF II* pending the outcome of the *WARF I* appeal, noting that "a final judgment in *WARF I* will likely have a preclusive effect" in *WARF II*. (2/5/16 Order ('621 dkt. #36) (original order staying case); 7/10/17 Text Order ('621 dkt. #56) (continuing stay pending resolution of *WARF I* appeal).) Consistent with their positions outlined above, neither side objected to this approach.

OPINION

## I. Request to Reopen Doctrine of Equivalents Infringement Claim in *WARF I*

In support of plaintiff's argument that the court should reopen its claim of infringement under the doctrine of equivalents in *WARF I*, plaintiff largely ignores the procedural history outlined above and instead, principally relies on the Federal Circuit's decision in *Exxon Chemical Patents, Inc. v. Lubrizol Corporation*, 137 F.3d 1475 (Fed. Cir. 1998. In *Exxon*, the court of appeals reversed a district court's denial of the plaintiff's motion for a new trial on infringement under the doctrine of equivalents in light of the Federal Circuit's new claims construction on appeal from the jury's finding on the literal

infringement claim. *Id.* at 1478-79. In particular, in reversing the district court, the Federal Circuit explained in *Exxon* that "an appellate mandate governs only that which was actually decided, [so] the district court was therefore free to consider Exxon's motion for a new trial," and because the Federal Circuit's earlier "opinion referred only to the issue of literal infringement," the court of appeal's mandate left the district court the "authority to consider Exxon's motion for a new trial" under the doctrine of equivalents. *Id.* at 1478-79.

Given that the Federal Circuit arguably only addressed literal infringement in its *WARF I* opinion as well, the court agrees that *Exxon* allows an opening for a claim of infringement under the doctrine of equivalents' upon remand from an appeal reversing a finding of literal infringement. However, *Exxon* did *not* dictate the result, *id.* at 1484, and plaintiff's attempts to argue that its situation is on all fours with the procedural posture of *Exxon* falls flat. *First,* the plaintiff in *Exxon* abandoned its doctrine of equivalents theory of infringement after the district court adopted a claim construction that effectively mooted any further claim of infringement under the doctrine of equivalents. *Id.* at 1479 (explaining that the doctrine of equivalents infringement claim "became moot" by virtue of the district court's decision). As a result, the Federal Circuit explained that "[t]he question whether there could be doctrine-of-equivalents infringement under the claim construction adopted by this court became a critical issue in the case *only after* this court's decision on appeal." *Id.* at 1497 (emphasis added). Here, however, plaintiff abandoned its doctrine of equivalents theory in response to Apple's agreement not to introduce its newly-acquired patent on a LSD Predictor despite the patent-in-suit to demonstrate that the accused

technology was separately patentable and, therefore, *not* equivalent. In other words, unlike the plaintiff in *Exxon*, WARF made the decision to abandon its doctrine of equivalents infringement claim neither because the district court adopted an unfavorable claims construction to its doctrine of equivalence contention nor favorable to its claim of literal infringement.

Perhaps if a dispute had arisen over the meaning of "particular" at claims construction or at some other point before plaintiff abandoned its doctrine of equivalents claim for reasons wholly apart from that construction, plaintiff may have an argument, but this is the very nature of complex litigation, where moving parts require parties to make decisions based on what was known at that time. Where, as was the case in *Exxon*, a party makes a decision clearly traceable to a district court decision that is reversed on appeal, then the wronged party has a strong case for the district court to exercise its discretion to revisit the issue on remand. Here, however, WARF's decision to abandon its doctrine of equivalents claim cannot be traced to any decision by this court found to be in error on appeal. On the contrary, as outlined above, this court adopted a plain meaning of the word "particular" advocated by plaintiff *and* did not preclude plaintiff from pursuing a doctrine of equivalence claim. As the court previously explained, *both* parties were at fault for not bringing the "particular" construction to a head earlier in the litigation. (10/8/15 Order (dkt. #559) 1-2.) Regardless, as already quoted above, the Federal Circuit concluded that *WARF* abandoned its theory of infringement under the doctrine of equivalents infringement before trial, and has proceeded only on a theory of literal infringement, which is now the law of the case.

Second, even if the Federal Circuit's finding of error in this court's treatment of the term "particular" as the parties requested somehow allowed for the possibility of a do-over under *Exxon*, the Federal Circuit's own conclusion -- that the "plain meaning of 'particular' as understood by a person of ordinary skill in the art after reading the '752 patent requires" an LSD Predictor "to be associated with a single load instruction" -- precludes as a matter of law of the case WARF's argument now that this limitation allows for an equivalence infringement based on the prediction being associated with a group of load instructions, something it is undisputed each load tag in the accused LSD Predictor depends upon. *See Olaf Soot Design, LLC v. Daktronics, Inc.*, 839 F. App'x 505, 511 (Fed. Cir. 2021) (where relevant claim language properly construed requires a limitation not present in the accused product "a finding of infringement under the doctrine of equivalence would impermissibly eliminate the requirement"); *see also Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ("[T]he application of the doctrine [of equivalents], even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety."); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1344–45 (Fed. Cir. 2016) (rejecting a theory of infringement under the doctrine of equivalents that would vitiate a claim limitation by rendering it meaningless). In this way, the situation here is the exact opposite of that in *Exxon*. In that case, the Federal Circuit reopened a claim of infringement under the doctrine of equivalence by accepting plaintiff's claim construction upon which it depended after that construction had been rejected by the district court below. In contrast, the Federal Circuit adopted in *WARF I* a claim construction that expressly reads out of the reach of the claims of the '752 patent any

argument that a LSD Predictor using a group of load instructions is equivalent of one using a single load instructor.

Accordingly, the Federal Circuit's *WARF I* leaves no room for WARF to revisit the doctrine of equivalence claim it voluntarily abandoned.

## II. Preclusion of Doctrine of Equivalence Claim in *WARF II*

Plaintiff also seeks to pursue a doctrine of equivalents theory of infringement in *WARF II* against Apple's products now using the A9, A9X and A10 chips. In response, defendant contends that the Federal Circuit's decision in *WARF I* also precludes a finding that LSD Predictor -- which is the same feature in all of the accused chips -- infringes the '752 patent under that doctrine. In support, defendant directs the court to *Nystrom v. Trex Co.*, 580 F.3d 1281 (Fed. Cir. 2009), in which the Federal Circuit -- after having already affirmed a non-infringement judgment and the district court's finding of waiver of the doctrine of equivalents claim -- determined that the assertion of patent infringement in a new lawsuit against second-generation products released during the pendency of the first suite was barred by preclusion principals. *Id.* at 1286. Specifically, the Federal Circuit held that since the court "ha[d] already determined in the earlier case that Trex I Boards [the first generation product] do not infringe the patent," that judgment would preclude Nystrom from proceeding against the second generation products under a theory of "both literal infringement, and as a result of Nystrom's waiver, infringement by equivalents." *Id.* at 1285. Of course, the Federal Circuit's holding in *Nystrom* rested on the fact that the products accused in the second case "remain[ed] unchanged with respect to the corresponding claim limitations at issue in the first suit," meaning that the plaintiff had

"no remaining avenue to pursue his claims now." *Id.*

Here, too, the Federal Circuit's holding in *WARF I* applies with equal force to the accused products (namely iPhones and iPads with chips still using the same LSD Predictor found not to have infringed the '752 patent in *WARF I*). Similarly, plaintiff WARF not only waived any doctrine of equivalents claim in *WARF I*, but the Federal Circuit's opinion precludes any arguable claim to equivalence, both as explained already. Therefore, WARF is barred from pursuing such a claim not only in *WARF I* but in this new case, procedurally and on the merits. Finally, as detailed above, WARF concedes -- or, at minimum, it is now estopped from disputing -- the LSD Predictor in the A9, A9X and A10 chips that are the subject of *WARF II* are the same as the chips at issue in *WARF I,* at least for purposes of plaintiff's infringement claims under the '752 patent.

Plaintiff's response to this seemingly obvious conclusion is scattershot at best, positing a number of technical arguments, including that there can be no claim preclusion because a judgment reflecting the Federal Circuit's decision has yet to be entered, claim preclusion cannot apply because at least some of the products at issue in *WARF II* were not on the market at the time WARF filed its first lawsuit, or claim preclusion cannot apply because the doctrine of equivalents theory was not actually decided in *WARF I*. (Pl.'s Reply (dkt. #798) 56-75.) The court's entry of an amended judgment in *WARF I* consistent with this opinion and order addresses the first argument. Moreover, whether viewed as claim or issue preclusion, the procedural posture of this case is the same as that presented in the *Nystrom* case, and the Federal Circuit had *no* trouble concluding, as the court does here, that the plaintiff in that case was barred from revisiting a doctrine of

equivalents theory of infringement based on waiver of that doctrine in past litigation over materially similar, earlier generation of the same products despite later generations being produced during and after the course of the first litigation. Finally, as already explained above, WARF no longer has any viable doctrine of equivalence infringement claim on the merits in light of the Federal Circuit's limitation resulting from the '752 patent's use of "particular" within the plain meaning to one of ordinary skill in the art as explained in *WARF I*.

ORDER

IT IS ORDERED that:

1) Plaintiff's request to reopen Case No. 14-cv-062 and allow it to pursue a doctrine of equivalents infringement theory is DENIED.

2) The clerk's office is directed to enter an amended final judgment in favor of defendant Apple, Inc., reflecting the Federal Circuit's decision of non-infringement of the '752 patent.

3) The clerk's office is also directed to enter final judgment in favor of defendant Apple, Inc., on the claims asserted in Case No. 15-cv-621, finding them barred by the judgment in Case No. 14-cv-062.

4) Plaintiff's motions for a status conference ('062 dkt. #803; '621 dkt. #82) are DENIED AS MOOT.

Entered this 10th day of May, 2022.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

WISCONSIN ALUMNI RESEARCH
ROUNDATION,

Plaintiff,

Case No. 14-cv-62-wmc

v.

APPLE INC.,

Defendant.

---

THIRD AMENDED JUDGMENT IN A CIVIL CASE

---

IT IS ORDERED AND ADJUDGED that judgment is entered is entered in favor of defendant Apple, Inc., against Wisconsin Alumni Research Foundation finding non-infringement of claims 1, 2, 3, 5, 6 and 9 of U.S. Patent No. 5,781,752 (the "'752 patent").

IT IS FURTHER ORDERED AND ADJUDGED that judgment is entered in favor of plaintiff Wisconsin Alumni Research Foundation against defendant Apple, Inc., on defendant's claims of invalidity of claims 1, 2, 3, 5, 6 and 9 of the '752 patent.

IT IS FURTHER ORDERED AND ADJUDGED that judgment is entered in favor of defendant Apple, Inc., against plaintiff Wisconsin Alumni Research Foundation on plaintiff's willful infringement claim.

Approved as to form this 10th day of May, 2022.

William M. Conley
District Judge

Joel Turner, Clerk of Court

May 10, 2022
Date

3:14-cv-00062-wmc

**PX0001**

# The United States of America

## The Commissioner of Patents and Trademarks

*Has received an application for a patent for a new and useful invention. The title and description of the invention are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the invention shall be granted under the law.*

*Therefore, this*

## United States Patent

*Grants to the person(s) having title to this patent the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States of America or importing the invention into the United States of America for the term set forth below, subject to the payment of maintenance fees as provided by law.*

*If this application was filed prior to June 8, 1995, the term of this patent is the longer of seventeen years from the date of grant of this patent or twenty years from the earliest effective U.S. filing date of the application, subject to any statutory extension.*

*If this application was filed on or after June 8, 1995, the term of this patent is twenty years from the U.S. filing date, subject to any statutory extension. If the application contains a specific reference to an earlier filed application or applications under 35 U.S.C. 120, 121 or 365(c), the term of the patent is twenty years from the date on which the earliest application was filed, subject to any statutory extension.*

*Commissioner of Patents and Trademarks*

*Attest*

## NOTICE

*If the application for this patent was filed on or after December 12, 1980, maintenance fees are due three years and six months, seven years and six months, and eleven years and six months after the date of this grant, or within a grace period of six months thereafter upon payment of a surcharge as provided by law. The amount, number and timing of the maintenance fees required may be changed by law or regulation. Unless payment of the applicable maintenance fee is received in the Patent and Trademark Office on or before the date the fee is due or within a grace period of six months thereafter, the patent will expire as of the end of such grace period.*

US005781752A

# United States Patent [19]

Moshovos et al.

[11] Patent Number: 5,781,752

[45] Date of Patent: Jul. 14, 1998

[54] TABLE BASED DATA SPECULATION CIRCUIT FOR PARALLEL PROCESSING COMPUTER

[75] Inventors: Andreas I. Moshovos; Scott E. Breach; Terani N. Vijaykumar; Gurindar S. Sohi, all of Madison, Wis.

[73] Assignee: Wisconsin Alumni Research Foundation, Madison, Wis.

[21] Appl. No.: 773,992

[22] Filed: Dec. 26, 1996

[51] Int. Cl.[6] .......... G06F 9/38

[52] U.S. Cl. .......... 395/392

[58] Field of Search .......... 395/392

[56] References Cited

U.S. PATENT DOCUMENTS

5,664,138 9/1997 Yoshida .......... 395/395

5,666,506 9/1997 Hesson et al. .......... 395/392

OTHER PUBLICATIONS

Gurinda Sohi et al., Instruction Issue Logic for High-Performance Interruptable Pipelined Processors; ACM 1987, pp. 27–34.

*Primary Examiner*—Krisna Lim

*Attorney, Agent, or Firm*—Quarles & Brady

[57] ABSTRACT

A predictor circuit permits advanced execution of instructions depending for their data on previous instructions by predicting such dependencies based on previous mis-speculations detected at the final stages of processing. Synchronization of dependent instructions is provided by a table creating entries for each instance of potential dependency. Table entries are created and deleted dynamically to limit total memory requirements.

9 Claims, 7 Drawing Sheets





10
14
12
20
ALLOCATION
16
XX1
XX2
XX3
XX4
XX5
XX6
19
22
33
35
PREDICTOR
30
DATA SPECULATION
28
RETIREMENT
26
12
24
PROCESSING UNIT
24
PROCESSING UNIT
24
PROCESSING UNIT
12


FIG. 1



18
FOR i=0,i<N, i++
A[i+1]=A[i]*19
XX8 LD A[i]
XX9 MUL 19
XX10 ST A[i+1]
12
32
34
XX8.1 LD A[1]
XX9.1 MUL 19
XX10.1 ST A[2]
36
XX8.2 LD A[2]
XX9.2 MUL 19
XX10.2 ST A[3]
38
XX8.3 LD A[3]
XX9.3 MUL 19
XX10.3 ST A[4]


FIG. 2



40
INSTRUCTION FROM RETIREMENT CIRCUIT
242
IS THIS A SQUASH REQUEST ?
YES
NO
48
IS THIS A STORE OR A LOAD ?
LOAD
STORE
50
ISSUE STORE REQUEST
52
MIS-SPECULATION ?
NO
YES
57
HANDLE MIS-SPECULATION
64
HANDLE STORE
60
IS THERE A SUBSEQUENT LOAD THAT HAS NOT BEEN SQUASHED ?
NO
YES
62
SQUASH LOAD
66
WILL THIS BE A DATA SPECULATIVE LOAD ?
NO
YES
70
HANDLE READY TO LOAD
72
WAIT=1 ?
NO
YES
80
WAIT UNTIL ANY OF THE FOLLOWING EVENTS OCCURS:
1 WAKE UP
2 CONSUMER NO LONGER DATA SPECULATIVE
3 SQUASHED
82
SQUASHED ?
YES
NO
74
ISSUE LOAD REQUEST
76
WAIT UNTIL ANY OF THE FOLLOWING EVENTS OCCURS:
1 SQUASHED
2 LOAD NO LONGER DATA SPECULATIVE
84
WAKE UP ?
YES
NO
68
HANDLE LOAD
86
ISSUE LOAD REQUEST
78
SQUASHED ?
YES
NO
46
HANDLE SQUASH
DONE


FIG. 3


HANDLE READY TO LOAD
70
IS LOAD IN THE PRED. TABLE ?
100
NO
YES
IS SYNCHRONIZATION REQUIRED ?
104
NO
YES
SYNC. TABLE ENTRY EXISTS FOR THE PARTICULAR LOAD /STORE PAIR AND W /THE GIVEN DATA ADDRESS ?
106
NO
YES
SELECT A SYNC. TABLE ENTRY
108
—FILL IN STORE & LOAD INSTRUCTION ADDRESSES
—FILL IN THE DATA ADDRESS ACCESSED BY THE CONSUMER
—FILL IN LOAD ID
—SET SYNC. FLAG TO Ø
110
IS THE SYNC. FLAG SET TO 1 ?
118
NO
YES
UPDATE THE PREDICTION TOWARDS "DO NOT SYNCHRONIZE"
120
WAIT=1
116
FREE SYNC. TABLE ENTRY
122
WAIT=0
102
DONE

FIG. 4




FIG. 5




FIG. 6




FIG. 8


64
HANDLE STORE
201
IS STORE IN THE PREDICTION TABLE ?
NO
YES
202
IS SYNCHRONIZATION REQUIRED ?
NO
YES
204
SYNC. TABLE ENTRY EXISTS FOR THE LOAD /STORE PAIR AND W /THE SAME DATA ADDR. ?
NO
YES
206
SELECT A SYNC. TABLE ENTRY
212
IS THE SYNC. FLAG OF THE ENTRY 1 ?
YES
NO
208
- FILL IN STORE & LOAD INSTRUCTION ADDRESSES
- FILL IN THE DATA ADDRESS ACCESSED BY THE STORE
- SET THE SYNC. FLAG TO 1
- FILL IN STORE ID
214
UPDATE PREDICTION TOWARDS "SYNCHRONIZE"
216
WAKE UP LOAD
218
FREE SYNC. TABLE ENTRY
DONE

FIG. 7



HANDLE MIS-SPECULATION
56
301
IS THERE A PRED. TABLE ENTRY FOR THIS LOAD /STORE PAIR ?
YES
NO
304
REPLACE=1
306
IS THERE A PRED. TABLE ENTRY FOR THE LOAD ?
YES
NO
308
UPDATE ENTRY'S PREDICTOR TOWARDS "DO NOT SYNCHRONIZE"
309
IS THE PREDICTOR BELOW THE REPLACE LIMIT ?
NO
YES
312
REPLACE=0
310
FREE PRED. TABLE ENTRY REPLACE=1
314
IS THERE A PRED. TABLE ENTRY FOR THE STORE ?
YES
NO
316
UPDATE ENTRY'S PREDICTOR TOWARDS "DO NOT SYNCHRONIZE"
318
IS THE PREDICTOR BELOW THE REPLACE LIMIT ?
NO
YES
322
REPLACE=0
320
FREE PRED. TABLE ENTRY REPLACE=1
302
UPDATE DATE PREDICTOR TOWARDS "SYNCHRONIZE"
324
REPLACE =1 ?
YES
NO
326
ALLOCATE A PREDICTION TABLE ENTRY
328
-FILL IN THE ADDRESSES OF THE LOAD AND STORE
-SET PREDICTOR TO THE DEFAULT VALUE
DONE


FIG. 9



HANDLE LOAD
68
402
IS THERE A SYNC. TABLE ENTRY FOR THIS LOAD (LOAD ID) ?
NO
YES
FREE THAT ENTRY
404
406
IS THERE A PREDICTION TABLE ENTRY FOR THIS LOAD ?
NO
YES
408
UPDATE PREDICTOR TOWARDS "DO NOT SYNCHRONIZE"
DONE


FIG. 10



HANDLE SQUASH
46
502
IS THERE A SYNC. TABLE ENTRY FOR THIS INST. ?
NO
YES
504
FREE SYNC. TABLE ENTRY
DONE


FIG. 11

# TABLE BASED DATA SPECULATION CIRCUIT FOR PARALLEL PROCESSING COMPUTER

This invention was made with United States government support awarded by the following agencies:

ARPA Grant No. DABT63-95-C-0127;

ONR, Grant No. N00014-93-1-0465; and

NSF, Grant Nos.: CCR-9303030 and MIP-9505853.

The United States has certain rights in this invention.

## FIELD OF THE INVENTION

The invention relates generally to architectures of electronic computers and specifically to electronic computers for parallel processing.

## BACKGROUND OF THE INVENTION

### General Computer Architecture and Instruction Level Parallel (ILP) Processing

In an electronic computer with a single processing unit, the processing unit may communicate with a memory holding the data and program instructions. The processing unit may also hold data in internal registers. The program instructions are executed by the processing unit which operates on the data according to the instructions.

Typically, the processing unit repeats a series of fetch/execute cycles in which each instruction is first fetched from memory and then executed. The order in which the instructions are executed is determined by the value of a program counter within the processing unit. After each execution of an instruction, the program counter normally increases in value by one so that the next instruction memory is fetched. The order of the instructions in the stored program will be termed "memory order".

Some instructions, when executed, cause data to be loaded into the processing unit from memory or stored from the processing unit to memory. Other instructions may perform their operation on data that are stored in registers without loading or storing data from or to memory. Still other instructions change the value of the program counter permitting the processing unit to jump or branch through the program instructions according to a "program order" that normally differs from the memory order. The branch or jumps in a program may be conditional on values of data used by the program that may change as the program is executed.

One method of increasing the speed of electronic computers involves using multiple processing and/or functional units to execute multiple instructions at the same time or in an "execution order" differing from the program order. Computers using this technique are termed "parallel processing units". An instruction level parallel ("ILP processing unit") is one where individual instructions of a single program are separated to be run on different processing units in contrast to systems in which independent programs may be assigned different processing units, for example.

### Control and Data Dependencies

There are two types of dependencies exhibited by instructions. "Control dependency" is a dependency of instructions after a conditional branch or jump instruction on whether the branch or jump was taken. For example, instructions immediately after a branch are properly executed only if the branch is not taken. "Data dependency" is a dependency of instructions that use data on earlier instructions that change the data. These latter instructions may correctly execute only if the earlier instructions using the same data do not change the common data or have completed the change of the common data. A dependency is "unambiguous" if it necessarily produces an error when the dependent instruction is executed before the instruction on which it is dependent. The dependence of an instruction may remain ambiguous until both instructions involved are executed. A dependency between two instructions is ambiguous if it cannot be determined whether a dependency really exists without executing the instructions.

Usually, instructions that are data dependent must be executed in the program order.

### Control and Data Speculation

Since dependencies are often ambiguous, as the ILP processing unit prepares to execute an instruction, it cannot always determine if the instruction will in fact be dependent on earlier instructions that have not yet completed their execution. In the case of ambiguous dependencies and unless special circuitry is provided as will be explained in the next paragraph, the ILP processing unit is forced to assume dependencies exist.

However, it is quite often the case that an ambiguous dependency is resolved as no dependency at all. For this reason, some ILP processors may provide for "speculation", that is, execution of an instruction that has ambiguous dependency as if it had no dependency at all. One may speculate on control dependencies and on data dependencies. Control speculation, for example, might involve executing an instruction that follows a branch instruction without knowing the outcome of the branch (and thus whether the following instruction should have been executed or was branched around). Data speculation, for example, might involve reading from memory to obtain data for a later instruction, even though there are earlier STORES to that memory location that have not yet been completed and that may change the value of the memory location.

### Squashing

Control and data dependencies are important in an ILP processing unit which, in the course of execution of instructions, may execute some dependent instructions before the instructions on which they are dependent. If the dependency is unambiguous, then the results of the prematurely executed dependent instructions must be discarded ("squashed") and the instructions of the correct branch executed.

Squashing instructions is a time consuming process that to some extent defeats the advantages to be gained from parallel processing. In order to avoid the problems associated with unambiguous dependencies, it is necessary that when the ILP processing unit speculates, that it is mostly correct.

### Speculation in an ILP Processor

In an ILP processor, the processor may fetch multiple instructions at a single time and an allocation circuit allocates those instructions to separate processing units. The separate processing units may read data from memory and perform arithmetic or logical operations on that data. A data speculation circuit may exist to detect data dependencies and report any mis-speculation to a retirement circuit. The retirement circuit collects results generated by the indepen-

dent processing units and "retires" the instructions executed by those processing units by writing final results to memory. The retirement circuitry also resolves mis-speculation detected by the data speculation circuit, that is, instructions that were executed out of program order but were in fact dependent on an earlier instruction in the execution order and have produced an erroneous result. These instructions are squashed as is understood in the art. Data speculation circuitry currently does not decide when to do data speculation. Either all memory accesses are speculated or none at all.

For either type of speculation to be successful (control or data speculation), the performance cost associated with the speculation must be low. The performance cost is a function of the frequency that speculation is required, the time required to perform the speculation, the probability of mis-speculation and the time required to recover from a mis-speculation. A cumbersome or inaccurate speculation system may hurt overall system performance, especially when many dependencies must be evaluated.

Because the ILP processing is relevant primarily for high speed processing units, the speculation process must be implemented in circuitry rather than software. The process of speculation must be capable of rapid execution using limited amounts of high speed memory.

Control speculation is well understood in the art. The points were control speculation is needed are clearly identified by conditional branch and jump instructions (we will refer to these instructions as "control transfer instructions"). Typically all control transfer instructions are speculated since: (1) control transfer instructions are relatively frequent, (2) relatively few instructions from those that appear between two consecutive control transfer instructions can be executed in parallel, (3) typically the performance of a processor that always mis-speculates on control is virtually the same as the performance of a processor that never speculates on control.

In contrast the points where data speculation is needed are not clear since any instruction loading data from memory can be data dependent on any previous instructions that writes to memory. Consequently , predicting and tracking data dependencies, "data dependence speculation" can easily become overwhelming. Furthermore, the cost of a data mis-speculation typically cannot be neglected, that is the performance of a processor that always mis-speculates on data dependencies is far less than that of a processor that never speculates on data.

## BRIEF SUMMARY OF THE INVENTION

The present inventors have recognized that most data dependence mis-speculations can be attributed to a few static STORE/LOAD instruction pairs. Furthermore, these instruction pairs exhibit "temporal locality" that is, if one LOAD/STORE pair causes a data mis-speculation at a given point in time, it is highly likely that a later instance of the same pair will soon cause another mis-speculation. For this reason, a table based approach may be used in which data dependent instructions likely to be a source of mis-speculation, are stored in a small, high speed memory. These particular instruction pairs can be identified based on previous mis-speculations.

Very low overhead in a table based data dependence speculation is obtained by a three-tiered approach. If there is no history of data mis-speculation, an instruction is executed without further inquiry. This will be the case for most data independent instructions. If there has been a mis-speculation with a given LOAD instruction, a predictor based on the past history of mis-speculations for that LOAD instruction is employed to determine whether the instruction should be executed or delayed. Thus, instructions that are typically not dependent may be executed immediately. If the instruction is to be delayed, a synchronization table is used to determine when the instruction is to be performed.



Specifically, the present invention provides a speculation decision circuit for use in a processor capable of executing program instructions in an execution order differing from the program order of the instructions, the processing unit further having a data speculation circuit for detecting data dependence between instructions and detecting a mis-speculation where a data consuming instruction dependent for its data on a data producing instruction of earlier program order is, in fact, executed before the data consuming instruction. The speculation decision circuit includes a predictor circuit receiving the mis-speculation signal from the data speculation circuit to produce a prediction associated with the particular data producing/consuming instruction pair and based on the mis-speculation indication. A prediction threshold detector prevents data speculation for instructions having a prediction value within a predetermined range. This prediction threshold detector may include an instruction synchronizing circuit instructing a processing unit to delay a later execution of the particular data consuming instruction until after the execution of the particular data producing instruction when the prediction associated with the data producing/consuming instruction pair is within a predetermined range.

Thus, it is one object of the invention to provide a predictor circuit that may identify data dependencies on an on-going or dynamic basis. Recognizing that there are relatively few instructions which will cause data mis-speculations, these instructions are identified by reference to historical mis-speculation associated with the instructions as stored in a prediction.

The instruction synchronization circuit may include a prediction table listing certain data consuming instructions and certain data producing instructions each associated with a prediction. The instruction synchronization circuit will delay the particular data consuming instruction only when the prediction associated with the data consuming instruction is within a predetermined range of predictions and when the particular data consuming instruction is in the prediction table.

Thus, it is another object of the invention to provide a prediction of data dependence which adds very little overhead to the execution of instructions that historically have not resulted in mis-speculation. If the particular data consuming instruction is not in the prediction table, no further inquiry into the prediction table is required.

The instruction synchronization circuit may also include a synchronization table associating certain data consuming instructions and certain data producing instructions, each with a flag indicating whether the respective data producing instruction has been executed. The instruction synchronization circuit delays the subsequent instances of the certain data consuming instruction only when the prediction associated with the data consuming instruction is within a predetermined range and when the particular data consuming instruction is in the prediction table and when the flag indicates that particular data producing instruction has not been executed.

Thus, it is another object of the invention to provide reduced instruction overhead even for instructions that have

a history of mis-speculation when it is unlikely that, in the given instance, mis-speculation will occur. If the prediction indicates that mis-speculation is unlikely, no further synchronization steps need be taken.

It is yet another object of the invention to allow data consuming instructions that are historically dependent on preceding data producing instructions to be executed rapidly if the preceding data producing instruction has already been executed. Thus, if the flag indicates that the data producing instruction has been executed, the data consuming instruction may be immediately executed without further waiting.

The predictor circuit may create an entry in this synchronization table only after mis-speculation has occurred for a previous instance of the particular data consuming instruction and particular data producing instruction of the entry. After synchronization has occurred, this entry may be removed.

Thus, it is another object of the invention to provide a predictor circuit that minimizes the need for storage. Synchronizing table entries, which may be more numerous than the prediction table entries as a result of possible multiple instances of each instruction, have entries in the synchronization table that are dynamically created and released to minimize storage requirements. This also minimizes search overhead in identifying instructions within this table.

The foregoing and other objects and advantages of the invention will appear from the following description. In this description, references made to the accompanying drawings which form a part hereof and in which there is shown by way of illustration a preferred embodiment of the invention. Such embodiment does not necessarily represent the full scope of the invention, however, and reference must be made therefore to the claims for interpreting the scope of the invention.

## BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWINGS

FIG. 1 is a block diagram showing the architecture of an instruction level parallel processor having multiple processing units, an allocation unit allocating instructions of a program in memory to the processing units, and a retirement unit retiring the parallel processed instructions, the latter unit incorporating the predictor circuit of the present invention;

FIG. 2 is a fragmentary listing of a source code program and its corresponding object code instructions stored in memory order at physical addresses in memory and as unwound in program order producing multiple instances of each object code instruction in execution;

FIG. 3 is a flow chart of the operation of a typical data speculation circuit of the processor of FIG. 1 as modified to work with the predictor circuit of the present invention to provide READY TO LOAD, HANDLE STORE, HANDLE MIS-SPECULATION, HANDLE LOAD, and HANDLE SQUASH messages to the predictor circuit of the present invention;

FIG. 4 is a flow chart showing the steps performed by the predictor circuit of FIG. 1 upon receiving a READY TO LOAD message from the data speculation circuit;

FIG. 5 is fragmentary view of prediction and synchronization tables used by the predictor circuit of FIG. 1;

FIG. 6 is a figure similar to that of FIG. 5 showing the prediction and synchronization tables at a later point in the operation of the predictor circuit;

FIG. 7 is a flow chart showing the steps performed by the predictor circuit of FIG. 1 upon receiving a HANDLE STORE message from the data speculation circuit;



FIG. 8 is a figure similar to that of FIGS. 5 and 6 showing the prediction and synchronization tables at yet a later point;

FIG. 9 is a flow chart showing the steps performed by the predictor circuit of FIG. 1 upon receiving a HANDLE MIS-SPECULATION message from the data speculation circuit;

FIG. 10 is a flow chart showing the steps performed by the predictor circuit of FIG. 1 upon receiving a HANDLE LOAD message from the data speculation circuit; and

FIG. 11 is a flow chart showing the steps performed by the predictor circuit of FIG. 1 upon receiving a HANDLE SQUASH message from the data speculation circuit.

## DETAILED DESCRIPTION OF THE INVENTION

An Example Program with Data Dependency Referring now to the following Table I, an example object code program may have three instructions: I1, I2 and I3.

TABLE I

| | |
|---|---|
| I1 | st $M(R_1)$ |
| I2 | ld $M(R_2)$ |
| I3 | ld $M(R_3)$ |

These instructions provide for a storage of data from a processor to a memory location and the loading of data from the memory location to the processor.

The first instruction I1 stores data from a processor register (implied in the instruction) to memory at a specific address determined by the contents of register $R_1$ of the processing unit. Generally, the contents of register $R_1$ will have been set by an earlier instruction and cannot be deduced simply by looking at instruction I1.

The following instructions I2 and I3 each load data from a specific physical address of memory to the processor register. Again, the registers $R_2$ and $R_3$ have been set by earlier instructions and the relevant addresses cannot be determined from these instructions alone.

If a parallel processor were to load the three instructions I1–I3 for parallel processing, there would be two possible data dependencies. I2 may be dependent on I1 insofar that the contents of register $R_1$ and $R_2$ may be the same and therefore the information stored in $M(R_1)$ may be the same that is loaded from memory location $M(R_2)$. For instruction I2 to be executed correctly, it may be necessary that instruction I2 wait for instruction I1. Likewise, instruction I3 may be dependent on instruction I1. That is, the address $M(R_3)$ may be the same as the physical address $M(R_1)$.

Each of these dependencies is ambiguous. That is, it cannot be determined whether there is in fact a dependency without knowing the contents of registers R1, R2 and R3 which cannot be deduced from the instructions alone.

In a parallel processor that seeks to load blocks of instructions and execute them in parallel, possibly out of their memory or program order, it is important to identify and address ambiguous data dependencies to eliminate mis-speculation and time consuming instruction squashing.

### General Processor Architecture

Referring now to FIG. 1, an ILP processor 10 suitable for use with the present invention includes a memory 12 having a portion 14 holding a stored program 16 at a plurality of physical addresses 19 here depicted as xx1–xx6 where the values xx indicate some higher ordered address bits that may be ignored in this example.

The data speculation circuit 30 receives signals from the allocation circuit 20 that notify it of the program order of any instructions that are allocated to the processing units 24 and that will access memory. The data speculation circuit is responsible of keeping track of order of the memory operations as they are performed by the processing units so that it can detect any mis-speculations.

The ILP processor 10 includes an allocation circuit 20 which may read memory 12 and in particular program memory portion 14 to fetch a subset of the program 16 encompassing multiple instructions of an instruction window 22. Generally, as is understood in the art, the allocation circuit 20 sends different ones of these instructions to different independent processing units 24 for execution.

The processing units 24 may communicate with memory 12 for the purpose of obtaining data, but generally do not modify portions of the memory 12 that may be also read by other processing units 24. Thus, for example, an instruction which requires data to be obtained from memory 12 and added to a constant may be completely executed. However, an instruction, which stores a register to memory 12, may read the register but stop before the store operation which may modify memory 12 used by other processing units 24. An instruction that has been executed as far as possible is considered "ready to commit the operation". Prior to reading data from memory or requesting a store operation the processing units 24 notify the data speculation unit 30 of the operation so that the latter can, in conjunction with the allocation unit, keep track of the program and execution order of the operations.

A retirement circuit 26 receives signals from the processing units 24 indicating that their instructions are ready to perform the operation. The retirement circuit 26 then retires the instructions by writing any computed values to memory 12.

Prior to the retirement circuit 26 writing values to memory, a data speculation circuit 30 communicating with the allocation circuit 20 and the retirement circuit 26 detects mis-speculation. As described above, mis-speculation occurs in an instruction that has been executed prematurely and erroneously. Whenever a store instruction is ready to commit and write its data to a memory address, the data speculation circuit 30, checks to see if any subsequent in the instruction window load instructions have accessed the same memory address, and if so instructs the allocation circuit 20 and retirement circuit 26 that these load instructions are to be squashed and re-allocated by the allocation circuit 20 at a later time. Thus, for example, in the program Table I, if instructions I1 through I3 represent the instruction window 22 and instruction I3 has accessed memory prior to I1 writing to memory, the data speculation circuit 30 and at the time I1 is ready to commit checks if I3 has accessed the same memory address as I1, and if so it instructions the allocation circuit 20 and the retirement circuit 26 that I3 is to be squashed and reallocated at a later time. If so, the data speculation circuit 30 instructs the allocation circuit and retirement circuit 26 that instruction I3 is to be squashed and must be reallocated by the allocation circuit 20 at a later time. The writing of results from instructions that have not been squashed is then done by the retirement circuit 26 as indicated by arrow 28.

The retirement circuit 26, the data speculation circuit 30, and the allocation circuit 20 communicate by a number of control signals 35. Each of these elements described above are well known in the art.

The data speculation circuit 30 also communicates with the predictor circuit 33 of the present invention. The predictor circuit 33 provides a dynamic indication to the data speculation circuit 30 as to whether data speculation should be performed. The data speculation circuit 30 may then, based on the indication of the predictor circuit 33 stall the execution of a memory operation at the processing units 24 in order to avoid mis-speculation.

The prediction provided by the predictor circuit 33, as will be described, is updated based on historical mis-speculations detected by the data speculation circuit 30. For this reason, the data speculation circuit 30 must communicate with the predictor circuit 33 on an ongoing basis. Generally, as will be described below, the data speculation circuit 30 provides five signals to the predictor circuit 33 as listed in the following Table II.

TABLE II

| Signal Name | Description |
|---|---|
| HANDLE MIS-SPECULATION | The data speculation circuit has detected a mis-speculation. |
| HANDLE STORE | The data speculation circuit has decided to issue a STORE operation. |
| READY TO LOAD | The data speculation circuit is about to perform a speculative LOAD operation and needs information from the predictor as to whether the LOAD should wait. |
| HANDLE LOAD | The data speculation circuit has decided to perform a non-speculative LOAD operation without data dependency. |
| HANDLE SQUASH | The data speculation circuit has issued a squash for a particular instruction either as the result of data or control mis-speculation. |

Generally, prior to each instruction being retired, the instruction is provided to the data speculation circuit 30 which detects mis-speculations. The retirement circuit 26 also instructs the data speculation circuit 30 when a squash instruction is required.

Referring to FIG. 2, an example source code program 18 includes two lines as follows:

```
for i=0, i<N, i++
A[i+1]=A[i]*19
```

These instructions represent typical source code instructions 18 which may create a data dependence speculation problem. The source code instructions 18 describe a loop executed N times in which each element of an array variable A(i) receives a value of 19 times that of its preceding array value.

The source code instructions 18, when reduced to machine language instructions 32, involve repeated LOAD and STORE operations. That is, to realize the second line of the source code instructions 18, the memory value of the array element A[i] must be: (1) loaded, (2) multiplied by 19, and (3) stored in memory location for array element A[i+1]. The LOAD and STORE instructions of the machine language instructions 32 have logical addresses within the memory 12 of xx8 and xx10, respectively, which may be used to identify the instructions uniquely.

As the machine language instructions 32 execute in a loop, they create an execution thread 34 of successive LOAD and STORE operations in which the variable 'i' is incremented from 0 to N. This execution thread 34 produces multiple instances of the LOAD and STORE instructions. For illustration purposes, each instance may be uniquely

identified and is designated in FIG. 2 by an integer to the right of a decimal point forming a suffix to the physical address of the operation. Thus. the first instance of the LOAD instruction of the execution thread **34** is designated **8.1**. the physical address of the LOAD instruction being **8** and the instance being **1**. Likewise. the first STORE instruction is designated **10.1** and so forth.

The LOAD instruction **8.1** loads the contents of memory location A[1]. The STORE instruction **10.1** then stores a value in memory location A[2]. The LOAD instruction **8.2** then loads a value from the same memory location A[2]. This LOAD instruction **8.2** is thus unambiguously dependent on instruction **10.1**. the data dependency **36** as indicated by an arrow. If instruction **8.2** were to be executed prior to instruction **10.1**. it would operating on erroneous data.

Likewise. the LOAD instruction **8.3** which loads data from memory location A[3] is dependent on the STORE instruction **10.2** which stores data in that same memory location. This unambiguous dependence **38** is indicated by an arrow.

If the ILP processor **10** is to process the machine code instructions out of execution order. the data dependencies **36** and **38** must be observed to ensure that the out of order processing instruction **8.2** does not execute before instruction **10.1** and instruction **8.3** does not execute prior to instruction **10.2**.

The circuitry necessary to construct an ILP processor will typically involve many millions of transistors. however. its operation can be described by means of a description of a flow chart and the data structures modified during the steps described. Implementing the device described below in discrete circuitry. although laborious. is a routine engineering matter whose practice will be well understood to those of ordinary skill in the art. Generally the data structures described below will be implemented in solid state memories and the steps of the flow chart will be incorporated into a state machine of a type well understood in the art.

### Operation of the Data Speculation Circuit

Referring now to FIG. **3**. the normal operation of the data speculation circuit **30** such as is known in the prior art. must be modified slightly to accommodate the present invention. These modifications provide the necessary signals referred to in Table 2 to the predictor circuit 33.

Starting at process block **40** of FIG. **3**. a program instruction may be received from the retirement circuit **26** by the data speculation circuit **30** together with an indication that the instruction should be either squashed or is about to execute. At decision block **42**. if the instruction is to be squashed. the data speculation circuit **30** provides a HANDLE SQUASH signal to the predictor circuit **33** as indicated by process block **46**. Otherwise. the program proceeds to process block **48** which determines whether the instruction. which must be then assumed to be ready to issue is a LOAD or STORE instruction.

If the instruction is a STORE instruction. the program proceeds to process block **50** and a STORE request is issued. This STORE request may. for example. authorize the retirement circuit **26** to perform the STORE operation for the data.

At decision block **52**. the data speculation circuit **30** checks other concurrent LOAD instructions to see if they have been prematurely executed and thus whether there has been a mis-speculation. At process block **57** if there has been a mis-speculation. a HANDLE MIS-SPECULATION signal is sent to the predictor circuit 33. This signal is used by the predictor circuit **33** in adjusting its prediction **109** as will be described. The dependent instructions are then squashed by the loop of decision block **60** and process block **62**.

If at decision block **52** there was no mis-speculation. then the data speculation circuit **30** sends a HANDLE STORE signal to the predictor circuit **33** as indicated by process block **64** as will be described below.

If at decision block **48** the instruction received by the data speculation circuit **30** is a LOAD instruction. then at decision block **66** it is determined whether this is a data speculative LOAD. that is whether there are prior STORE instructions on which it might depend. If the answer is no. then the data speculation circuit **30** provides a HANDLE LOAD signal to the predictor circuit **33** as indicated by process block **68** as will be described below. Otherwise. the data speculation circuit **30** provides a HANDLE READY TO LOAD signal to the predictor circuit **33** as indicated by process block **70** as will also be described below.

The predictor circuit **33** will address the READY TO LOAD request from the data speculation circuit by making a prediction as to whether the LOAD should take place through the use of a wait flag. Thus. at subsequent decision block **72** if the wait flag equals 1 indicating that speculation should occur. the program proceeds immediately to process block **74** and a LOAD request is generated.

Next at process block **76**. the data speculation circuit **30** waits for that particular instruction. either to be squashed indicating that it had been erroneously speculated or for an indication that it is no longer data speculative. that is any previous STORE instructions were for different memory addresses. At decision block **78**. if the condition of case block **76** was that the instruction was squashed. the data speculation circuit **30** proceeds to the handle squash block **46** as is previously described.

At decision block **72**. the predictor circuit **33** may have indicated that data speculation was not appropriate by providing that the wait flag equal 1. In this case. a LOAD request is not issued but instead. at case block **80**. the data speculation circuit **30** waits for a wakeup signal indicating that the dependent STORE instruction has been executed or a signal indicating that the LOAD instruction is no longer speculative because the earlier STORE instructions did not write to its memory location or for a squash signal indicating that the instruction should be squashed as a result of a later occurring control or data dependency mis-speculation. At decision block **82**. if the condition of process block **80** was that of being squashed. the program branches to the handle squash process block **46**. If not. then at decision block **84** if the event was a wakeup signal. the program branches to previously described process block **74** where the LOAD request is issued. If the triggering event was that the LOAD instruction is no longer data speculative. then at process block **68**. the HANDLE LOAD signal is provided by the data speculation circuit **30** to the predictor circuit 33 and the LOAD request is issued as indicated by process block **86**.

### Operation of the Predictor

#### 1. Handle Ready to Load

Referring also to FIG. **1**. after instructions of instruction window **22** have been received by the allocation circuit **20** and allocated to the processing units **24**. the processing units **24** will begin execution of the instructions and at various times certain instructions will become ready for their operations to be performed and will be received by the retirement circuit **26** and the data speculation circuit **30**.

As an example. assume that instruction **8.2** in FIG. **2** becomes ready for its operation to be performed. Referring

now to FIG. 3. instruction 8.2 is a LOAD instruction and thus will cause a HANDLE READY TO LOAD signal to be passed to the predictor circuit 33. Referring to FIG. 4. at decision block 100. the predictor circuit 33 reviews a prediction table 44 shown generally in FIG. 5 to see if the particular instruction 8.2 identified by its physical address is in the prediction table 44.

The prediction table 44 includes three elements for each entry. the elements depicted as columns. the entries as rows. The first column identifies. by physical address. an instruction that is ready for its operation to be performed; the second column identifies the instruction on which the instruction in the first column may be data dependent: and the third column holds a prediction 109 as will be described.

For the purpose of this example. it will be assumed that the prediction table 44 is initially empty. In this case at decision block 100. the operation of the predictor circuit 33 is to set the wait flag equal to zero as indicated by process block 102 and return that flag value to the data speculation circuit 30 as has been described. Generally. the prediction table 44 has an entry if there has been a historical pattern of mis-speculation and thus at least one mis-speculation. Accordingly. if no entry is found in the prediction table 44. the reasonable assumption is that speculation can proceed. How the prediction table 44 is loaded will be described below.

If there is an entry in the prediction table 44 at decision block 104. then the prediction 109 of the prediction table 44 is examined to see if it indicates that it is likely there is data dependence of this instruction. The higher the prediction 109. the more likelihood of mis-speculation if the instruction of the first column is executed before the instruction of the second column. Normally the prediction 109 starts at zero when an entry is first made in the prediction table 44 and is incremented and decremented as will be described below. At decision block 104. if synchronization is not required as indicated by the prediction 109. the program proceeds to process block 102. On the other hand. if the prediction 109 indicates that there is a likelihood of mis-speculation. the program proceeds to process block 106 and a synchronization table 56 is examined.

The synchronization table 56 is generally similar to the prediction table 44 but whereas the prediction table 44 compiles a prediction statistic as to whether data dependence exists between a LOAD/STORE pair. the synchronization table 56 indicates whether there is in fact a pending LOAD instruction awaiting its dependent STORE instruction.

Assuming that there is no entry in the synchronization table 56 as shown in FIG. 5. then an entry must be added to reflect the fact that there is a pending LOAD instruction that must wait for its preceding STORE instruction. At process block 108. a new row of the table is selected and at process block 110 an entry is created. In this creation of an entry. the STORE instruction address is filled in as indicated in FIG. 6. The address of the LOAD instruction is also stored. A synchronization flag 112 is set equal to zero indicating that the STORE instruction with which this LOAD instruction must be synchronized has not occurred and a LOAD identifier 114 is entered providing a unique number for this instance of the LOAD instruction used for tracking the instruction and generated arbitrarily with the only requirement that it be unique to this particular instruction.

At process block 116. the wait flag is set. This is the same wait flag that is used by the data speculation circuit 30 as shown in process block 72 of FIG. 1.

Referring again to decision block 106. if there is an entry in the synchronization table 56 then the program proceeds to decision block 118 where the synchronization table 56 is checked to see if the synchronization flag 112 is equal to 1. If so. the program branches to process block 102 and sets the wait flag equal to zero which causes the data speculation circuit 30 to go ahead and issue a LOAD request. This is a situation where another instance of the LOAD instruction is in fact waiting for the same predicate STORE instruction and the decision is made simply to release the current LOAD instruction.

On the other hand. at decision block 118. if the synchronization flag 112 is set to 1. that indicates that the predicate STORE instruction has already occurred and the LOAD instruction may be released as no longer being data dependent. In this case. the prediction that there was a need to synchronize was wrong and so at process block 120 the prediction 109 is decremented toward the do not synchronize state. Finally. at process block 122 the entry of the synchronization table 56 is erased as no longer needed so as to preserve room in the synchronization table 56.

### 2. Handle Store

Referring now to FIG. 7. the initial stages of the HANDLE STORE routine of process block 64 are similar to that of the HANDLE READY TO LOAD. That is at a process block 201. the prediction table 44 is checked to see if the STORE instruction is in the prediction table 44. If not. the program exits. but if so at decision block 202. the prediction 109 is checked to see if synchronization is required between this instruction and another LOAD instruction. If not. again the program exits but if so. at decision block 204 the synchronization table 56 is checked to see if a previous dependent LOAD instruction is awaiting execution. If not. at process block 206. a new entry is added to the synchronization table 56 and at process block 208 that new entry is loaded with the STORE and LOAD instruction addresses. the data address 209 of the STORE instruction (as indicated in FIG. 6). the synchronization flag 112 is set to 1. and a STORE ID 210 identifying uniquely that STORE instruction is added to the table. The program then exits again. the STORE instruction having been executed.

At decision block 204. if a synchronization table entry is present. then at decision block 212 the synchronization flag 112 is checked. If the synchronization flag is 1. indicating that entry exists already indicating that a predicate STORE instruction has been enrolled (but never claimed by a dependent LOAD instruction). the program proceeds to process block 208 and that entry is replaced with the data from the present STORE instruction.

More typically. the synchronization flag 112 will be zero indicating that there is a pending LOAD instruction. In this case. the prediction 109 is updated toward the synchronize condition indicating that the prediction that there was a need to synchronize was correct as there is in fact a LOAD instruction waiting to be synchronized.

The LOAD instruction is released at process block 216 and the entry in the synchronization table 56 is erased at process block 218.

### 3. Handle Mis-Speculation

Referring now to FIG. 9. the predictor circuit 33 must also make adjustments in its prediction table 44 if there is a mis-speculation. an occurrence that provides considerable information as to whether synchronization is required. At an initial decision block 301. the prediction table 44 is checked to see whether the LOAD/STORE pair causing the mis-speculation is in the prediction table 44 already. If so then at

process block 302, the prediction 109 is updated toward synchronize so that this mis-speculation may be avoided in the future. If not, a 'replace' flag is set equal to 1 at process block 304 and the program proceeds to decision block 306 and the prediction table 44 is again examined but this time for an entry having only the LOAD instruction.

Such an entry indicates a possible lack of temporal locality, that is, indicates that there are different instances of the instructions having different data dependencies that can make the prediction wrong. It is desired in this case to neutralize these table entries, but slowly, as it cannot be determined which particular instance represents the better prediction. Accordingly at process block 308, the prediction 109 is moved toward the do not synchronize direction or decremented and if it is below a limit as determined at process block 309, the table entry is deleted at process block 310 and the value of the flag replace is set equal to 1.

In cases where the prediction 109 is still above the limit, then the program proceeds to process block 312 and the replace flag is set equal to zero. In all cases, the program next proceeds to decision block 306 and a similar inquiry is made for the STORE instruction, that is whether a prediction table entry exists having only the STORE instruction. As with process block 308 to 312, the same steps are taken to eliminate possibly erroneous predictions. That is at process block 316, the prediction 109 is moved toward the do not synchronize value at decision block 318 if the prediction 109 is below a certain limit, the program proceeds to process block 320 and the prediction table entry is erased and the replace flag set equal to 1.

If the prediction 109 is not below the limit, then replace is set equal to zero at process block 322 and the program proceeds to decision block 324, the same destination being arrived at from decision block 314 if there is no entry for either the STORE or LOAD instructions at decision blocks 306 and 314.

At decision block 324, if the replace flag equals 1 indicating that there are absolutely no prediction table entries left that match either one of the instructions involved in this mis-speculation, then at process block 326 a prediction table entry is allocated and at process block 328 the addresses of the LOAD and STORE instructions are inserted in the prediction table 44 and the prediction 109 is set to the default value, typically zero. If the value of the replace flag did not equal the 1 indicating that there was an entry, no further processing is needed.

4. Handle Load

Referring now to FIG. 10, the HANDLE LOAD routine of process block 68 is relatively straightforward and first examines, at decision block 402, whether there is a synchronization table entry for this particular LOAD instruction which has now been released for execution. If so at process block 404 that entry is erased. Next at decision block 406, prediction table 44 is examined for this particular LOAD instruction. If there is an entry in the prediction table 44, then the prediction 109 is decremented toward a do not synchronize condition at process block 408.

5. Handle Squash

Referring now to FIG. 11, the predictor circuit 33 must also receive the handle squash message of block 46 with regard to updating the synchronization table 56. Specifically, at a decision block 502, if there is a synchronization entry, that synchronization entry is eliminated at process block 504.

As will be understood from this description, the prediction 109 is used to determine the likelihood of a dependency between two instructions in the future. The higher the prediction 109 the more likelihood of mis-speculation if the instruction in the first column is executed before the instruction in the second column. It will be understood that the prediction 109 may be obtained by methods other than simply incrementing it in value for each speculation as is described herein. For example, various weighting schemes can be provided to cause the predictor circuit 33, for example, to be less sensitive to the earliest mis-speculations. More complex pattern matching techniques may be also used, for example, to catch situations where mis-speculations occur in groups or regular patterns.

The present inventors believe that a relatively limited number of LOAD/STORE pairs will create mis-speculation and so the operation described above prevents the majority of the LOAD/STORE pairs from being slowed in execution. The list of critical LOAD/STORE pairs is prepared dynamically in a synchronization method for those LOAD/STORE pairs is created that can expand or shrink depending on the operation of the program. It should be noted that the present invention may be used in any processor where execution of instructions deviates from the program order, for example, processing units that during execution of time consuming instructions may move to other instructions out of order to begin their execution.

The above description has been that of a preferred embodiment of the present invention. It will occur to those that practice the art that many modifications may be made without departing from the spirit and scope of the invention. In order to apprise the public of the various embodiments that may fall within the scope of the invention, the following claims are made:

We claim:

1. In a processor capable of executing program instructions in an execution order differing from their program order, the processor further having a data speculation circuit for detecting data dependence between instructions and detecting a mis-speculation where a data consuming instruction dependent for its data on a data producing instruction of earlier program order, is in fact executed before the data producing instruction, a data speculation decision circuit comprising:

a) a predictor receiving a mis-speculation indication from the data speculation circuit to produce a prediction associated with the particular data consuming instruction and based on the mis-speculation indication; and

b) a prediction threshold detector preventing data speculation for instructions having a prediction within a predetermined range.

2. The data speculation decision circuit of claim 1 wherein the prediction threshold detector includes an instruction synchronization circuit instructing the processor to delay a later execution of the particular data consuming instruction until after the particular data producing instruction when the prediction associated with the data consuming instruction is within the predetermined range.

3. The data speculation decision circuit of claim 2 wherein the instruction synchronization circuit includes a prediction table listing certain data consuming instructions and certain data producing instructions each associated with a prediction and wherein the instruction synchronization circuit delays the particular data consuming instruction only:

i) when the prediction associated with the data consuming instruction is within a predetermined range; and

ii) when the particular data consuming instruction is in the prediction table.

4. The data speculation decision circuit of claim 3 wherein the certain data consuming and data producing instructions are identified in the prediction table only by the address of the instructions in a program memory.

5. The data speculation decision circuit of claim 2 wherein the instruction synchronization circuit includes a synchronization table associating the certain data consuming instructions and the certain data producing instructions each with a flag value indicating whether the respective certain data producing instruction has been executed and wherein the instruction synchronization circuit delays the particular data consuming instruction only:

i) when the prediction associated with the data consuming instruction is within a predetermined range; and

ii) when the particular data consuming instruction is in the prediction table; and

iii) when the flag indicates the particular data producing instruction has not been executed.

6. The data speculation decision circuit of claim 2 wherein the instruction synchronization circuit creates an entry in the synchronization table including the particular data consuming instructions and data producing instructions and the flag value only after a mis-speculation indication is received for the particular data consuming instruction and the particular data producing instruction.

7. The data speculation decision circuit of claim 5 wherein when the flag indicates the particular data producing instruction has been executed, the instruction synchronization circuit removes the entry from the synchronization table.

8. The data speculation decision circuit of claim 1 wherein the prediction produces the mis-speculation indication by tallying the mis-speculation indications for a data consuming instruction.

9. In a processor capable of executing program instructions in an execution order differing from the program order of the instructions, the processor further having a data speculation circuit for detecting data dependence between instructions and detecting a mis-speculation where a data consuming instruction dependent for its data on a data producing instruction of earlier program order, is in fact executed before the data producing instruction, a data speculation decision circuit comprising:

a) a prediction table communicating with the data speculation circuit to create an entry listing a particular data consuming instruction and data producing instruction each associated with a prediction when a mis-speculation indication is received; and

b) an instruction synchronization circuit only instructing a processor to delay a later execution of the particular data consuming instruction if the prediction table includes an entry.

* * * * *

## CERTIFICATE OF SERVICE

I hereby certify that, on this 7th day of September 2022, I filed the foregoing Brief of Plaintiff-Appellant Wisconsin Alumni Research Foundation with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Dated: September 7, 2022

*/s/ Amy E. Proctor*

Amy E. Proctor
Irell & Manella LLP
1800 Avenue of the Stars, Ste 900
Los Angeles, CA 90067
(310) 277-1010
aproctor@irell.com

## CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1. The filing has been prepared using a proportionally spaced typeface and includes 13,950 words.

2. The motion has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: September 7, 2022

*<u>/s/ Amy E. Proctor</u>*

Amy E. Proctor
Irell & Manella LLP
1800 Avenue of the Stars, Ste 900
Los Angeles, CA 90067
(310) 277-1010
aproctor@irell.com