# United States Court of Appeals for the Federal Circuit

---

**WISCONSIN ALUMNI RESEARCH FOUNDATION,**
*Plaintiff-Appellant*

**v.**

**APPLE INC.,**
*Defendant-Appellee*

---

2022-1884, 2022-1886

---

Appeals from the United States District Court for the Western District of Wisconsin in Nos. 3:14-cv-00062-wmc, 3:15-cv-00621-wmc, Judge William M. Conley.

---

Decided: August 28, 2024

---

MORGAN CHU, Irell & Manella LLP, Los Angeles, CA, argued for plaintiff-appellant. Also represented by ALAN J. HEINRICH, AMY E. PROCTOR.

WILLIAM F. LEE, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, argued for defendant-appellee. Also represented by ANDREW J. DANFORD, LAUREN B. FLETCHER; STEVEN JARED HORN, Washington, DC.

---

Before PROST, TARANTO, and CHEN, *Circuit Judges*.

PROST, *Circuit Judge*.

Wisconsin Alumni Research Foundation ("WARF") appeals two final judgments of the U.S. District Court for the Western District of Wisconsin in Case Nos. 14-cv-062 ("*WARF I*") and 15-cv-621 ("*WARF II*"). *Wis. Alumni Rsch. Found. v. Apple, Inc.*, No. 14-cv-062, No. 15-cv-621, 2022 WL 2080153 (W.D. Wis. May 10, 2022), J.A. 1–13. With respect to *WARF I*, the district court denied WARF's request to pursue an abandoned doctrine-of-equivalents theory and entered judgment in favor of Apple Inc. ("Apple") of noninfringement of U.S. Patent No. 5,781,752 ("the '752 patent"). The district court also entered a final judgment in favor of Apple in *WARF II*, which accused similar, next-generation Apple products of infringing the same '752 patent, finding that action barred by *WARF I*. For the reasons below, we affirm the district court's judgment in both *WARF I* and *WARF II*.

BACKGROUND

This case began more than ten years ago and involves a patent that has long since expired. The lengthy litigation history is scattered with strategic decisions that gave rise to the current appeal. We therefore begin with a mostly chronological retelling of the major events that have led to the matter before us.

In short, before us are the appeals from two district court cases with the same parties, the same patent, and multiple generations of the accused product. WARF accused Apple's A7 and A8 processors of infringing the '752 patent in *WARF I*. In *WARF II*, separately filed on the eve of trial in *WARF I*, WARF accused Apple's A9 and A10 processors of infringing the '752 patent. In *WARF I*, the jury found Apple's A7 and A8 literally infringed the '752 patent. Apple appealed, arguing no reasonable jury could find Apple literally infringed under the plain and ordinary meaning of "particular" as used in the asserted claims. We agreed and reversed the prior judgment. On remand,

WARF attempted to reassert infringement against A7 and A8 under the doctrine of equivalents. The district court denied that request based on WARF's prior affirmative abandonment of that theory. *WARF II* was stayed during the pendency of the previous appeal because the claim construction dispute was also relevant to the A9 and A10 processors accused in *WARF II*. Following the remand in *WARF I*, WARF attempted to continue *WARF II* against A9 and A10 under the doctrine of equivalents. But the district court found that *WARF I* precluded WARF from proceeding in *WARF II*. The context of these events is explained in more detail below.

## I

The ’752 patent was filed on December 26, 1996, and issued on July 14, 1998. The patent is titled “Table Based Data Speculation Circuit for Parallel Processing Computer” and is directed to “[a] predictor circuit [that] permits advanced execution of instructions.” ’752 patent Abstract. “In an electronic computer with a single processing unit . . . . [t]he order in which the instructions are executed is determined by the value of a program counter within the processing unit.” *Id.* at col. 1 ll. 22–32. “One method of increasing the speed of electronic computers involves using multiple processing and/or functional units to execute multiple instructions at the same time or in an ‘execution order’ differing from the program order.” *Id.* at col. 1 ll. 50–53. “An instruction level parallel (‘ILP processing unit’) is one where individual instructions of a single program are separated to be run on different processing units . . . .” *Id.* at col. 1 ll. 55–57. But “as the ILP processing unit prepares to execute an instruction, it cannot always determine if the instruction will in fact be dependent on earlier instructions that have not yet completed their execution.” *Id.* at col. 2 ll. 18–22. In some circumstances, “the ILP processing unit is forced to assume dependencies exist,” while in other circumstances, “an ambiguous dependency is resolved as no dependency.” *Id.* at col. 2 ll. 24–27.

"[S]ome ILP processors may provide for 'speculation', that is, execution of an instruction that has ambiguous dependency as if it had no dependency at all." *Id.* at col. 2 ll. 28–30. Yet "in the course of execution of instructions, [an ILP processing unit] may execute some dependent instructions before the instructions on which they are dependent," referred to as a mis-speculation. *Id.* at col. 2 ll. 45–47; *see also* Appellant's Br. 6. "A cumbersome or inaccurate speculation system may hurt overall system performance . . . ." '752 patent col. 3 ll. 18–19; *see also* Appellant's Br. 6 ("[A] 'mis-speculation' . . . caus[es] an error and harm[s] performance."). To overcome these problems, the '752 patent claims a processor with a "data speculation circuit for detecting data dependence between instructions and detecting a mis-speculation." '752 patent claims 1, 9.

## II

### A

On January 31, 2014, WARF filed a complaint against Apple, thus beginning *WARF I*. The complaint accused the Load-Store Dependency Predictor ("LSD Predictor") in Apple's A7 processor of infringing the '752 patent. *See* J.A. 1001–06. WARF later served its supplemental infringement contentions, accusing Apple's A7, A8, A9, and A10 processors of infringing claims 1–3, 5–6, and 9 of the '752 patent.[1] In October 2014, WARF moved to compel discovery related to A9 and A10. Apple objected to the production of discovery on A9 and A10 because they were still under development and subject to design changes. Apple submitted a declaration with its opposition to WARF's

---

[1] For simplicity, we refer to the A8 and A8X processors collectively as A8; the A9 and A9X processors collectively as A9; and the A10 and A10X processors collectively as A10.

motion, stating: "A9 is still in development. . . . [M]ajor changes will occur at A9's stage of design. One change being considered for A9 involves the LSD Predictor"; and "significant design changes are being considered for at least one model of the A10 design, including at least one significant change involving the LSD Predictor." Appellant's Br. 9 (cleaned up). Based at least in part on (1) the release dates for A9 and A10, which would not occur until the fall of 2015 for A9 (when trial was already scheduled) and 2016 for A10, (2) the need for experts to review materials prior to the deadline for expert reports in January 2015, and (3) the deadline for summary-judgment motions in March 2015, the district court concluded "[w]e can't just keep adding additional products that are still being worked on." J.A. 15129. The court reasoned that "the fairest line to draw right now is with all of the currently released products," J.A. 15129, and it denied WARF's motion to compel discovery related to A9 and A10. J.A. 15135.

In September 2015, less than two weeks before the scheduled *WARF I* trial, WARF filed a second lawsuit, *WARF II*, accusing the LSD Predictor in A9 of infringing the '752 patent. J.A. 1008–14. In March 2016, WARF moved to amend its complaint, adding A10 to the list of accused products. J.A. 8006–14.

B

WARF originally pursued both a literal and doctrine-of-equivalents theory of infringement in *WARF I*. *Wis. Alumni Rsch. Found.*, 2022 WL 2080153, at *1.

About a month before the *WARF I* trial, WARF filed a motion in limine to exclude evidence and argument regarding Apple's U.S. Patent Application No. 13/464,647 ("the '647 application"), which later issued as U.S. Patent No. 9,128,725. Apple opposed the motion because it intended to use the '647 application to rebut WARF's doctrine-of-equivalents theory and WARF's arguments that the '752 patent is not invalid. J.A. 6810–16. During

briefing, however, WARF "agreed to 'drop doctrine of equivalen[ts] and make no doctrine of equivalents arguments whatsoever at trial'" in exchange for Apple's agreement not to offer the '647 application at trial. J.A. 15290. The court thereafter denied WARF's motion in limine but ordered, based on the parties' agreement, that "neither side may introduce evidence or argument regarding the '647 application . . . during the liability phase of trial." J.A. 15294.

In October 2015, the jury returned a verdict of literal infringement in *WARF I*.

III

A

During the *WARF I* trial, Apple moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on WARF's abandoned noninfringement claims. Shortly after trial, the district court denied the motion but noted that "any attempt by WARF to resurrect abandoned claims would be futile in light of preclusion rules." J.A. 15322.

After the *WARF I* trial, Apple moved for renewed judgment as a matter of law under Federal Rule of Civil Procedure 50(b) on literal infringement, arguing that no reasonable jury could find that Apple's accused products literally infringe because, among other reasons, Apple's LSD Predictor did not "produce a prediction associated with the *particular* [load] instruction." '752 patent claim 1 (emphasis added); *see also* J.A. 15333–34. Instead, "Apple explained that the plain and ordinary meaning of 'particular' meant that the claimed 'prediction' must be associated with a *single* load instruction (i.e., one and only one load instruction), rather than with a *group* of load instructions." *Wis. Alumni Rsch. Found. v. Apple Inc.*, 905 F.3d 1341, 1347 (Fed. Cir. 2018) ("*2018 Decision*") (emphases in original). WARF's infringement theory, Apple argued, rendered the term "particular" meaningless.

Apple raised this argument as a noninfringement defense as early as March 2015 in its expert report. But the dispute over the meaning of "particular" was resurrected during trial when WARF moved to exclude Apple's noninfringement defense as inconsistent with the plain and ordinary meaning of "particular." The district court denied WARF's motion "because Apple's non-infringement argument . . . was consistent with the plain meaning of 'particular' as contemplating association with a single load instruction." *Wis. Alumni Rsch. Found.*, 2022 WL 2080153, at *2. Apple then asked the court to enter a jury instruction regarding the meaning of "particular," but the court denied this request because the parties had failed to seek a claim construction for the term. *Id.*

Ultimately, the district court denied Apple's renewed motion for judgment as a matter of law and entered a final judgment of infringement against Apple. J.A. 15328; J.A. 15372–73. Apple appealed, and we reversed, explaining that "the plain meaning of 'particular,' as understood by a person of ordinary skill in the art after reading the '752 patent, requires the prediction to be associated with a *single* load instruction. A prediction that is associated with more than one load instruction does not meet this limitation." *2018 Decision*, 905 F.3d at 1348 (emphasis in original). Then, we determined that even "drawing all reasonable inferences in favor of WARF, there is insufficient evidence to support the jury's finding that Apple's products literally satisfy the 'particular' limitation."[2] *Id.* at 1350.

[2] We also noted at that time that "WARF abandoned its theory of infringement under the doctrine of equivalents before trial, and has proceeded only on a theory of literal infringement." *2018 Decision*, 905 F.3d at 1347 n.5.

B

WARF also filed post-trial motions after the *WARF I* trial in 2015—for example, regarding the similarity between the A7 and A8 processors accused in *WARF I* and the A9 processor accused in *WARF II*.[3] In a motion for equitable relief, WARF argued that A9 uses "the same infringing LSD Predictor design" as A7 and A8. Appellee's Br. 8; J.A. 7005–06, 7008. In response, Apple confirmed that the "LSD Predictor in its recently released [A9] products is not more than colorably different from the LSD Predictor in the [A7 and A8] products addressed at trial." J.A. 7127. And Apple did not oppose WARF's request to include A9 in the calculation of damages from *WARF I*. WARF also filed a motion for an accounting, supplemental damages, and interest, the briefing of which again confirmed the similarities between A7, A8, and A9. For example, in response to WARF's motion, Apple agreed that "any award of supplemental damages should include not only Apple products containing the [A7 and A8 processors] but also Apple products containing the [A9 processors]" because "Apple does not dispute that the LSD Predictor contained in the [A9] products is not more than colorably different, with respect to the asserted claims of the '752 patent, from the LSD Predictor in the [A7 and A8] products that were addressed at trial." J.A. 7045–46. Apple explained that the inclusion of A9 in the damages award would "eliminate[] the need to pursue [*WARF II*] further." J.A. 7046.

In June 2017, the district court, in response to WARF's motion for an accounting and supplemental damages, ordered the parties to brief their positions on consolidating *WARF II* with *WARF I* and awarding damages for

---

[3] A10 was not yet asserted as an accused product in *WARF II* at the time of this post-trial briefing in 2015.

infringement of A9 and A10.[4] J.A. 15362–63. WARF stated that, although "[t]he parties appear to agree with the [c]ourt's proposal in substance," it believed that "the most efficient path forward would be to enter final judgment regarding the [A7 and A8] chips now and to defer, until after Apple's appeal is complete, the more extensive discovery that will be required for the [A9 and A10] chips."[5] J.A. 7129. WARF also stated that "Apple represented that it would not dispute that the [A9] and A10 chips are not more than colorably different from the [A7 and A8] chips with respect to the accused feature," and "[t]he parties are now working together to formulate a stipulation to this effect." J.A. 7129–30; *see also* Appellant's Reply Br. 29–30; Appellee's Br. 8. WARF explained that "[s]hould WARF prevail on appeal, then the task of calculating the numbers of infringing units of [the A9 and A10] processors can resume in [*WARF II*] once the stay is lifted. Conversely, should Apple prevail on appeal, there may be no need for such calculations." J.A. 7130; *see also* Appellee's Br. 19, 57–58; Appellant's Reply Br. 29. Apple, in response, did not oppose WARF's proposal to keep the two cases unconsolidated but again confirmed that the damages award for A9 and A10 should be awarded at the same rates as A7 and A8 because the LSD Predictor in each generation of chips was "not more than colorably different." J.A. 7148–50.

---

[4] By this time, WARF had amended its complaint in *WARF II* to add A10 as an accused product.

[5] The only additional discovery that WARF asserted may be necessary for A9 and A10 was related to damages—e.g., information on the number of unit sales, the effect of the '752 patent's expiration in 2016 on a damages award, and the number of products containing infringing processors that were imported into the United States. J.A. 7129–39.

As a result of WARF's desire to keep the cases separate, and Apple not opposing that request, the district court stayed *WARF II* pending the outcome of the appeal in *WARF I*. J.A. 15457.[6]

IV

After this court's *2018 Decision*, which effectively reversed the jury verdict finding Apple's A7 and A8 processors literally infringe the '752 patent, a briefing schedule was set in both *WARF I* and *WARF II* to determine next steps in both proceedings.

A

With respect to *WARF I*, WARF requested a new trial on infringement under the doctrine of equivalents. Apple opposed this request, and the district court denied WARF's request for two reasons. First, it concluded that WARF "abandoned its doctrine of equivalents theory in response to Apple's agreement not to introduce its newly-acquired patent on a LSD Predictor despite the patent-in-suit to demonstrate that the accused technology was separately patentable and therefore, not equivalent." *Wis. Alumni Rsch. Found.*, 2022 WL 2080153, at *3 (emphasis omitted). Second, the district court held that WARF's argument under the doctrine of equivalents is precluded as a matter of law because the plain and ordinary meaning of "particular" as determined by this court—"to be associated with *a single load instruction*"—foreclosed an equivalent where the prediction could be associated with *a group of load instructions*. *Id.* at *4 (emphases added). In other words, WARF's doctrine-of-equivalents theory would, according to the district court, vitiate the claim limitation by rendering

---

[6] The district court had also previously stayed *WARF II* in part, recognizing that "a final judgment in *WARF I* will likely have preclusive effect" in *WARF II*. J.A. 8003.

"particular" meaningless. The district court therefore concluded that "*WARF I* leaves no room for WARF to revisit the doctrine of equivalen[ts] claim it voluntarily abandoned," and it denied WARF's request to pursue a doctrine-of-equivalents theory in *WARF I*. *Id.* at *4–5.

B

With respect to *WARF II*, WARF sought to continue the case under a doctrine-of-equivalents theory of infringement against Apple's A9 and A10 processors. Apple opposed, arguing that our decision in *WARF I* precluded a finding that A9 and A10 infringe the '752 patent under multiple preclusion doctrines, including claim preclusion, issue preclusion, the *Kessler* doctrine, and judicial estoppel.

The district court agreed and, relying on *Nystrom v. Trex Co.*, 580 F.3d 1281 (Fed. Cir. 2009) ("*Nystrom II*"), held that the claims in *WARF II* were barred by the judgment in *WARF I*. The court reasoned that "the procedural posture of this case is the same as that presented in the *Nystrom* [*II*] case, and the Federal Circuit had *no* trouble concluding . . . that the plaintiff in that case was barred from revisiting a doctrine of equivalents theory of infringement based on waiver of that doctrine in past litigation over materially similar, earlier generation of the same products despite later generations being produced during and after the course of the first litigation." *Wis. Alumni Rsch. Found.*, 2022 WL 2080153, at *5 (emphasis in original).

Final judgments were thus entered in both *WARF I* and *WARF II*. WARF timely appealed both, and we consolidated the appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

DISCUSSION

WARF appeals the final judgments in both *WARF I* and *WARF II*. With respect to *WARF I*, WARF argues that it did not waive its doctrine-of-equivalents theory generally

with respect to A7 and A8. With respect to *WARF II*, WARF argues that issue preclusion does not apply. Apple disagrees with each of WARF's arguments and further argues that, even if issue preclusion does not apply, the *Kessler* doctrine bars *WARF II*.

We affirm the district court's conclusion that WARF waived its doctrine-of-equivalents theory in *WARF I* and thus its denial of WARF's motion for a new trial. We also affirm, under both issue preclusion and the *Kessler* doctrine, the district court's ruling that *WARF I* bars *WARF II*.

## I

We begin with *WARF I* and whether WARF waived its doctrine-of-equivalents theory.[7] "We apply our law to substantive and procedural issues unique to and intimately involved in federal patent law, and we apply regional circuit law to other substantive and procedural issues." *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 830 F.3d 1335, 1338 (Fed. Cir. 2016). "Waiver is a procedural issue," but we have held that Federal Circuit law controls where "the underlying substance of the arguments is intimately related with the substance of enforcement of a patent right." *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1250–51 (Fed. Cir.

---

[7] "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (cleaned up); *see also In re Google Tech. Holdings LLC*, 980 F.3d 858, 862–63 (Fed. Cir. 2020). Although some aspects of WARF's actions (or inactions) in *WARF I* sound more in forfeiture and others more in waiver, for simplicity—and because any distinction between the two is immaterial to our disposition—we use the term "waiver" in our discussion.

2005) (cleaned up). We "review[] the trial court's decision on the waiver issue for an abuse of discretion." *United States v. Ziegler Bolt & Parts Co.*, 111 F.3d 878, 883 (Fed. Cir. 1997). "An abuse of discretion occurs when a court misunderstands or misapplies the relevant law or makes a clearly erroneous finding of fact." *Nat'l Westminster Bank, PLC v. United States*, 512 F.3d 1347, 1363 (Fed. Cir. 2008).

WARF argues that it "did not and could not have waived" its doctrine-of-equivalents theory in *WARF I*. Appellant's Br. 36. WARF argues that it "believed Apple literally infringed" under the plain and ordinary meaning of "particular," and such claim construction "did not require" a doctrine-of-equivalents theory. *Id.* Instead, WARF argues that it was Apple who waived a claim construction for the term "particular" in *WARF I*, that WARF relied on this alleged waiver of a narrower claim construction for the term "particular" in deciding that "it could present only literal infringement at the 2015 trial," that the narrower construction of "particular" "became relevant only after appeal," and that the narrower construction "foreclosed literal infringement." *Id.* at 36–37 (emphasis omitted). WARF further argues it did not take any actions to waive its doctrine-of-equivalents theory generally, "did not stipulate to any adverse inferences or judgments against it," and successfully opposed Apple's motion for judgment as a matter of law on the doctrine of equivalents on the basis that it was never actually litigated. *Id.* at 38. Where there has been a change in claim construction as a result of an appeal, WARF believes that *Exxon Chemical Patents, Inc. v. Lubrizol Corp.* controls. 137 F.3d 1475 (Fed. Cir. 1998) ("*Exxon II*").

Apple presents a different narrative of events—i.e., "WARF made the strategic choice to abandon its [doctrine-of-equivalents] theory in order to prevent Apple from introducing evidence of Apple's own patent during the trial's liability phase." Appellee's Br. 22. Apple relies on this court's *2018 Decision* for support, arguing (1) we expressly

acknowledged that "WARF abandoned its theory of infringement under the doctrine of equivalents before trial," and (2) we reversed without remand for further proceedings, such that the district court must follow that mandate. *Id.* at 22–24 (quoting *2018 Decision*, 905 F.3d at 1347 n.5). Apple further asserts that this court "did not adopt a new claim construction" and thus argues that *Exxon II* does not apply. *Id.* at 24–29.

For the reasons below, we agree with the district court that WARF waived its doctrine-of-equivalents theory in *WARF I*. In particular, we conclude that (1) no change in the claim construction excused WARF's failure to present its doctrine-of-equivalents theory to the jury in *WARF I*; (2) in fact, WARF affirmatively abandoned that theory for strategic purposes unrelated to claim construction; and (3) for each of these reasons, our holding in *Exxon II* does not help WARF.

A

We begin with WARF's argument that our *2018 Decision* adopted a claim construction for the term "particular" that was different from what had previously been advanced or understood as the proper construction in the *WARF I* trial. Whether our *2018 Decision* changed the claim construction is not the correct inquiry. The correct inquiry is whether the claim construction changed in a way that would excuse WARF's failure to raise, at the previous trial, the doctrine-of-equivalents theory that it now attempts to reassert in *WARF I*. We find under the facts here that it did not.

Our *2018 Decision* clarified the plain and ordinary meaning of "particular," the meaning of which was wholly consistent with Apple's understanding of the plain and ordinary meaning of the term before and during trial. *2018 Decision*, 905 F.3d at 1348 ("Giving a term its plain and ordinary meaning does not leave the term devoid of any meaning whatsoever."). For example, by at least March

2015 (six months before trial), Apple set forth a noninfringement defense in its expert report that argued, even under the plain and ordinary meaning of "particular," a "'prediction' must be associated with a *single* load instruction (i.e., one and only one load instruction), rather than with a *group* of load instructions." *Id.* at 1347 (emphases in original). And during trial, when WARF moved to exclude Apple's noninfringement defense as inconsistent with the plain and ordinary meaning of "particular," the district court disagreed and denied WARF's motion "because Apple's non-infringement argument . . . was consistent with the plain meaning of 'particular' as contemplating association with a single load instruction." *Wis. Alumni Rsch. Found.*, 2022 WL 2080153, at *2. These examples demonstrate Apple's consistent understanding of the plain and ordinary meaning of "particular"—an understanding that persisted through Apple's trial presentation in *WARF I* and that is substantively equivalent to the *2018 Decision*'s articulation of the plain and ordinary meaning of "particular."

Moreover, WARF was not foreclosed from raising the doctrine of equivalents at trial as an alternative to literal infringement given Apple's noninfringement position. Rather, WARF subjectively "believed [that] Apple literally infringed" such that it "did not require" a doctrine-of-equivalents theory. Appellant's Br. 36. That confidence in the strength of its literal infringement theory does not excuse WARF from failing to litigate the doctrine of equivalents. Similarly, WARF's argument that our *2018 Decision* foreclosed WARF only from pursuing a theory of *literal infringement* is unavailing because it is irrelevant to whether WARF waived its right to assert a *doctrine-of-equivalents* theory. *Id.* at 36–37. Indeed, WARF asserts that "[i]f Apple had timely requested and received the narrower 'one and only one' construction that it later sought and obtained for the first time on appeal . . . then WARF would have certainly pursued an infringement claim under the [doctrine

of equivalents] at trial." *Id.* at 36. But Apple had asserted its understanding of the plain and ordinary meaning of "particular" (as one and only one) since well before trial in its expert reports, such that WARF could have raised, and had ample incentive to raise, the doctrine of equivalents at trial under the same theory it attempts to resurrect now.

B

We also conclude that WARF separately, and for reasons unrelated to claim construction, waived its doctrine-of-equivalents theory.

"Waiver is the intentional relinquishment or abandonment of a known right." *Olano*, 507 U.S. at 733 (cleaned up). "[F]ail[ing] to present substantive arguments to the district court concerning infringement under the doctrine of equivalents" constitutes a waiver of the issue. *Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372, 1380 (Fed. Cir. 2005); *see also United States v. Hible*, 700 F.3d 958, 961 (7th Cir. 2012) (finding waiver when a party "for strategic reasons elects to pursue one argument while foregoing another" (cleaned up)).

While WARF attempts to recharacterize its reasons for not pursing the doctrine of equivalents in *WARF I*, the record speaks for itself: before the *WARF I* trial, WARF intentionally relinquished and abandoned its doctrine-of-equivalents theory in exchange for Apple's agreement not to present its own patent at trial. J.A. 15290 (explaining that WARF had "agreed to 'drop doctrine of equivalen[ts] and *make no doctrine of equivalents arguments whatsoever* at trial'" (emphasis added)). This was a relinquishment of a known right. As a result of the parties' bargained-for exchange, the district court ordered that "neither side may introduce evidence or argument regarding [Apple's patent] . . . during the liability phase of trial." J.A. 15294. Moreover, when WARF struck this bargain and dropped its doctrine-of-equivalents theory, and indeed throughout the district court proceedings, both WARF and Apple retained

their ability to argue their positions on what the plain and ordinary meaning required or allowed. The incentive for preserving a doctrine-of-equivalents theory persisted through trial, and WARF dropped that theory for reasons independent of that incentive.

WARF essentially asks this court to allow WARF to relitigate *WARF I* under a doctrine-of-equivalents theory that would have been available and realistically useful to it in *WARF I* in essentially the same form as it is today. We find that WARF's abandonment of the doctrine of equivalents forecloses this result.

C

Finally, we disagree that *Exxon II* applies to the circumstances here. WARF argues that this case stands for the proposition that "when the doctrine of equivalents becomes a critical issue only after a new claim construction is adopted on appeal, a plaintiff's prior choice to not present that theory at trial does not constitute abandonment." Appellant's Br. 38. WARF's understanding of the holding of *Exxon II* is too broad.

There, Exxon sued Lubrizol for patent infringement. The parties disputed how to interpret the claims. Under Exxon's read, the patent claims were like a "recipe" of ingredients that extended to any product made *by using* the claimed ingredients; Lubrizol, on the other hand, argued that the claims were directed to *the composition* of the final product. *Exxon Chem. Pats., Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995) ("*Exxon I*"). The district court did not decide which claim construction was correct "until all the evidence was in, just before the case was submitted to the jury." *Id.* at 1561. Thus, during trial, Exxon "had the choice of simply proving infringement under its view of the claims, or in addition proving infringement under Lubrizol's view as well. Exxon chose to do both." *Id.* at 1559 (emphasis omitted). After the evidence was presented, the judge charged the jury under Exxon's view of

the claims as a "recipe." *Id.* at 1555. Exxon then chose to stop pursuing its doctrine-of-equivalents theory. *See Exxon II*, 137 F.3d at 1477. "To find infringement as charged, all the jury had to find is that Lubrizol used Exxon's claimed starting ingredients in the amount claimed, an essentially uncontested fact." *Exxon I*, 64 F.3d at 1559 n.5. In other words, "[o]nce the district judge construed the claim language in Exxon's favor, the doctrine-of-equivalents issue in the case became moot." *Exxon II*, 137 F.3d at 1479. The jury found Lubrizol infringed Exxon's patents.

On a first appeal, we concluded that the correct claim construction was a third option—one that, while partially based on Lubrizol's construction, was neither party's proposed construction in full. *Exxon I*, 64 F.3d at 1555; *Exxon II*, 137 F.3d at 1477. We then "held that under the correct claim interpretation no reasonable jury could have found that Lubrizol's products literally infringed Exxon's patent," and we reversed the judgment of the district court. *Exxon II*, 137 F.3d at 1477. Back at the district court, Exxon moved for a new trial on the doctrine of equivalents, but the district court denied the motion, stating it had "no authority to grant a new trial." *Id.*

Exxon filed a second appeal, "arguing that although our reversal of the jury verdict foreclosed any further proceedings relating to literal infringement, our mandate did not preclude the district court from entertaining a motion for a new trial on the issue of infringement under the doctrine of equivalents." *Id.* at 1477–78. We agreed, explaining that "in determining that Lubrizol did not literally infringe Exxon's patent [in *Exxon I*], this court did not dispose of Exxon's doctrine-of-equivalents infringement claim." *Id.* at 1478. The question in *Exxon II* was "what the appellate court's mandate left for the district court to do." *Id.* at 1482. We decided that the district court could consider a motion for a new trial, and "we le[ft] to the district court the questions whether Exxon is entitled to a new trial on th[e] [doctrine-of-equivalents] theory and whether

there is any procedural flaw in Exxon's motion that would prevent the district court from considering the motion on its merits." *Id.* at 1483.

At a bird's eye view, there are similarities between *Exxon I* and *II* and the facts before us, but there are critical differences. First, while the district court's claim construction charge to the jury rendered Exxon's doctrine-of-equivalents theory moot, here there was no such mootness. *Id.* at 1479. In other words, while there was no reason for the jury to consider Exxon's doctrine-of-equivalents theory under the uncontested facts, here, in contrast, there *were* reasons for WARF to pursue its doctrine-of-equivalents theory—namely, the parties were actively disputing the scope of the plain and ordinary meaning of "particular" before, during, and after trial. And the district court had informed WARF that Apple's noninfringement defense (under what WARF calls a narrower construction of the plain and ordinary meaning) "was consistent with the plain meaning of 'particular.'" *Wis. Alumni Rsch. Found.*, 2022 WL 2080153, at *2. Therefore, the dispute on this term was not moot. And while we explained in *Exxon II* that Exxon "could not realistically be expected to request alternative jury instructions asking for an advisory verdict on whether the patent would be infringed under the doctrine of equivalents on Lubrizol's proposed claim construction," *Exxon II*, 137 F.3d at 1479, the same is not true here. Proceeding on the doctrine of equivalents in *WARF I* would not have resulted in a mere "advisory verdict."

Second, unlike *Exxon I* and *II*, WARF affirmatively abandoned its doctrine-of-equivalents theory. In *Exxon II*, we explained that, because the doctrine-of-equivalents theory became moot, Exxon had not "abandoned [that] theory of liability by not submitting it to the jury or raising it on the previous appeal." *Id.* at 1478–79. Here, WARF abandoned its doctrine-of-equivalents theory in a quid-pro-quo exchange where Apple agreed not to present evidence of its

patent at trial—not in reliance on a particular claim construction that mooted any doctrine-of-equivalents theory.

Third, *Exxon II* "simply [held] that our prior mandate did not deprive the district court of the authority to entertain the motion [for a new trial]." *Id.* at 1483. *Exxon II* did not grant a per se right to a new trial on the doctrine of equivalents as WARF appears to suggest. Here, the district court considered WARF's motion for a new trial on the doctrine of equivalents but disagreed that WARF's motion should be granted. Indeed, the district court agreed that *Exxon II* "allow[ed] an opening for a claim of infringement under the doctrine of equivalents" but "did *not* dictate th[at] result." *Wis. Alumni Rsch. Found.*, 2022 WL 2080153, at *3 (emphasis in original). Upon consideration of the facts here, the district court determined WARF was not entitled to a new trial because it had abandoned its doctrine-of-equivalents theory. *Id.* at *4.[8] The district court's consideration of the motion, and its denial of that motion due to the "procedural flaw" of WARF's previous waiver, was not inconsistent with *Exxon II*. *See* 137 F.3d at 1483.

For the reasons above, the district court did not err in finding that WARF waived its doctrine-of-equivalents theory in *WARF I*. We therefore affirm its denial of WARF's motion for a new trial.

---

[8] The district court also determined that our prior appellate ruling as to the plain and ordinary meaning of "particular" "precludes as a matter of law" WARF's doctrine-of-equivalents theory of infringement. *Wis. Alumni Rsch. Found.*, 2022 WL 2080153, at *4. Due to the sua sponte nature of this claim vitiation determination, which the parties had no opportunity to brief, we do not rely on this analysis.

## II

We next turn to *WARF II* and the question of whether *WARF I* precludes WARF from pursuing a doctrine-of-equivalents theory in *WARF II*. We conclude that it does. As stated above, we affirm the district court's judgment as to *WARF II* based on issue preclusion and the *Kessler* doctrine. We address each in turn below.

### A

"We apply the law of the regional circuit to the general procedural question of whether issue preclusion applies." *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015). "We apply this court's precedent to questions involving substantive issues of patent law, issues of issue preclusion that implicate substantive patent law issues, or issues of issue preclusion that implicate the scope of our own previous decisions." *Id.* Whether issue preclusion applies is a legal question reviewed de novo. *Bernstein v. Bankert*, 733 F.3d 190, 225 (7th Cir. 2013). Underlying factual findings are reviewed "under the highly deferential clear error standard." *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1070 (7th Cir. 2013). Clear error exists when "the trial judge's interpretation of the facts is implausible, illogical, internally inconsistent or contradicted by documentary or other extrinsic evidence." *Id.* (cleaned up).

Issue preclusion, sometimes called collateral estoppel, requires that "(1) the issue sought to be precluded is the same as that involved in a prior action; (2) the issue was actually litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is invoked was represented in the prior action." *Adair v. Sherman*, 230 F.3d 890, 893 (7th Cir. 2000); *see also Soverain Software*, 778 F.3d at 1315.

The dispute between the parties here relates only to elements (1) and (2), which requires an answer to the

threshold question—what is the "issue"? WARF defines the issue in *WARF I* as "whether Apple's A7 and A8 processors literally infringe the '752 patent" and the issue in *WARF II* as "whether Apple's A9 and A10 processors infringe the '752 patent under the [doctrine of equivalents]." Appellant's Br. 28. Apple defines the issue as the same in both cases—"whether Apple's accused products infringe the '752 patent." Appellee's Br. 41. The differences between these two characterizations of "the issue" require us to determine whether, for the purposes of issue preclusion, the A7/A8 and A9/A10 processors are "essentially the same" and whether literal infringement and the doctrine of equivalents are part of the same overall issue of infringement.

1

Issue preclusion may apply and bar a second litigation, even where the products are different from the first litigation, under "limited circumstances where it is shown that a close identity exists between the relevant features of the accused device and the device previously determined to be non-infringing such that they are essentially the same." *ArcelorMittal Atlantique et Lorraine v. AK Steel Corp.*, 908 F.3d 1267, 1274 (Fed. Cir. 2018) (cleaned up). "Accused devices are essentially the same where the differences between them are merely colorable or unrelated to the limitations in the claim of the patent." *Id.* (cleaned up).

We find no clear error in the district court's finding that the LSD Predictors in the A7/A8 and the A9/A10 processors are essentially the same. *See Wis. Alumni Rsch. Found.*, 2022 WL 2080153, at *3 ("There is no dispute that the LSD Predictor technology at issue in this second lawsuit, *WARF II*, is the same as that at issue in *WARF I*, at least as material to plaintiff's renewed infringement claims under the '752 patent."). While framed as an issue not in dispute by the district court, WARF argues that "the district court . . . erred in apparently concluding that the A9 and A10

processors were essentially the same as the A7 and A8 processors at issue in *WARF I*." Appellant's Br. 27.

Yet WARF waffles on whether it disputes that the A7/A8 and A9/A10 processors are essentially the same. For example, in WARF's opening brief, WARF does not appear to dispute that A7/A8 and A9/A10 are essentially the same for the purposes of issue preclusion (instead, it focuses on whether literal infringement and the doctrine of equivalents are the same issue). *See id.* at 28–36. Likewise, in reply, WARF again relies on the distinction between literal infringement and the doctrine of equivalents even in rebutting Apple's argument that the products are essentially the same. *See* Appellant's Reply Br. 11 n.2 ("Apple suggests issue preclusion turns on whether the accused products in the later case are 'essentially the same' as those in the earlier case. . . . But that only holds if *all of the other requirements of issue preclusion are also met*, including that the identical issue was actually litigated." (emphasis in original)). Similarly, WARF quotes its June 2017 briefing on the potential consolidation of *WARF I* and *II*, saying "Apple represented that it would not dispute that the [A9] and A10 chips are not more than colorably different" and adding that this is "not inconsistent with WARF's positions." *Id.* at 29–30 (emphasis omitted). Yet, when asked at oral argument whether WARF was still disputing whether A7/A8 and A9/A10 are essentially the same, WARF indicated it was. Oral Arg. at 1:06–9:24; *see also id.* at 18:40–21:00.[9]

At any rate, a generous read of WARF's briefing reveals just two possible arguments for why the A7/A8 and A9/A10 processors may not be essentially the same: (1) "Apple provided no discovery on the A9 and A10 processors,"

---

[9] Nos. 22-1884, -1866, https://oralarguments.cafc.uscourts.gov/default.aspx?fl=22-1884_06032024.mp3.

Case: 22-1884 Document: 54 Page: 24 Filed: 08/28/2024



Appellant's Br. 27 (citing J.A. 15106);[10] and (2) there was a potential "significant change involving the [LSD] Predictor" in the later A9 and A10 processors from the earlier A7 and A8 processors. *Id.* at 9 (emphasis omitted). Neither argument is persuasive. Apple was initially able to resist discovery on A9 and A10 as part of *WARF I*, resulting ultimately in the filing of *WARF II*. J.A. 15129. At that time, in October 2014, before the development of A9 and A10 was complete, Apple indeed represented certain design changes were being contemplated for the LSD Predictor in A9 and A10. Appellant's Br. 9. But this was not the end of the story. A year later in late 2015, after WARF had won a jury verdict on infringement, WARF moved for equitable relief, repeatedly stating that A9 used "the same infringing LSD Predictor design" as A7 and A8. *See* J.A. 7005–06, 7008. Apple also admitted in post-trial briefing that "the LSD Predictor contained in the A9 and A9X products is not more than colorably different . . . from the LSD Predictor in the A7, A8, and A8X products that were addressed at trial" and agreed to produce financial information on A9 for the calculation of damages in *WARF I*. J.A. 7046; *see also* J.A. 7127 (same). In 2017 (by which time A10 had been accused in *WARF II*), WARF and Apple again agreed that the A9 and A10 processors were not more than colorably different. J.A. 7129–30 ("The parties are now working together to formulate a stipulation to this effect . . . .").

WARF contends, however, that it did not want *WARF I* and *II* consolidated after trial in *WARF I* because more discovery was necessary for A9 and A10. Appellant's Reply Br. 6. But the only discovery WARF still needed was

---

[10] Apple disputes the merits of this argument, explaining that source code for A9 was produced, WARF's expert reviewed that source code, and a declaration and other documents about A9 and A10 were produced. Oral Arg. at 41:43–43:29.

damages-related discovery—not technical discovery for the purposes of determining the products were essentially the same. *See* J.A. 7129–39 (never once mentioning the need for additional technical discovery). Indeed, WARF explained its preference to keep *WARF I* and *II* separated as follows:

> The second case [*WARF II*], which concerns Apple's A9, A9X, A10, A10X and later processors, should not be consolidated and should remain stayed pending resolution of Apple's appeal in [*WARF I*]. Should WARF prevail on appeal, then the task of calculating the numbers of infringing units of these processors can resume in [*WARF II*] once the stay is lifted. Conversely, should Apple prevail on appeal, *there may be no need for such calculations*.

J.A. 7130 (emphasis added); *see also* J.A. 7149 (Apple again agreeing damages may be awarded at the same rates for the A9/A10 as the A7/A8 LSD Predictors because they are not more than colorably different); *see also* J.A. 7187–7208 (same). Further still, in 2019, Apple confirmed with source code and an Apple engineer's declaration supporting the conclusion that "all of the chips at issue in these two cases contain the same accused feature—the LSD Predictor using hashed load tags." Appellee's Br. 34 (quoting *Wis. Alumni Rsch. Found.*, 2022 WL 2080153, at *3).

From 2015 until the filing of this appeal, WARF has not disputed that the A7/A8 and A9/A10 LSD Predictors are essentially the same. It is simply not credible to rely on statements made while the products were still under development in 2014 and ignore all of the parties' statements and evidence after the products were developed from 2015 to today. We therefore conclude that the district court did not err in finding that the A7/A8 and A9/A10 processors are essentially the same.

2

Having settled that *WARF I* and *II* raise infringement allegations against essentially the same products, the only other difference between WARF's and Apple's articulation of "the issue" is whether the issue is infringement or the separate theories of infringement.

WARF correctly states that the issue "actually litigated" in the first action must be "identical" to the issue in the second action for issue preclusion to apply. Appellant's Br. 28. WARF quotes *B & B Hardware, Inc. v. Hargis Industries, Inc.* for the proposition that "[i]ssues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits may be the same." 575 U.S. 138, 154 (2015) (quoting 18 C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 4417, p. 449 (2d ed. 2002)). WARF then concludes that because literal infringement and the doctrine of equivalents have different tests, they must be different issues. But WARF reads this statement in *B & B Hardware* too broadly.

In *B & B Hardware*, the dispute was about whether a Trademark Trial and Appeal Board ("TTAB") decision could have preclusive effect on a district court proceeding. In trademark law, a party may seek to register a trademark with the Patent and Trademark Office ("PTO"). If another entity believes the to-be-registered trademark would be too similar to its own trademark, it may oppose the registration before the TTAB in an administrative proceeding. Separately, that entity may also file a trademark infringement suit in district court. Both proceedings, authorized by two different statutes, look to whether there would be a "likelihood of confusion" between the two trademarks. *Compare* 15 U.S.C. § 1052(d) (PTO registration permissibility), *with* § 1114(1) (district court trademark infringement liability). The Supreme Court held that TTAB proceedings did have preclusive effect on district-court

trademark-infringement suits and concluded that "the same likelihood-of-confusion standard applies to both registration and infringement" even though they arise from different statutory authority and apply different factors to assess "likelihood of confusion." *B & B Hardware*, 575 U.S. at 154. The Court explained that "minor variations in the application of what is in essence the same legal standard do not defeat preclusion." *Id.* (cleaned up).

Critical here, *B & B Hardware* does not hold that the factors or tests must be identical for issues to be identical. Indeed, the "likelihood of confusion" factors at the TTAB were different from (albeit similar to) those in district-court proceedings. *Id.* For this reason, WARF reads *B & B Hardware* too broadly, and WARF's mere observation that the tests for literal infringement and the doctrine of equivalents are different is insufficient to demonstrate that the issues are different. *See* Appellant's Br. 29–30.

Instead, the Court concluded that the legal standards were the same in *B & B Hardware*, giving reasons for that conclusion that are relevant here: (1) "the operative language [of the two statutes] is essentially the same"; (2) "the likelihood-of-confusion language . . . has been central to trademark registration since at least 1881"; and (3) the Restatement (Second) of Judgments supported the conclusion that the issues were the same. *B & B Hardware*, 575 U.S. at 148, 154–55, 157. In other words, the Court looked to the statutes, the history, and the Restatement (Second) of Judgments. *Id.* at 148, 153, 157. We take the same approach.

Here there is only one statute governing patent infringement. *See* 35 U.S.C. § 271. Section 271(a) provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the

patent."[11] This is the statutory basis for direct infringement, which covers both literal infringement and the doctrine of equivalents. Thus, unlike *B & B Hardware*, we are not dealing with two statutes, just one describing liability for all direct infringement.

As to history, the statute and the derivation of the doctrine of equivalents demonstrate that the doctrine of equivalents is a long-established theory of infringement. Liability for patent infringement was first enacted in the Patent Act of 1790. By 1853, the Supreme Court recognized a patentee may prevail on a theory of infringement where the accused device "substantially . . . embod[ies] the patentee's mode of operation, and thereby attain[s] the same kind of result as was reached by his invention"—thereby laying the foundation for what today is the doctrine of equivalents. *Winans v. Denmead*, 56 U.S. 330, 344 (1853); *see also Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950) (articulating the now familiar test for the doctrine of equivalents).[12] Both *Graver Tank* and *Winans* treated infringement, either literal or doctrine of equivalents, as a single issue. *See Graver Tank*, 339 U.S. at 607 (considering the "issue" under both the doctrine of equivalents and literal infringement and noting that "the *single issue* before us is whether the trial court's holding that the . . . claims have been infringed will be sustained" (emphasis added)); *Winans*, 56 U.S. at 343 ("How is *a*

---

[11] Other sections of § 271 provide the basis for other types of infringement not at issue here, such as induced and contributory infringement. *See* 35 U.S.C. § 271(b)–(c).

[12] "A patentee may invoke this doctrine to proceed against the producer of a device if it performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank*, 339 U.S. at 608 (cleaned up).

*question of infringement* of this patent to be tried?" (emphasis added)).[13]

The Restatement (Second) of Judgments § 27 also provides guidance on the scope of the "issue" here as it did in *B & B Hardware*. Indeed, the Restatement (Second) of Judgments contemplates the difficulties in defining the "issue" for purposes of issue preclusion:

> When there is a lack of total identity between the particular matter presented in the second action and that presented in the first, there are several factors that should be considered in deciding whether for purposes of the rule of this Section the "issue" in the two proceedings is the same, for example: Is there a substantial overlap between the

---

[13] Underscoring this is the Supreme Court's recognition that the doctrine of equivalents is limited to covering products or processes that are at most insubstantially different from what would literally infringe a patent claim. *See Graver Tank*, 339 U.S. at 607 (noting that allowing recovery only under strict literal infringement "would leave room for—indeed encourage—the unscrupulous copyist *to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing*, would be enough to take the copied matter outside the claim, and hence outside the reach of law" (emphasis added)). In *B & B Hardware*, a trademark case, the Court explained that "trivial variations between the usages set out in an application [for registration] and the use of a mark in the marketplace do not create different 'issues,' just as trivial variations do not create different 'marks.'" 575 U.S. at 157. A same-issue conclusion is likewise warranted for an assertion of patent infringement under the doctrine of equivalents, which is necessarily an assertion that the accused product or process is at most insubstantially different from what the patent claim at issue literally sets out.

Case: 22-1884 Document: 54 Page: 30 Filed: 08/28/2024



> evidence or argument to be advanced in the second proceeding and that advanced in the first? Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding? Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second? How closely related are the claims involved in the two proceedings?

Restatement (Second) of Judgments § 27 cmt. c (AM. L. INST. 1982). Here, the evidence would be substantially the same between literal infringement and the doctrine of equivalents; it will always boil down to the patent claim, the accused product (or method), and a comparison of the two. Indeed, the evidence must necessarily be substantially the same because the doctrine of equivalents is intended to cover "*unimportant and insubstantial changes* and substitutions in the patent which, though *adding nothing*, would be enough to take the copied matter outside the claim." *Graver Tank*, 339 U.S. at 607 (emphases added). Further, and for essentially the same reason, it is hardly disputable that pretrial preparation and discovery in a patent suit could be "reasonably expected" to embrace both literal infringement and the doctrine of equivalents.

Finally, we note that treating literal infringement and the doctrine of equivalents as the same issue is consistent with our precedent. For example, in *Nystrom II*, Nystrom filed a first lawsuit, alleging Trex's first-generation "Trex boards" infringed Nystrom's patent. After claim construction, Nystrom stipulated to noninfringement, and the district court entered judgment accordingly. We affirmed this judgment but remanded for further proceedings on validity. "On remand, Nystrom attempted to pursue his infringement claim under the doctrine of equivalents." *Nystrom II*, 580 F.3d at 1284. The district court determined the doctrine of equivalents had been waived. *Id.*

Thereafter, Nystrom filed a second lawsuit, accusing second-generation products (that were essentially the same as the first-generation products) of infringing the same patent under the doctrine of equivalents. We held this second suit barred by the first. *Id.* at 1286. And we clarified, in *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, that *Nystrom II* applied issue preclusion to reach this result.[14] 672 F.3d 1335, 1343 (Fed. Cir. 2012); *cf. ArcelorMittal*, 908 F.3d at 1273 (explaining that even though a first lawsuit found noninfringement under the doctrine of equivalents, a second lawsuit on infringement would be barred if *the products* in both suits were "materially" the same).[15]

For the foregoing reasons, we are convinced that literal infringement and the doctrine of equivalents are the same issue for issue-preclusion purposes. To conclude otherwise would allow a patentee to proceed through the entirety of litigation only on a theory of literal infringement and, after losing its case, allow that same party to accuse the same entity of infringing the same patent, accusing the same or essentially the same products, as long as those products were sold after judgment of the first suit. *See Galderma*

---

[14] At oral argument, WARF agreed that the stipulation to noninfringement in *Nystrom II* "necessarily embraced" both literal infringement and the doctrine of equivalents. *See* Oral Arg. at 30:11–32:03. Such an admission implicitly concedes that the issue of infringement necessarily embraces both underlying theories.

[15] At oral argument, WARF also argued that *Exxon I* and *II* demonstrate that literal infringement and the doctrine of equivalents are different issues. Oral Arg. at 25:11–26:35, 29:00–30:11, 32:03–32:32. We disagree. *Exxon I* and *II* involved a single case, meaning there was no possibility that a final judgment in one case could preclude an issue in another. In contrast, the appeal before us involves multiple, repetitious lawsuits.

*Labs., L.P. v. Amneal Pharms., LLC*, 337 F. Supp. 3d. 371, 411 (D. Del. 2018) (Stark, J.) (treating literal and doctrine-of-equivalents infringement as a single issue because not doing so would "upend[] the finality of judgements that collateral estoppel aims to preserve and would require parties to relitigate infringement of the same products covered by the same patents when the issue of infringement has already been decided – a decidedly wasteful use of judicial resources."), *rev'd in part on other grounds*, 806 F. App'x. 1007 (Fed. Cir. 2020). Such a repetitious litigation strategy is untenable.

Therefore, like *Nystrom II*, when the district court entered a judgment of noninfringement in *WARF I*, issue preclusion barred *WARF II* which accuses essentially the same products of infringement.

B

Additionally, *WARF II* is barred by the *Kessler* doctrine. *See Kessler v. Eldred*, 206 U.S. 285 (1907).

*Kessler* is a patent-specific preclusion doctrine that "fills the gap between [claim and issue] preclusion doctrines . . . allowing an adjudged non-infringer to avoid repeated harassment for continuing its business as usual post-final judgment." *Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045, 1056 (Fed. Cir. 2014) (emphasis omitted). In *Kessler*, Eldred filed a patent infringement suit against Kessler. The district court and the court of appeals determined that Kessler did not infringe. Eldred then filed a second patent suit against Kessler's customer for infringement of the same patent. The Supreme Court deemed the second suit barred, explaining that the first action "settled finally and everywhere . . . that Kessler had the right to manufacture, use, and sell the [accused product]." *Kessler*, 206 U.S. at 288; *see also Rubber Tire Wheel Co. v. Goodyear Tire & Rubber Co.*, 232 U.S. 413, 418 (1914) (under *Kessler*, a prevailing non-infringer obtains "the right to have that which it lawfully produces freely bought and sold without

restraint or interference"). The Supreme Court explained that the right "attaches to its product—to a particular thing—as an article of lawful commerce." *Rubber Tire Wheel*, 232 U.S. at 418. Likewise, we too have held that *Kessler* operates to grant a product a noninfringing status.

> The principle that, when an alleged infringer prevails in demonstrating noninfringement, the specific accused device(s) acquires the "status" of a noninfringing device vis-à-vis the asserted patent claims is an essential fact of a patent infringement claim. The status of an infringer is derived from the status imposed on the *thing* that is embraced by the asserted patent claims. And, when the devices in the first and second suits are "essentially the same," the "new" product(s) also acquires the status of a noninfringing device vis-à-vis the same accusing party or its privies.

*Brain Life*, 746 F.3d at 1057 (cleaned up).

We have applied the *Kessler* doctrine in limited circumstances.[16] For example, in *Brain Life* we deemed a second suit asserting method claims barred where the patent owner had proceeded to trial solely on apparatus claims in

---

[16] We have previously questioned "whether the *Kessler* doctrine was created as an exception to the mutuality of estoppel rule that existed at the time or as a matter of substantive patent law." *SpeedTrack Inc. v. Off. Depot, Inc.*, 791 F.3d 1317, 1329 (Fed. Cir. 2015); *see also MGA, Inc. v. Gen. Motors Corp.*, 827 F.2d 729, 733–34 (Fed. Cir. 1987); *Brain Life*, 746 F.3d at 1058. "But, the *Kessler* Doctrine exists, and we are bound by it . . . ." *Brain Life*, 746 F.3d at 1058. "[W]e must follow *Kessler* unless and until the Supreme Court overrules it . . . ." *SpeedTrack*, 791 F.3d at 1329. Until then, "[w]e may only apply the law as it continues to exist." *Brain Life*, 746 F.3d at 1058.

a first lawsuit. *Id.* at 1050. We explained that "[w]hile [the original plaintiff] ultimately abandoned the method claims prior to trial, it could have continued to assert those claims. Thus, once the accused devices . . . were adjudged to be noninfringing with respect to the asserted claims and judgment was entered as to all claims, [the defendant] was free to continue engaging in the accused commercial activity as a non-infringer." *Id.* at 1058. We determined this applied even where the second lawsuit was directed to allegations of infringement for subsequent versions of the originally accused products because there were "no material differences between the currently accused products and the previously adjudicated non-infringing products." *Id.* (cleaned up).

As a second example, in *SpeedTrack*, the plaintiff originally asserted only literal infringement in its contentions. *See SpeedTrack*, 791 F.3d at 1320. When the defendant moved for summary judgment of noninfringement, SpeedTrack simultaneously moved to amend its infringement contentions to assert the doctrine of equivalents. *Id.* SpeedTrack's motion for leave to amend was denied because "SpeedTrack had actually been on notice of defendants' non-infringement argument" for nearly six months. *Id.* The district court entered a judgment of noninfringement in the first suit, but SpeedTrack filed a second lawsuit, alleging infringement of the same product under the doctrine of equivalents. *Id.* at 1320–21. The district court deemed the second lawsuit barred by the *Kessler* doctrine, and we affirmed. *Id.* at 1329. We explained:

> [T]he *Kessler* doctrine is a necessary supplement to issue and claim preclusion: without it, a patent owner could sue a manufacturer for literal infringement and, if unsuccessful, file suit against the manufacturer's customers under the doctrine of equivalents. Or, a patent owner could file suit against the manufacturer's customers under any claim or theory not actually litigated against the

> manufacturer as long as it challenged only those acts of infringement that post-dated the judgment in the first action. That result would authorize the type of harassment the Supreme Court sought to prevent in *Kessler* . . . .

*Id.* at 1328. *WARF II* presents exactly this type of litigation harassment, applied to a second suit against the very same defendant, the manufacturer itself.[17]

There is little relevant difference between *SpeedTrack* and the facts here except that *SpeedTrack*'s second suit accused the same software as the first suit, *id.* at 1321, whereas here WARF has accused subsequent versions of the originally accused products. But this difference is immaterial. As explained above, *Brain Life* concluded that the "non-infringing status" applies to subsequent versions of the originally accused products if there are "no material differences" between the accused products in each suit. *Brain Life*, 746 F.3d at 1058. Therefore, like in *SpeedTrack*, the *Kessler* doctrine bars WARF's second lawsuit against essentially the same products.

WARF does not respond to *SpeedTrack* and argues only that *Kessler* does not apply because we have "relied on the *Kessler* doctrine only to bar assertion of the claims at issue against essentially the same products made or sold after the judgment of noninfringement in the earlier case." Appellant's Reply Br. 13 (emphases omitted) (quoting *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1170 (Fed. Cir.

---

[17] As we explained in *SpeedTrack*, had the product manufacturer been a party to the second action, there would be "no doubt" that "the facts here would fall squarely within *Kessler*." *SpeedTrack*, 791 F.3d at 1324.

2018)).[18] WARF is mistaken, as was the quoted dicta in *SimpleAir*. For example, in *SpeedTrack*, the first suit was filed in November 2006 and ended in a jury verdict in 2012. The second suit was filed in July 2007 (i.e., well before there was a first judgment). And there, we stated "that the *Kessler* doctrine precludes SpeedTrack's infringement claims *in full*." *SpeedTrack*, 791 F.3d at 1318 (emphasis added). In other words, this court has indeed relied on the *Kessler* doctrine to bar assertion of claims against essentially the same products made or sold before the judgment of noninfringement in the earlier case. Therefore, WARF's argument—that *Kessler* does not apply because A9 and A10 were sold before any final judgment of noninfringement—fails.

## CONCLUSION

We have considered WARF's remaining arguments and find them unpersuasive. For the foregoing reasons, we affirm the district court's denial of WARF's motion for a new trial in *WARF I* and affirm the district court's conclusion that *WARF I* precludes *WARF II*.

**AFFIRMED**

---

[18] WARF also cites *Brain Life* for the same proposition, stating the "*Kessler* doctrine is 'temporally limited to acts occurring after final judgment was entered in the first suit.'" Appellant's Reply Br. 14 (quoting *Brain Life*, 746 F.3d at 1054). This quote is about claim preclusion—not the *Kessler* doctrine.